# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

John Baltz,

Case No. 11-cv-00170 (JRT/AJB)

Plaintiff,

v.

U.S. Bancorp d/b/a U.S. Bank,

**Index to Appendix to
U.S. Bank's Memorandum of Law
in Support of Its Motion for
Summary Judgment**

Defendant.

| Description | Page Number(s) |
|---|---|
| Deposition Transcript - John Baltz | USB App 1 - 18 |
| Deposition Transcript – Stephanie Buckley | USB App 19 - 50 |
| Deposition Transcript – Lori Hasenstab | USB App 51 - 66 |
| Deposition Transcript – Jason Scott | USB App 67 - 96 |
| 06/28/05 Letter to Mary K. Patterson *(Filed Under Seal)* | USB App 97 |
| 10/31/11  TransUnion Personal Credit Report for John T. Baltz *(Filed Under Seal)* | USB App 98 - 105 |
| 07/12/10  TransUnion Personal Credit Report for John T. Baltz *(Filed Under Seal)* | USB App 106 - 117 |
| US Bank April, 2004, Statement for Mary K. Patterson and  John T. Baltz *(Filed Under Seal)* | USB App 118 |
| 11/21/11  Experian Consumer Dispute *(Filed Under Seal)* | USB App 119 |
| 09/22/10  Equifax Automated Consumer Dispute Verification *(Filed Under Seal)* | USB App 120 |
| 03/28/12  Equifax Automated Consumer Dispute Verification *(Filed Under Seal)* | USB App 121 |
| 10/05/10  Trans Union Corporation Consumer Relations Responses *(Filed Under Seal)* | USB App 122 |

---

**Page 2**

```
 1              APPEARANCES
 2
 3
 4        MR. THOMAS J. LYONS, Attorney
 5   at Law, 367 Commerce Court, Vadnais Heights,
 6   Minnesota 55127 appeared by telephone on
 7   behalf of named Plaintiff.
 8
 9
10        MS. ELLEN B. SILVERMAN, Attorney
11   at Law, 90 South Seventh Street, Suite 2200,
12   Minneapolis, Minnesota 55402 appeared on
13   behalf of named Defendant.
14
15        Also Present:  Thomas Lyons, Jr.
16
17
18
19
20
21
22
23
24
25
```

---

**Page 4**

```
 1              *   *   *
 2            I N D E X
 3         DEPOSITION EXHIBITS
 4
 5   Exhibit                             Page
 6
 7   No. 1  .............................  13
 8
 9   No. 2  .............................  18
10
11   No. 3  .............................  31
12
13   No. 4  .............................  40
14
15   No. 5  .............................  53
16
17   No. 6  .............................  55
18
19
20
21
22
23
24
25
```

---

**Page 3**

```
 1              *   *   *
 2            I N D E X
 3           EXAMINATION
 4
 5                                   Page
 6   By Ms. Silverman ...................  5, 68
 7   By Mr. Lyons .......................  66
 8
 9
10              *   *   *
11     INSTRUCTIONS NOT TO ANSWER
12
13       (NO INSTRUCTIONS WERE GIVEN)
14
15
16              *   *   *
17   REQUEST FOR PRODUCTION OF DOCUMENTS/INFORMATION
18
19       (NO REQUESTS WERE MADE)
20
21
22              *   *   *
23           REFERENCE INDEX
24
25      (ATTACHED TO BACK OF TRANSCRIPT)
```

---

**Page 5**

```
 1           P R O C E E D I N G S
 2
 3           JOHN BALTZ
 4
 5      A witness in the above-entitled action,
 6   after having been first duly sworn, testifies
 7   and says as follows:
 8
 9           EXAMINATION
10
11   BY MS. SILVERMAN:
12   Q.  Good Morning, Mr. Baltz.  My name is Ellen
13      Silverman.  We met earlier.  I am an attorney
14      with Faegre Baker Daniels in Minneapolis and
15      we are representing U.S. Bank here today.  I
16      am sorry to drag you up here from Florida
17      given the weather.
18        I want to go over some ground rules.  I
19      don't know if you have had your deposition
20      taken before.  I will ask you that a minute,
21      but it's real important that you listen to my
22      questions.  The court reporter writes down
23      everything that we say, so please wait until
24      I am finished asking a question before you
25      answer.
```

---

USB App 1

**Page 6**

1    It's important that you give a verbal
2    answer to everything.  If you want to take a
3    break at any time, let me know.  If you don't
4    understand my question, just ask me to
5    rephrase it and I am happy to do that.
6       Do you have any questions?
7  A. No.
8  Q. Have you ever had your deposition taken
9     before?
10 A. No.
11 Q. Mr. Baltz, can you tell me your date of
12    birth?
13 A. 10/7/70.
14 Q. And where were you born?
15 A. Albert Lea, Minnesota.
16 Q. Where do you currently live?
17 A. Boca Raton, Florida.
18 Q. And how long have you lived in Boca Raton?
19 A. The last year or two years.
20 Q. So 2010?
21 A. Yes.
22 Q. Where did you live before 2010?
23 A. I lived in Boca, just a different address.
24 Q. And how long did you live -- what address was
25    that?

**Page 7**

1  A. I lived at -- now at 6962 Consolata Street.
2     The previous address was -- hold on one
3     second.
4  Q. If you don't remember the address, that's
5     fine.
6  A. It's 5901 Town Bay Drive and that was
7     Apartment 817, Boca Raton, Florida 33486.
8  Q. And how long did you live on Town Bay Drive?
9  A. One year.
10 Q. Where did you live before you lived on Town
11    Bay Drive?
12 A. In an apartment off of Cypress Creek in
13    Pompano Beach, Florida.
14 Q. How long did you live at that address?
15 A. One year.
16 Q. You move a lot.
17 A. That's why I'm -- I would like to buy a house
18    and this is one of the reasons I am trying to
19    do what I am doing.
20 Q. And where did you live before you lived in
21    Pompano Beach?
22 A. Back in Boca on Spanish River Avenue or
23    Boulevard.
24 Q. Let's make this simple, when did you first
25    move to Florida?

**Page 8**

1  A. I moved to Florida in '90.
2  Q. And have you lived continuously in Florida
3     since 1990?
4  A. I did move away from Florida for four years.
5     I was working with the Marriott.  I
6     transferred within the Marriott out to Vale,
7     Colorado as a promotion and after being there
8     for a few years I missed the warm weather of
9     Florida and moved back.
10 Q. So since 1990 it's fair to say that you have
11    lived in Florida and Vale?
12 A. Yes.
13 Q. Perfect.  Are you married?
14 A. No.
15 Q. Do you have any children?
16 A. Three children.
17 Q. Can you tell me their ages approximately?
18 A. Four, two and 5 months.
19 Q. Do your children live at your current address
20    on Consolata with you?
21 A. Yes.
22 Q. And does anyone else live at that address?
23 A. Yes.
24 Q. Who would that be?
25 A. Mirllana.

**Page 9**

1  Q. Can you spell that for the court reporter?
2  A. M-I-R-L-L-A-N-A, Patricia Hidalgo.
3  Q. Is Mirllana your girlfriend?
4  A. Yes, the mother of the three children.
5  Q. Thank you.  I was going to ask you that, so
6     thanks.
7       I have to ask you a series of questions
8     that might be perceived as a little
9     offensive, so I apologize in advance.
10      Have you ever been convicted of a crime?
11 A. Yes.
12 Q. Can you tell me what crime and when?
13 A. A DUI in 2005.
14 Q. Anything else?
15      MR. LYONS: I think I am going to
16    object to the question about a crime.  I'm
17    wondering whether or not it would have to be
18    more specific than that.  I am going to
19    instruct him to not answer to all the driving
20    offenses that may or may not have occurred.
21 BY MS. SILVERMAN:
22 Q. Apart from any driving offenses, have you
23    ever been convicted of any other type of
24    crime?
25 A. One disorderly conduct.

USB App 2

Page 10

1  Q.  And approximately when was that?
2  A.  It was in 2006, right around there.
3  Q.  Have you ever been a plaintiff suing someone
4     in another lawsuit besides this one?
5  A.  Never, no.
6  Q.  And have you ever been a defendant in a
7     lawsuit, someone suing you?
8  A.  No.
9  Q.  And have you ever declared bankruptcy?
10 A.  No.
11 Q.  Those are all the bad questions.
12 A.  Okay.
13 Q.  Are you currently employed?
14 A.  Yes.
15 Q.  Where do you work?
16 A.  Marine Max.
17 Q.  And what is Marine Max?
18 A.  It's a boat retailer.  They sell Sea Rays,
19     Boston Whalers, Makos, Azimuts, Cabos.  They
20     have 57 stores nationwide, so I am in one of
21     the locations in Pompano Beach.
22 Q.  And how long have you worked for Marine Max?
23 A.  Over a year.
24 Q.  And did you have a job before that?
25 A.  Yes.

Page 11

1  Q.  And where did you work before that?
2  A.  I have held a position with a real estate
3     company, Bob Wyman Real Estate and also
4     Lauderdale Marina.
5  Q.  Before you were with Bob Wyman Real Estate
6     and Lauderdale Marina, did you have a job
7     before that?
8  A.  Of course.
9  Q.  What did you do?
10 A.  I worked for a real estate company then,
11     Ocean Paradise Realty.
12 Q.  And when you say you worked for a real estate
13     company, I am assuming you were a real estate
14     agent.
15     Is that correct?
16 A.  Yes.
17 Q.  What did you do before you were a realtor for
18     Ocean Paradise?
19 A.  I worked for a company out in Minneapolis
20     here.
21 Q.  And what company was that?
22 A.  It was John Ryan Performance, a marketing
23     company.
24 Q.  And where was that job based?  Were you in
25     Florida doing that job or were you here in

Page 12

1     Minnesota?
2  A.  It was a job that was on the road.  They
3     acquired the job that did the merger between
4     Nation's Bank and Bank of America, so we had
5     to travel to all the locations nationwide and
6     change out their marketing materials.  I was
7     living at my address in Florida, the condo I
8     owned, and flying to the locations where we
9     had to work.
10 Q.  Let's talk about your education for a minute.
11     Did you graduate from high school?
12 A.  Yes.
13 Q.  Where did you graduate from?
14 A.  Brainerd High School.
15 Q.  And that's in Brainerd, Minnesota?
16 A.  Yes.
17 Q.  Thank you.  What year did you graduate?
18 A.  '89.
19 Q.  '89?
20 A.  Yes.
21 Q.  Did you attend any sort of schooling after
22     high school?
23 A.  I went to two years at Brainerd Community
24     College.
25 Q.  Did you major in anything or specialize in

Page 13

1     any kind of study in particular?
2  A.  I was going to school for hospitality
3     management.  I transferred from there down to
4     a school in Florida.
5  Q.  Would that be in 1990?
6  A.  Yes.
7  Q.  What was the name of the school you
8     transferred to?
9  A.  St. Leo College.
10 Q.  And did you graduate from there?
11 A.  No, I did not.
12 Q.  What did you do to prepare for your
13     deposition today?
14 A.  Flew up here.
15 Q.  That's fair.  Did you review any documents at
16     all?
17 A.  You know, just the documents that I have
18     signed and prepared on the Complaint.
19 Q.  Okay.  I am actually going to show you the
20     Complaint now.
21
22     (Deposition Exhibit No. 1 marked for the
23     record)
24
25

USB App 3

**Page 14**

BY MS. SILVERMAN:

1  BY MS. SILVERMAN:
2  Q. I am handing you what's been marked as Baltz
3     Exhibit 1. This is a copy of your Complaint.
4     I would like, if you could, to turn to
5     Page 7 and confirm that that is your
6     signature on Page 7.
7  A. Yes, it is.
8  Q. Do you remember reading this Complaint before
9     you signed it?
10 A. Yes, I did.
11 Q. We're going to look at some of the factual
12    allegations and I am going to ask you
13    probably the same questions.
14       Can you look at No. 5 for me and can you
15    tell me if this statement on No. 5 is true?
16 A. Yes.
17 Q. And how do you know that that's true?
18 A. She -- I have been very close with my great
19    aunt for all my life and so she's been there
20    for us and not only me, my brothers and my
21    family.
22 Q. And so did she tell you at some point that
23    she obtained a credit card from U.S. Bank?
24 A. Yes.
25 Q. Can you take a look at No. 6 for me, please?

**Page 15**

1     I am going to ask you again while you're
2     reading this if this is true and how do you
3     know that that's true?
4  A. I know this is true because after this she
5     received a letter from U.S. Bank and asked if
6     anyone else can -- would like to be on there,
7     if she wanted anyone else to be on the
8     account, and that's when she put me and my
9     brother on there.
10 Q. When you say she, you're referring to Mary
11    Patterson?
12 A. Yes.
13 Q. I just wanted that to be clear for the
14    record.
15 A. Yes.
16 Q. Thank you. The same question for No. 8 and
17    how do you know that that's true if it indeed
18    is true?
19 A. Both my brother and I received credit cards
20    from U.S. Bank mailed to us.
21 Q. And when you received the credit cards did --
22    I will only ask you about your's, did it have
23    your name on it?
24 A. Yes.
25 Q. When you say you received it mailed to you,

**Page 16**

1     do you remember where it was mailed to, what
2     address?
3  A. To 1535 Southeast 15th Street, Fort
4     Lauderdale, Florida 33316.
5  Q. So the credit card that you received from
6     U.S. Bank was mailed to your address in Fort
7     Lauderdale?
8  A. By Mary.
9  Q. That's what I wanted to know.
10 A. Right.
11 Q. Then would it be safe to say that Mary
12    received the card with your name on it from
13    U.S. Bank and she mailed it to you?
14 A. Yes.
15 Q. Do you remember approximately when that was?
16 A. I don't.
17 Q. Was it in the 1990s? Was it in the 2000s?
18 A. I would say 2000s.
19 Q. Okay. I want you to take a look at No. 13
20    and read that and let me know if that's a
21    true statement and, again, how do you know
22    that that's true?
23 A. It was her individual account. This is
24    saying that upon information and belief -- I
25    wrote them a letter stating that this was not

**Page 17**

1     mine, that I was an authorized user and that
2     this was Mary Patterson's individual account.
3  Q. How about this last one, how about No. 18,
4     can you read that on Page 3 and tell
5     me if that's a true statement and how you
6     know that that's true?
7  A. Prior to the bankruptcy Mary never once
8     received any bill or letter with my name on
9     this account or my brother's. The only time
10    we ever received anything was after the
11    bankruptcy with my name on one bill, one
12    letter.
13 Q. Okay. Thank you. Let's just focus on the
14    U.S. Bank credit card account.
15       Did you personally ever open an account
16    with U.S. Bank, credit card account?
17 A. No.
18 Q. But you testified that your Aunt Mary sent
19    you a credit card with your name on it from
20    U.S. Bank, right?
21 A. Correct.
22 Q. Do you know approximately when Mary Patterson
23    opened the account with U.S. Bank?
24 A. I think around '88.
25 Q. And do you know where Mary was living at the

USB App 4

**Page 18**

1   time that she opened the account with U.S.
2   Bank?
3 A. 1620 West Highway 36 in Roseville, Minnesota.
4 Q. And does Mary still at that address?
5 A. Yes.
6 Q. Have you ever lived at that address?
7 A. No.
8
9       (Deposition Exhibit No. 2 marked for
10   identification)
11
12   BY MS. SILVERMAN:
13 Q. Now, I think you said earlier that you got
14   the card from U.S. Bank in the 2000s at some
15   point?
16 A. Right.
17 Q. Did you use the card?
18 A. Yes.
19 Q. What generally kinds of charges did you use
20   the card for?
21 A. Pretty much every day living, whatever I
22   needed it for.
23 Q. I am going to hand you what the court
24   reporter has marked as Exhibit 2. These are
25   statements from U.S. Bank on account number

**Page 19**

1   ending in 2818.
2       Have you ever seen these statements
3   before?
4 A. I have never seen any statements.
5 Q. I want you to take a look at page -- all the
6   pages are marked at the bottom with a number
7   because we produced them to your counsel and
8   we put a number on them to identify them, so
9   I would like you to look at USB/Baltz 105 for
10   me. There are charges listed on here from
11   Fort Lauderdale, Boca Raton, Hollywood, West
12   Palm Beach, Dania, Florida?
13 A. Right.
14 Q. Are these all charges that you would have
15   made on this account?
16 A. Yes.
17 Q. Now, there's also a charge on here on the
18   same statement, which is July 3rd, 2004,
19   through August 3rd, 2004, for Saint Patrick's
20   Guild in Saint Paul, Minnesota.
21       Is that a charge you would have made?
22 A. No.
23 Q. Do you know who would have made that charge?
24 A. I imagine my great aunt.
25 Q. Was your great aunt the only person who had a

**Page 20**

1   card on this account who lived in Minnesota
2   at this time?
3 A. Yes.
4 Q. I believe you stated earlier that your
5   brother Patrick also got a card on this
6   account.
7       Is that right?
8 A. Yes.
9 Q. Do you know where Patrick lived in the 2000s?
10 A. He lived at 1535 Southeast 15th Street in
11   Fort Lauderdale.
12 Q. So Patrick lived with you?
13 A. Yes.
14 Q. How long did Patrick live with you throughout
15   the 2000s? Was it the whole time?
16 A. The whole time.
17 Q. Thank you. That made it easier.
18       Can you look at USB/Baltz 95 for me
19   please? There are a series of charges on
20   this page from Saint Paul, Roseville, Vadnais
21   Heights, I always pronounce that incorrectly.
22       Are these charges that you made on this
23   account?
24 A. No.
25 Q. Tell me about your relationship with your

**Page 21**

1   Aunt Mary? When's the last time you saw her?
2 A. This morning.
3 Q. I knew you were going to say that.
4       How often would you say you see each other
5   in the course of a year?
6 A. It's been less now that I have children. In
7   the past it was quite a bit. She would come
8   down and stay with me for an extended period
9   of time, a month or two months.
10 Q. Now that you don't see her as much, do you
11   talk to her more on the phone?
12 A. Yes.
13 Q. How often would you say you speak to her?
14 A. Every other day at least, daily.
15 Q. Have you spoken to your Aunt Mary about this
16   lawsuit?
17 A. Yes.
18 Q. Can you tell me what your conversations about
19   this lawsuit have been about?
20 A. You know, just more or less arrangements and
21   getting up here and the way -- first I guess
22   to start off it was trying to find someone to
23   help me with this case since her bankruptcy
24   and how to handle it because we kept on
25   getting bills at her house.

**Page 22**

1 Q. Okay. Has the conversation changed more
2   recently?
3 A. No.
4 Q. Looking back at the statements, you will see
5   that there are payments made to U.S. Bank on
6   various statements and just generally
7   speaking have you ever made a payment to U.S.
8   Bank on this account?
9 A. No. I attempted and they would not allow me.
10 Q. So if payments were made on this account
11   shown on the statements, they would have been
12   made by Aunt Mary?
13 A. Yes.
14 Q. Did you make payments to your Aunt Mary?
15 A. Yes.
16 Q. Did you make payments to your Aunt Mary on a
17   monthly basis or a semi-monthly, yearly
18   basis? How did that work?
19 A. When I would have money to send her. It
20   wasn't on an annual or monthly. It was
21   really when I was -- I had money saved up I
22   was able to repay her.
23 Q. So Aunt Mary didn't take the statement and
24   figure out which charges were your's and
25   which charges were her's and send you a

**Page 23**

1   letter in the mail or something and say here
2   is what you owe?
3 A. No.
4 Q. Did Aunt Mary ever ask you to make payments
5   to her or did you just decide that you were
6   going to pay her on your own?
7 A. It was an agreement we had.
8 Q. And was the agreement that you would pay her
9   back for all the charges or just what you
10   could pay?
11 A. What I could pay.
12 Q. And when you paid Aunt Mary did you send her
13   a check?
14 A. Yes.
15 Q. All right. It's your contention that you are
16   an authorized user on this account, right?
17 A. Right.
18 Q. At some point did you find out that U.S. Bank
19   considered you a joint account holder and not
20   an authorized user on the account?
21 A. Not -- actually not until after the
22   bankruptcy.
23 Q. But at some point that's kind of what I want
24   to know?
25 A. Yes.

**Page 24**

1 Q. When was that?
2 A. After the bankruptcy.
3 Q. And how did you find that out?
4 A. She was receiving bills in my name.
5 Q. So Mary was receiving statements at her house
6   that had your name on them?
7 A. Yes.
8 Q. So, for example, if you look at USB/Baltz
9   No. 1, your name is on the statement,
10   correct?
11 A. Yes.
12 Q. At the address in Roseville, right?
13 A. Yes.
14 Q. But you didn't live at that address?
15 A. No.
16 Q. Now, if you turn in the statements to, let's
17   say, USB/Baltz 105 again, do you see that the
18   statement there is addressed to Mary
19   Patterson and yourself in Roseville?
20 A. Yes.
21 Q. At the time of the statement in July 3rd,
22   2004 to August 3rd, 2004, did you know that
23   the statement was addressed to both and you
24   Aunt Mary?
25 A. No.

**Page 25**

1 Q. Do you remember when approximately Aunt Mary
2   declared bankruptcy?
3 A. 2005.
4 Q. And you said that after she declared
5   bankruptcy in 2005 you found out that U.S.
6   Bank considered you a joint holder on the
7   account?
8 A. Yes.
9 Q. And you discovered that because statements
10   were being mailed to Aunt Mary in just your
11   name?
12 A. Right. Everything else that she went through
13   bankruptcy on had been charged off and this
14   one account kept on coming to her address in
15   my name.
16 Q. So did Aunt Mary tell you that the statements
17   were coming to her address in your name?
18 A. Yes.
19 Q. And what did you do in response to that?
20 A. I contacted her bankruptcy attorney.
21 Q. And what did you ask him or her to do?
22 A. For direction on what to do. I ended up
23   sending letters to U.S. Bank and also
24   letters of -- letters to all the credit
25   agencies myself.

**Page 26**

1 Q. Do you have copies of any of the letters that
2 you sent at that time to either U.S. Bank or
3 the credit agencies?
4 A. I do.
5 Q. Have you given copies of those letters to
6 your attorneys?
7 A. Yes.
8 MS. SILVERMAN: Tom, have those
9 letters been produced?
10 MR. LYONS: I believe they have.
11 We produced all the documents that we
12 received. I am not sure exactly how many
13 letters he wrote, but I have seen letters.
14 They are not in front of me right now.
15 MS. SILVERMAN: Okay. That's
16 fine. If I have them, I will talk about them
17 later. We'll see.
18 MR. LYONS: All right.
19 BY MS. SILVERMAN:
20 Q. Do you know how many letters you sent to U.S.
21 Bank?
22 A. I sent an envelope with one statement with
23 her name on them. I sent him -- I sent them
24 a letter explaining that it was not my
25 account and it was just all enclosed in an

**Page 27**

1 envelope directly to U.S. Bank and then the
2 same -- the same ones to the credit agencies.
3 Q. So it was one letter with all the supporting
4 documentation to U.S. Bank?
5 A. Correct.
6 Q. Did you receive a response from U.S. Bank?
7 A. No. I received many calls, just collection
8 calls.
9 Q. But no written response?
10 A. (Witness shakes head.)
11 Q. You have to say yes or no.
12 A. No.
13 Q. Besides the one letter that you wrote to U.S.
14 Bank in 2005, did you call U.S. Bank?
15 A. I talked to them. I never -- I talked to
16 them almost daily when they called me.
17 Q. So you spoke to U.S. Bank about this in
18 response to -- in connection with them
19 calling you, but you didn't actually initiate
20 a call to them?
21 A. I called them initially to find out where I
22 had to mail them and talk to them and
23 complain about this and then I sent them out.
24 Q. The letter that you spoke about earlier?
25 A. Right, yes.

**Page 28**

1 Q. When you spoke to U.S. Bank daily, that was
2 in 2005?
3 A. Yes.
4 Q. Did you take --
5 A. Through -- I mean for many years they called,
6 so it wasn't just 2005.
7 Q. Okay. So when U.S. Bank called in 2005 and
8 forward, can you tell me approximately how
9 often you would get a phone call?
10 A. Really daily and not only me, but my mother.
11 They called my mother, you know. They were
12 calling my cell phone and harassing her.
13 Q. So that's what I was going to ask you next.
14 When U.S. Bank called you, let's start in
15 2005, do you know what phone number they were
16 calling?
17 A. One was probably my mom's and the other was
18 my cell phone.
19 Q. Do you know how U.S. Bank got your cell phone
20 number?
21 A. No.
22 Q. Did you ever give them your cell phone
23 number?
24 A. No.
25 Q. Did you ever give U.S. Bank your mother's

**Page 29**

1 phone number?
2 A. No.
3 Q. Did you at any point in time live in your
4 mother's house, besides when you were a child
5 in Minnesota?
6 A. No.
7 Q. And where does your mom live?
8 A. She lives in Deerfield Beach.
9 Q. Has she lived in Deerfield Beach for the last
10 ten years?
11 A. No.
12 Q. Your mom currently lives in Deerfield Beach?
13 A. Yes.
14 Q. Where did she live before she lived in
15 Deerfield Beach?
16 A. Pompano Beach.
17 Q. And do you know when she moved from Pompano
18 Beach to Deerfield Beach?
19 A. Approximately five or six years ago, six
20 years ago.
21 Q. Do you know when she moved to Pompano Beach?
22 A. Not exactly.
23 Q. Was it in the 2000s or before?
24 A. I would say '99.
25 Q. And did she move from Minnesota?

Page 30

1 A. Yes.
2 Q. Now, when you spoke to or when you received
3    phone calls from U.S. Bank, did you answer
4    those phone calls?
5 A. Yes.
6 Q. And did you speak to a representative from
7    U.S. Bank?
8 A. Every time.
9 Q. And what did the person from U.S. Bank say to
10    you?
11 A. It was a lot of times very rude and just
12    saying -- trying to collect money, trying to
13    arrange and I explained that I have -- you
14    know, this wasn't my account. I just
15    explained that I sent them information
16    showing them it wasn't my account and they
17    just kept on demanding money and kept on
18    calling.
19 Q. Did you ever take handwritten notes of
20    conversations with anybody at U.S. Bank?
21 A. No.
22 Q. Do you remember any of the names of people
23    you spoke to?
24 A. I don't.
25

Page 31

1      (Deposition Exhibit No. 3 marked for
2    identification)
3
4 BY MS. SILVERMAN:
5 Q. I am handing you what's been marked as Baltz
6    Exhibit 3 and these are Initial Disclosures
7    that your attorney provided to us and I would
8    like you to take a look at the document and
9    it has some attachments as well, so just take
10    a minute to look through that for me.
11      Attached to the disclosures are 15 pages
12    of documents labeled Plaintiff 1 through 15.
13    Now, I will represent to you that these are
14    the only documents that we have received from
15    your attorneys in connection with this
16    lawsuit.
17      Do you have any other documents that you
18    know of that are not attached to these
19    disclosures?
20 A. Not that I know, no.
21 Q. Let's look at No. 15, which is a letter from
22    U.S. Bank to Mary and you dated June 28th,
23    2005.
24      My first question is there's an asterisk
25    and some handwritten notation on the letter.

Page 32

1    Do you recognize the handwriting?
2 A. I believe it's my Aunt Mary's.
3 Q. Do you recall receiving this letter from U.S.
4    Bank?
5 A. I received it from my aunt.
6 Q. So your aunt received the letter and then she
7    sent it to you?
8 A. Right.
9 Q. Do you know if once you read the letter what
10    your understanding of the letter was? Do you
11    remember?
12 A. More or less that, you know, this was the
13    letter that when she -- I asked her to send
14    me all the information she could on the
15    account so I could send it to all the credit
16    agencies.
17 Q. This is the letter that she sent you?
18 A. This is the letter she sent me.
19 Q. So when you received this letter from Aunt
20    Mary, you then took this letter and other
21    documents and sent them to U.S. Bank?
22 A. Right.
23 Q. And in your cover letter to U.S. Bank, this
24    would be back in 2005, correct?
25 A. Yes.

Page 33

1 Q. Do you see the cover letter to U.S. Bank in
2    these documents that are attached to the
3    disclosures?
4 A. It was the same letter, but it's -- but
5    basically I just -- this is the same letter
6    right here on Page 13.
7 Q. But this is not the same letter because --
8 A. It's a different address, right. I updated
9    the address.
10 Q. So, in other words, I don't want to testify
11    for you, so Plaintiff 13 is a copy of a
12    letter that you would have sent to U.S. Bank
13    in 2005?
14 A. Yes.
15 Q. But you don't have that original letter from
16    2005?
17 A. No.
18 Q. Okay. Thank you. I was a little confused
19    because Plaintiff 13 is dated, so I didn't
20    know when you sent that to U.S. Bank.
21 A. Right.
22 Q. So the Town Bay Drive address on Plaintiff 13
23    is what leads you to believe that this is a
24    copy of a letter that was sent later in time
25    and not 2005.

**Page 34**

1    Is that correct?
2  A. It was the same letter I sent to the -- all
3    the credit agencies and U.S. Bank with this
4    attachment.  It was these pages right here,
5    these three pages.
6  Q. Plaintiff 13, Plaintiff 14 and Plaintiff 15?
7  A. Yes.
8  Q. So plaintiff 13, 14 and 15 were sent to U.S.
9    Bank at some point in 2005?
10 A. Yes.
11 Q. Do you know if after receiving Plaintiff 15,
12   do you know if your Aunt Mary contacted U.S.
13   Bank?
14 A. I don't know, no.
15 Q. You don't know?
16 A. I don't know.
17 Q. That's fine.
18     Now, you testified a little while ago that
19   you got daily phone calls from U.S. Bank
20   beginning in 2005, right?
21 A. Yes.
22 Q. Have those phone calls ended?  Do you still
23   get daily phone calls from U.S. Bank?
24 A. No.
25 Q. Do you know when those phone calls stopped

**Page 35**

1    coming?
2  A. 2007 or 2008, right around there.
3  Q. So from 2005 until 2007 or 2008 you got daily
4    phone calls from U.S. Bank?
5  A. Yes.
6  Q. Do you remember the phone number that you
7    received those phone calls at?
8  A. No.
9  Q. And was it both your home phone and your cell
10   phone?
11 A. It was just my cell and my mom's.  I know her
12   number, but I don't recall my cell phone
13   number.
14 Q. Can you tell me your mom's phone number?
15 A. 954-428-2060.
16 Q. I just want to be super clear on this.  Did
17   you receive daily calls on your cell phone
18   from 2005 through 2007 or 2008?
19 A. Yes.
20 Q. Do you know, did your mom receive daily phone
21   calls from U.S. Bank between 2005 and 2007 on
22   the 954-428-2060 number?
23 A. Her's started a little bit later.
24 Q. Do you know when her's started?
25 A. Not right offhand.  Not an exact date.

**Page 36**

1  Q. Do you know how many phone calls your mom
2    received?
3  A. Several.
4  Q. By several do you know how many several is?
5  A. Well, she was going through chemotherapy
6    right then.  She had cancer and this was
7    really making her upset where she was getting
8    daily phones and she was calling me on this.
9  Q. Do you remember back to approximately when
10   the phone calls to your mom -- let's just
11   start with phone calls to your mom, when did
12   they start?
13 A. I would have to say around 2006.
14 Q. How often was your mom receiving phone calls
15   from U.S. Bank?
16 A. I would say a few times a day it went on and
17   she kept on explaining that I didn't live
18   there and they kept on calling her at least
19   once a day.
20 Q. So once a day for how long?
21 A. It was over, I would say, at least a two-year
22   period where she was receiving phone calls.
23 Q. And was she receiving those phone calls every
24   day for a two or three year period?
25 A. Yes.

**Page 37**

1  Q. Did you ever receive phone calls or letters
2    from someone other than U.S. Bank telling you
3    that you owed money on this account?
4  A. My Aunt Mary.
5  Q. Besides your Aunt Mary, I mean someone
6    outside of the family?
7  A. No.
8  Q. Okay.  Thank you.
9      So you testified that your mom received
10   phone calls and you received phone calls?
11 A. Yes.
12 Q. Anyone else in your family that received
13   phone calls about the U.S. Bank account?
14 A. No.
15 Q. Now, back in 2006 when your mom received
16   phone calls on the U.S. Bank account, where
17   was she living?
18 A. In Deerfield Beach.
19 Q. And where were you living at that time?
20 A. I was living in Boca.
21 Q. In 2006 how often would you say you saw your
22   mom?
23 A. Daily or talking to her daily.  I would see
24   her once every couple of days.
25 Q. How would you characterize your relationship?

**Page 38**

1 **Were you close?**
2 A. Very close.
3 Q. **How about today, how would you characterize**
4 **your relationship with your mom?**
5 A. Very close.
6 Q. **Have you ever spent any length of time out of**
7 **the United States, more than a month?**
8 A. Yes.
9 Q. **When was that?**
10 A. It was between 2005 and 2006.
11 Q. **And where were you living?**
12 A. Costa Rica.
13 Q. **Can you pinpoint for me approximately when**
14 **that was? Can you pinpoint that a little bit**
15 **more?**
16 A. I would have to look back at dates. I am not
17 sure exactly.
18 Q. **What were you doing in Costa Rica?**
19 A. I moved over there for a job. It didn't work
20 out, so I moved back.
21 Q. **And how long were you there?**
22 A. For about three months.
23 Q. **Let's switch gears and talk about credit**
24 **history.**
25 **Have you ever requested your credit report**

**Page 39**

1 **from any of the credit reporting agencies?**
2 A. Yes.
3 Q. **Do you recall when you first requested your**
4 **credit report?**
5 A. I would say it was probably around 2005.
6 Q. **Do you know why you requested your credit**
7 **report?**
8 A. With this charge from U.S. Bank.
9 Q. **Do you recall what agency you requested your**
10 **report from or did you request it from all**
11 **three?**
12 A. I think I requested it from all three. I
13 think I sent them all three letters.
14 Q. **Eventually did you receive a credit report?**
15 A. Oh, yes.
16 Q. **And did you review it when you received it?**
17 A. Yes.
18 Q. **Did you notice anything, any inaccuracies in**
19 **it?**
20 A. It was -- it was all correct.
21 **MS. SILVERMAN:** Let's go off the
22 record.
23
24 (A recess was had in the proceedings)
25

**Page 40**

1 (Deposition Exhibit No. 4 marked for
identification)
3
4 **BY MS. SILVERMAN:**
5 Q. **I am handing you what's been marked as**
6 **Exhibit 4 which for the record is a**
7 **November 2, 2006 Experian credit report**
8 **prepared for you, John Baltz.**
9 **Do you remember when you requested this**
10 **report?**
11 A. Not exactly.
12 Q. **Do you know why you requested the report?**
13 A. From the charge for U.S. Bank.
14 Q. **If you look at the report, do you see the**
15 **U.S. Bank account appearing on the credit**
16 **report?**
17 A. I believe this is it here.
18 Q. **And that's on Page 0043 on the corner, do you**
19 **see that?**
20 A. Yes.
21 Q. **And when you saw the U.S. Bank account on**
22 **your credit report, did you do anything in**
23 **response to seeing the account on the report?**
24 A. I discussed this with Mary's bankruptcy
25 attorney.

**Page 41**

1 Q. **Is that when he told you that you should**
2 **write a letter to U.S. Bank and to the credit**
3 **reporting agencies?**
4 A. Yes.
5 Q. **And you did that?**
6 A. Yes.
7 Q. **Do you know when the U.S. Bank account first**
8 **appeared on your credit report?**
9 A. No, I don't.
10 Q. **So as of November 2006, is this the first**
11 **time that you knew of the U.S. Bank account**
12 **appearing on your credit report?**
13 A. Yes.
14 Q. **Do you know if the U.S. Bank account is still**
15 **on your credit report?**
16 A. I haven't pulled it up recently. I believe
17 it is.
18 Q. **Let's take a look -- go back to the second**
19 **page of this exhibit. I am just going to ask**
20 **you about some of the accounts on your credit**
21 **report. The first one is Asset Acceptance,**
22 **LLC.**
23 **Do you see that?**
24 A. Yes.
25 Q. **Do you know what that account is?**

**Page 42**

1  A.  I am not sure.
2  Q.  When you saw this on your credit report back
3      in 2006 did you make any phone calls or send
4      any letters relating to that account?
5  A.  No.
6  Q.  It says Original Creditor Bally Total Fitness
7      Corp, does that --
8  A.  Yes.
9  Q.  Can you tell me what it is now?
10 A.  It's a fitness club.
11 Q.  In the column on the right it says Status:
12     Collection account, $560.00 past due as of
13     October 2006.
14         Was that correct at the time?
15 A.  Yes.
16 Q.  The next account is Bank of America.
17         Do you recognize that account?
18 A.  Yes.
19 Q.  And can you tell me what that was?
20 A.  That I am not sure of right offhand.  I don't
21     remember.
22 Q.  Do you know if it was your account?
23 A.  I had a Bank of America account, yes.
24 Q.  In the column on the right towards the bottom
25     it says Creditor's Statement:  Account closed

**Page 43**

1      at credit grantor's question.
2          Do you know why Bank of America closed the
3      account?
4          MR. LYONS:  Objection.  Go ahead.
5      You can answer.  Objection.
6          THE WITNESS:  Objection.
7          MR. LYONS:  No, you have to
8      answer.  I am objecting for the record
9      because it's asking for you to explain what's
10     in somebody else's mind.
11         THE WITNESS:  I don't know.  I
12     don't remember.
13 BY MS. SILVERMAN:
14 Q.  The next one is Capital One.  Do you
15     recognize that account?
16 A.  Yes.
17 Q.  And was that your account?
18 A.  Yes.
19 Q.  And that also to the right says Creditor's
20     Statement:  Account closed at credit
21     grantor's request.
22         Do you know why Capital One closed the
23     account?
24         MR. LYONS:  Objection.  You may
25     answer.

**Page 44**

1          THE WITNESS:  For non-payment.
2  BY MS. SILVERMAN:
3  Q.  Underneath the Capital One account there is
4      another Capital One account.
5          Did you have two Capital One accounts?
6  A.  No.  Well, I may have over the years.
7  Q.  The next account is Chevron Credit Bank.
8          Do you know what account that was?
9  A.  Yes.
10 Q.  What kind of account was that?
11 A.  It was a gas card.
12 Q.  And was that account ever in collections?
13 A.  Not that I recall.
14 Q.  The next account is Credit First.
15         Do you know what that account is?
16 A.  I am not sure.
17 Q.  The next account is ER Solutions.
18         Do you know what account that was?  It
19     says underneath original creditor Cingular.
20 A.  Okay.
21 Q.  Do you know what that was?
22 A.  I'm sure it was a cell phone if it was
23     Cingular.
24 Q.  And it shows Status: Collection account.  Was
25     your cell phone account in collections at

**Page 45**

1      some point?
2  A.  You know, I recall an AT&T, but I wasn't sure
3      what it was under, so that might have been
4      it.
5  Q.  The next account is HSBC.
6          Do you recognize that account?
7  A.  Not because of the address.  I am not sure.
8      It's out of Oregon.  I don't know.
9  Q.  Did you ever have a credit card with HSBC?
10 A.  I don't believe so.
11 Q.  Did you ever have any account with HSBC?
12 A.  I am not sure on what that one is right now.
13 Q.  Do you recall when you received this credit
14     report if you ever contacted HSBC to ask
15     about the account?
16 A.  No.
17 Q.  You don't recall or you didn't?
18 A.  No, I don't recall.
19 Q.  The next account is MCYDSNB.  Do you
20     recognize that?
21 A.  I am not sure of this one.
22 Q.  Could it be a Macy's account?  Did you ever
23     have an account with Macy's?
24 A.  Yes, I did have an account.
25 Q.  Did your Macy's account ever go into

**Page 46**

1   collections?
2  A. It did. I am up-to-date with it now.
3  Q. The next account is Nissan Motor Acceptance.
4      Did you ever have a car loan with Nissan?
5  A. Yes.
6  Q. Was that account ever past due?
7  A. It was past due. It's paid off now.
8  Q. Your next account was with PCFS.
9      Do you recognize that?
10 A. Yes.
11 Q. What was that account for?
12 A. That was my condo I owned and that is paid
13     off now too.
14 Q. Was that a mortgage on your condo?
15 A. Yes.
16 Q. Were you ever behind on your mortgage
17     payments?
18 A. Yes.
19 Q. But now the condo is paid off?
20 A. Yes.
21 Q. Last one, THD/CBSD, do you know what that
22     account is?
23 A. I am not sure what these stand for, that's
24     why I'm --
25 Q. If you don't know, that's fine.

**Page 47**

1  A. I don't know.
2  Q. That's fine. Let's turn back for a minute to
3      Exhibit No. 3, which is the disclosures again
4      and I want you to take a look at Plaintiff 13
5      at the bottom, which is the letter that you
6      wrote to U.S. Bank.
7          Now, you testified that you wrote this
8      letter to U.S. Bank and to the credit
9      reporting agencies, right?
10 A. Yes.
11 Q. Did anyone help you draft the letter?
12 A. No.
13 Q. And I know you said that you sent the same
14     letter to U.S. Bank and the credit reporting
15     agencies in 2005?
16 A. Uh-huh.
17 Q. Did you send the letter again to U.S. Bank
18     and the credit reporting agencies?
19 A. Yes.
20 Q. Do you know approximately when that was?
21 A. Just recently, 2010 here.
22 Q. Is there any reason that you didn't date the
23     letter?
24 A. It's an over site.
25 Q. Do you know what month in 2010 you would have

**Page 48**

1   sent this letter?
2  A. Not exact date, no. I don't remember.
3  Q. If you look at the third to last sentence it
4      says I never once had received anything from
5      this bank until Mary K. Patterson went
6      through bankruptcy.
7  A. Right.
8  Q. So this bank refers to U.S. Bank?
9  A. Yes.
10 Q. So my question would be you never received
11     anything from U.S. Bank until Mary Patterson
12     went through bankruptcy, what did you receive
13     from U.S. Bank after --
14 A. Mary received bills at her house and then
15     that's when I received them from her.
16 Q. So you never --
17 A. No.
18 Q. What I want to just clarify for the record is
19     did you personally at your addresses in
20     Florida --
21 A. Never.
22 Q. -- ever receive anything --
23 A. No.
24 Q. -- from U.S. Bank.
25 A. No, never.

**Page 49**

1  Q. Sorry. I have to finish the question before
2      you can answer.
3          When you mailed this letter to U.S. Bank
4      and the credit reporting agencies in 2010,
5      did you receive a response, written response,
6      from U.S. Bank?
7  A. From the credit agencies.
8  Q. But not from U.S. Bank?
9  A. No.
10 Q. So you received written responses from the
11     credit reporting agencies?
12 A. Yes.
13 Q. But you never received a written response
14     from U.S. Bank?
15 A. That's correct.
16 Q. Do you recall what the credit reporting
17     agencies said to you in response to your
18     letter or wrote to you in response to your
19     letter?
20 A. They sent me a copy of my credit report and
21     stated that it was my charge. It was my
22     account.
23 Q. Did you do anything in response to receiving
24     that response from the credit reporting
25     agencies?

**Page 50**

1  A.  That's when I asked my aunt's attorney who to
2       speak to and who to handle the case.
3  Q.  And that's when you filed the lawsuit?
4  A.  Yes.
5  Q.  Just for the record, can you turn to
6       Plaintiff 10 on the Rule 26(a) Disclosures.
7          Is this Equifax's response to you after
8       you sent them Plaintiff 13?
9  A.  Yes.
10 Q.  If you look it says about halfway down
11      underneath the box it says we have researched
12      the credit account.  The results are Equifax
13      verified that this item belongs to you.
14         Do you see that?
15 A.  Yes.
16 Q.  Do you know what Equifax did to verify, in
17      their words, that the account belonged to
18      you?
19 A.  Just exactly what it says, that they
20      researched it and they found it was -- this
21      account had belonged to me.
22 Q.  Do you know if Equifax contacted U.S. Bank to
23      see if the debt belonged to you?
24 A.  From what it states, yes, I would imagine,
25      because it says they researched the credit

**Page 51**

1       account.
2  Q.  But do you know if they contacted U.S. Bank?
3  A.  No.
4  Q.  When you sent your letter to the credit
5       reporting agencies, do you recall the names
6       of the credit reporting agencies you sent
7       your letter to?
8  A.  Yes.
9  Q.  Can you tell me what they are?
10 A.  It was Experian.  I got them off of the
11      computer and so I just sent them to all three
12      of them that I needed to.
13
14         (Phone ringing)
15
16         MR. LYONS, JR.: Hello.
17         MR. LYONS: I got cut off for a
18      minute.
19         MS. SILVERMAN: We didn't know
20      you were gone.  Sorry.
21         MR. LYONS: It just cut off.  I
22      had to just call back.
23 BY MS. SILVERMAN:
24 Q.  So you sent the letter to the three credit
25      reporting agencies?

**Page 52**

1  A.  Yes.
2  Q.  Can I just say for the record, Equifax,
3       Experian, Trans Union?
4  A.  Yes.
5  Q.  You testified you don't know if Equifax
6       contacted U.S. Bank to --
7  A.  I assume they did.
8  Q.  But you don't know?
9  A.  I don't know.
10 Q.  Do you know if Experian or Trans Union
11      contacted U.S. Bank in connection with your
12      dispute?
13 A.  Again, I assume they do.  You know, I would
14      imagine that's their job to look at the
15      company I am complaining about, yes.
16 Q.  Do you know if they did contact U.S. Bank,
17      what they told U.S. Bank?
18 A.  That I was stating that this was not my
19      account.
20 Q.  But do you know if they did that?
21 A.  No.
22 Q.  Do you know if they did contact U.S. Bank
23      what U.S. Bank said in response?
24 A.  No.
25 Q.  Have you ever disputed any other account

**Page 53**

1       besides the U.S. Bank account to any of the
2       credit reporting agencies?
3  A.  No.
4
5          (Deposition Exhibit No. 5 Marked for
6       Identification)
7
8  BY MS. SILVERMAN:
9  Q.  I am showing you what's been marked as Baltz
10      Exhibit 5 which is a Trans Union Credit
11      Report dated July 12, 2010.
12         Do you remember when you requested this
13      credit report?
14 A.  Yes.
15 Q.  And when would that be?
16 A.  Just recently, 2010.
17 Q.  Did you review the report when you received
18      it?
19 A.  I looked over it, yes.
20 Q.  Did you notice any inaccuracies in the
21      report?
22 A.  No.
23 Q.  I just want to look at a couple of the
24      accounts in here.  On the third Page,
25      TU 000003, there's an account AFNI.

**Page 54**

1     Do you recognize that account?
2 A. On the third -- okay.
3 Q. Page 3, do you see that AFNI?
4 A. Yes.
5 Q. Do you recognize that account?
6 A. Not right offhand, no.
7 Q. Okay. Let's skip to Page 5. The pages are
8     marked at the bottom. There's an account
9     called Palisades Collection, LLC.
10     Do you know what that account is?
11 A. I don't. If I knew what the names of these
12     companies were, I might be able to have a
13     better idea.
14 Q. In the second column it says Original
15     Creditor and I believe it's AT&T?
16 A. Yes, that's correct.
17 Q. Was that the account you were referring to
18     before?
19 A. Yes.
20 Q. And was that account ever in collections?
21 A. Yes.
22 Q. The last one I am going to ask you about on
23     here is Home Depot.
24     Did you have a credit card with Home
25     Depot?

**Page 55**

1 A. Yes.
2 Q. It says account closed by credit grantor.
3     Do you know why Home Depot would have
4     closed the account?
5     MR. LYONS: Objection. If you
6     know, you can answer. Objection to the form
7     of the question.
8     THE WITNESS: No.
9
10     (Deposition Exhibit No. 6 marked for
11     identification)
12
13 BY MS. SILVERMAN:
14 Q. I am handing you what's been marked as Baltz
15     Exhibit 6. This is a Trans Union Credit
16     Report from October 31, 2011.
17     Do you remember requesting this report?
18 A. Yes.
19 Q. Did you review the report when you received
20     it?
21 A. I did.
22 Q. Did you notice anything inaccurate on the
23     report?
24 A. No.
25 Q. I just want to turn your attention to Page 45

**Page 56**

1     at the bottom.
2 A. Okay.
3 Q. It says JTL, Inc.
4 A. Okay.
5 Q. Do you know what this account is?
6 A. No.
7 Q. Does the balance of $44,509.00 help you?
8 A. No.
9 Q. Okay. That's all I had on that one.
10     Do you have any credit cards currently in
11     your name as an individual?
12 A. No.
13 Q. Do you have any credit cards now jointly with
14     anyone?
15 A. No.
16 Q. Have you ever had a credit card cancelled?
17 A. No.
18 Q. Have you ever been more than 30 days late on
19     a credit card payment?
20 A. Yes.
21 Q. Have you ever been beyond 30 days late on a
22     credit card payment?
23 A. Yes.
24 Q. Do you currently have any loans with any
25     bank, any mortgage company, any car?

**Page 57**

1 A. Yes.
2 Q. Can you tell me what loans you currently
3     have?
4 A. A loan and that's what this could be for.
5     It's a loan on an Infiniti, a car.
6 Q. A car?
7 A. Yes.
8 Q. Are you currently delinquent on that loan?
9 A. No.
10 Q. Have you ever been delinquent on that loan?
11 A. No.
12 Q. And I believe you stated earlier that you
13     don't own a home?
14 A. No.
15 Q. So you do not have a mortgage?
16 A. No.
17 Q. Have you ever owned a home?
18 A. Yes.
19 Q. You owned a condo, right?
20 A. Yes.
21 Q. Where was that condo located?
22 A. In Fort Lauderdale.
23 Q. Did you have a mortgage on that condo?
24 A. Yes.
25 Q. When did you obtain that mortgage?

---

**Page 58**

1 A. In '99, around; 99.
2 Q. **And did you have a co-signer?**
3 A. Yes.
4 Q. **Who was your co-signer?**
5 A. My stepfather.
6 Q. **Did you eventually sell the condo?**
7 A. Yes.
8 Q. **Did you pay off the mortgage?**
9 A. Yes.
10 Q. **Do you own any property at all?**
11 A. No.
12 Q. **Besides the U.S. Bank account, have you ever**
13     **been contacted by a collection agency in**
14     **connection with any account?**
15 A. Yes.
16 Q. **Can you tell me which accounts?**
17 A. AT&T.
18 Q. **Anybody else?**
19 A. Capital One.
20 Q. **Anybody else?**
21 A. That's all I can recall.
22 Q. **Have you ever been denied credit for a credit**
23     **card or a loan?**
24 A. Yes.
25 Q. **Can you tell me when?**

---

**Page 59**

1 A. The most recent is for the Infiniti, the car
2     I purchased. They couldn't get me into a
3     loan with their banks with good percentage
4     rates, APR, so I had to go right through
5     Infiniti with a very high interest rate.
6 Q. **Do you recall if you applied for that**
7     **Infiniti loan in person or by phone?**
8 A. In person.
9 Q. **Do you recall who you met with?**
10 A. No.
11 Q. **Do you recall what month and what year it**
12     **was?**
13 A. About four months ago.
14 Q. **Do you know if the person you met with ran a**
15     **credit report?**
16 A. Yes.
17 Q. **Did the person who you met with tell you why**
18     **you couldn't get a loan through a**
19     **non-Infiniti loan?**
20 A. He asked me questions regarding my credit
21     report.
22 Q. **What kinds of questions did he ask you?**
23 A. He saw the charge off from U.S. Bank and
24     asked what was this about and just specifics
25     about my credit report.

---

**Page 60**

1 Q. **Did he ask you about any other accounts on**
2     **your credit report besides U.S. Bank?**
3 A. No.
4 Q. **So he only asked you about U.S. Bank?**
5 A. That I can recall, yes.
6 Q. **Now, you stated that you couldn't get a car**
7     **loan through someone so you had to go through**
8     **Infiniti, right?**
9 A. Right.
10 Q. **Who is the someone?**
11 A. I am not sure what banks they use. I went in
12     there. I applied for the credit and I came
13     back the next day and they weren't able to --
14     actually we took the car and they weren't
15     able to put the loan through the companies
16     that they were trying, the banks they were
17     trying to use. I am not sure of the exact
18     banks they were going through.
19 Q. **So when you're saying they, are you talking**
20     **about --**
21 A. The Infiniti dealership.
22 Q. **Do you know where the Infiniti dealership is**
23     **located?**
24 A. Coconut Creek, Florida.
25 Q. **Is it on U.S. 1 by any chance?**

---

**Page 61**

1 A. No.
2 Q. **Do you know the street address?**
3 A. It's off of Sample Road.
4 Q. **And do you recall if the person that you met**
5     **with at the Infiniti dealership was a man or**
6     **a woman?**
7 A. It was a man.
8 Q. **Do you recall his first name?**
9 A. Not offhand, no.
10 Q. **Have you ever been turned down for a loan or**
11     **a credit card besides the Infiniti?**
12 A. No. I haven't applied for any other --
13 Q. **That was my next topic.**
14     **Have you ever applied for a loan or a**
15     **credit card since 2005 and been approved?**
16 A. No.
17 Q. **Back to the Infiniti for a second, you did**
18     **receive a loan, but the interest rate was**
19     **higher than you wanted?**
20 A. Right.
21 Q. **Do you know what the interest rate on the**
22     **Infiniti loan that you have now is?**
23 A. I believe like 14 percent.
24 Q. **Do you know what the rate was that the**
25     **Infiniti person was trying to get you?**

---

Min-U-Script®
(651) 681-8550 phone  1-877-681-8550 toll free
www.johnsonreporting.com
(15) Pages 58 - 61

**Page 62**

1  A. Around six, six or seven.
2  Q. Let's talk a little bit about the way that
3  you perceive that you have been hurt by U.S.
4  Bank.
5     If you turn to Exhibit 1 in the Complaint
6  it states in Paragraph 34 that U.S. Bank's
7  actions have caused you harm. I want to talk
8  to you a little bit about that.
9     How would you describe the harm that U.S.
10  Bank has caused you, in your own words?
11  A. A lot of stress. A lot of sleepless nights,
12  headaches, frustration through family members
13  and myself just not being able to get closure
14  on this.
15  Q. Tell me a little bit about your sleepless
16  nights. When did you start losing sleep?
17  A. Not every night but, you know, a lot of times
18  it did happen. There was a lot of stress
19  with my mom going through cancer and she's
20  getting these calls and she's complaining at
21  me. It was a lot of stress during the time.
22  This just kind of added to things.
23  Q. So were there other stresses going on in your
24  life? Is this back in 2006 when your mom had
25  cancer?

**Page 63**

1  A. 2007, yes, 2006 and 2007.
2  Q. So how often would you say that you lost
3  sleep over U.S. Bank?
4  A. Due to the calls, frequent calls I was
5  receiving, it was daily where I was
6  constantly thinking about it.
7  Q. And I think you testified the calls stopped
8  at some point in 2007 or 2008?
9  A. Yes, right around there. I really don't
10  remember. It was a few years ago.
11  Q. Was there anything else going on in this time
12  frame that was causing you stress?
13  A. Other than just my mother, no.
14  Q. When you say that you were feeling stress
15  about this, can you tell me what that felt
16  like, what that meant to you?
17  A. With someone hounding you for something that
18  you don't feel is your's, there's just a lot
19  of frustration and it builds up and you, you
20  know, then it's embarrassing too when you're
21  getting calls all the time on your cell phone
22  and that was my only phone and it's the only
23  phone number that they had and all throughout
24  the day.
25  Q. Did you ever see a doctor or a psychiatrist

**Page 64**

1  or a psychologist about this?
2  A. No.
3  Q. Did you talk to anyone aside from your Aunt
4  Mary and your mom about U.S. Bank?
5  A. Just immediate family.
6  Q. And who would you talk to about that?
7  A. My father, my brothers and my girlfriend.
8  Q. What damages are you claiming in this case?
9  A. I am mostly --
10     MR. LYONS: I am going to object.
11  Don't say anything that your lawyers have
12  told you. If there is a way to answer that,
13  go ahead. Anything that has been discussed
14  between you and me is something that should
15  not be disclosed.
16  BY MS. SILVERMAN:
17  Q. I never want to ask you what you spoke to
18  your lawyer about, that's privileged, but
19  what is it that you want to get out of this
20  case?
21  A. I want to make sure that this is off of my --
22  my name is not, you know, on this charge of
23  my aunt's credit card. I would like this off
24  of all my credit, removed from my credit.
25  Q. Is there anything else that you want?

**Page 65**

1  A. That's most important to me.
2     MS. SILVERMAN: Can we just take
3  two minutes? I want to look through and make
4  sure I have covered everything.
5     MR. LYONS: Sure. Go ahead.
6
7  (A recess was had in the proceedings)
8
9  BY MS. SILVERMAN:
10  Q. You testified that the Infiniti dealer pulled
11  your credit report?
12  A. Yes.
13  Q. Do you know which credit report, from what
14  credit reporting agency they pulled?
15  A. I don't.
16  Q. And the other thing I want to ask you about
17  is U.S. Bank calling your cell phone number.
18     You testified you don't remember your cell
19  phone number?
20  A. I can get it. I don't have it right offhand.
21  Q. Do you know who your carrier was?
22  A. It was AT&T.
23  Q. Was the cell phone in your name?
24  A. Yes.
25     MS. SILVERMAN: I would request,

**Page 66**

1   and I can do it in writing if you would like,
2   that we be provided with Mr. Baltz' cell
3   phone number at the time.
4        MR. LYONS: Okay.
5        MS. SILVERMAN: That's all I
6   have.
7
8        EXAMINATION
9
10  BY MR. LYONS:
11  Q.  John, in the testimony that you have given so
12      far you discussed back in 2006 and 2007 areas
13      where you were trying to straighten out the
14      credit report or, excuse me, the inaccuracy
15      with U.S. Bank.
16      What I would like you to do is take a look
17      at Exhibit No. 1, pick it up in your hand, go
18      to Paragraph 34, Exhibit 1, you testified
19      that in this case against U.S. Bank there's
20      been harm done to you and you have laid out a
21      few items there.  What I would like you to do
22      is explain to us when the problem occurred
23      with respect to U.S. Bank after you got your
24      credit report in 2010?  What happened then?
25  A.  This is the most recent was the car and I

**Page 67**

1   haven't applied for any credit cards or loans
2   because of this and, you know, I have been
3   jumping around from house to house and
4   there's been a lot of frustration because I
5   would really like to clean up my credit and
6   buy a house.  I have three children and it's
7   really frustrating.  This has caused a lot of
8   anxiety because, you know, getting this
9   information back from the credit agencies has
10  told me that they are still trying to come
11  after me and this is still hurting my credit
12  and it's really caused me a lot of emotional
13  distress.
14  Q.  So in Paragraph 34 it says that you have not
15      sought to use your credit other than getting
16      this Infiniti.
17      Have there been times when you have gone
18      to a mortgage broker and spoken to them about
19      this or have you not gone to that extent?
20  A.  I have not gone to that extent yet.
21  Q.  But for some reason you're concerned that
22      this matter is going to prevent you from
23      exercising your credit.
24      Is that true?
25  A.  That's correct.

**Page 68**

1   Q.  Now, you have said some other things in
2       Paragraph 34 regarding loss of sleep and some
3       other things.  As you're looking at it there,
4       have all of those things arisen since the
5       failure of the credit reporting agencies to
6       correct the U.S. Bank credit line?
7   A.  Yes.
8        MR. LYONS: I don't have any
9   further questions, Ellen.
10
11        EXAMINATION
12
13  BY MS. SILVERMAN:
14  Q.  I just have one other question.
15      If you turn back to Exhibit No. 6, which
16      is the October 31, 2011 Trans Union report
17      and if you turn, Mr. Baltz, to Page 45 and I
18      want to turn your attention again to that
19      JTL, Inc. with the balance of $44,509.00, I
20      believe you testified earlier you did not
21      know what this account was.
22      Is that true?
23  A.  If I knew the name of it, I might, but I am
24      not sure what this is, with these initials
25      and abbreviations.

**Page 69**

1   Q.  Do you recall any credit account that was
2       placed in collections in May of 2009 in the
3       approximate amount of $44,509.00?
4   A.  Not right off the top of my head, no.
5   Q.  Did you have any loans back in 2009 with a
6       balance of $44,000.00?
7   A.  Not that I recall.
8   Q.  When you went to the Infiniti dealer, the
9       only thing the Infiniti dealer pointed to on
10      your credit report was the U.S. Bank account?
11  A.  He asked about it, yes.
12  Q.  Did he ask about any other account?
13  A.  No.
14        MS. SILVERMAN: I have nothing
15  further.  Thank you.
16        MR. LYONS: I don't have any
17  further questions.  He is going to read and
18  sign.
19
20
21        * * * 11:50 * * *
22
23
24
25

Page 70

1 STATE OF MINNESOTA }
2 COUNTY OF DAKOTA } ss.

3

4      BE IT KNOWN, that I took the
deposition at the time and place set forth herein;
5

6      That I was then and there a Notary
Public in and for the County of Dakota, State of
Minnesota, and by virtue thereof, I was duly
7 authorized to administer an oath;

8      That the witness before testifying was
by me first duly sworn to testify to the whole
9 truth relative to said cause;

10      That the testimony of said witness was
recorded in shorthand and transcribed into
11 typewriting, that the deposition is a true record
of the testimony given by the witness, to the best
12 of my ability;

13      That I am not related to any of the
parties hereto nor interested in the outcome of
14 the action;

15      That the reading and signing of the
deposition by the witness and the Notice of Filing
16 were not waived;

17      That the original transcript was
delivered to the attorney conducting the
18 deposition for filing;

19

20      IN EVIDENCE HEREOF, WITNESS MY HAND AND
SEAL.

21

22

23 _____
       Leslie Pingley
       Notary Public

24

25

---

Page 71

1      READING & SIGNING CERTIFICATE

2

3      BE IT KNOWN, that I, the undersigned

4 Deponent, have on this date, _____,

5 read the transcript of my deposition testimony,

6 noting the following changes (if any):

7

8 _____

9      DEPONENT'S SIGNATURE

10

11 Page & Line No.      Correction      Reason

12 _____

13 _____

14 _____

15 _____

16 _____

17 _____

18 _____

19 _____

20 _____

21 _____

22 _____

23 _____

24 _____

25 _____

USB App 18

```
1              UNITED STATES DISTRICT COURT
                  DISTRICT OF MINNESOTA
2

3

4

5

6

7

8

               JOHN BALTZ                        COPY
9                 vs.

       U.S. BANCORP d/b/a U.S. BANK
10

          Cause No. 11-cv-170 JRT/AJB
11

12

13

14

15

16     DEPOSITION OF STEPHANIE BUCKLEY
17     TAKEN ON BEHALF OF THE PLAINTIFF
18            FEBRUARY 16, 2012
19

20

21

22

23

24

25   (starting time of deposition: 10:22 a.m.)
```

Stephanie Buckley

Page 2

1                          INDEX
2                                    PAGE
3    Index                    2
     Deposition Information          3
     Appearance Page                 4
4    Direct Examination by Mr. Lyons     5
     Cross-Examination by Ms. Silverman    118
5    Redirect Examination by Mr. Lyons    119
     Notarial Certificate            124
6
7              PLAINTIFF'S EXHIBITS
8    EXHIBIT    DESCRIPTION    PAGE MKD.
     NUMBER
9    4A       RMS Notes        12
     4B       More legible RMS notes    13
10   1   Plaintiff's amended notice    21
         of taking telephonic
11       deposition of Defendant's
         Rule 30(b)(6)
12       representatives
     9   Trans Union document    24
13   7   Bates stamped documents    24
         USB/Baltz 000155, 156 and
14       157
     6   Letter from USBank dated    27
15       6/28/05
     8   4 letters from USBank Bates    27
16       stamped TU 000016, 15, 18
         and 17
17   2   Rule 26(a)(1) Disclosures of    31
         Defendant U.S. Bank National
18       Association
     3   Summons    34
19   5   USBank's objections and    34
         answers to plaintiff's first
20       set of interrogatories
21
22
23   (Original exhibits were retained by the Court Reporter
     and will be copied and attached to copies of the
24   transcript.)
25

Page 4

1              A P P E A R A N C E S
2
     For the Plaintiff:
3
     LYONS LAW FIRM
4    By:  Thomas J. Lyons
     367 Commerce Court
5    Vadnais Heights, MN  55127
     (651)770-9707
6    tlyons@lyonslawfirm.com
     (via telephone)
7
8
     For the Defendant:
9
     FAEGRE BAKER DANIELS
10   By:  Ellen Silverman
     90 South 7th Street
11   Minneapolis, MN  55403
     (612)766-7462
12   ellen.silverman@FaegreBD.com
13
14
15
     Court Reporter:
16
     Amy A. Victoria, CCR MO #556
17   711 North Eleventh Street
     St. Louis, MO  63101
18   (314) 644-2191
     1-800-280-3376
19
20
21
22
23
24
25

Page 3

1              UNITED STATES DISTRICT COURT
                    DISTRICT OF MINNESOTA
2
3    JOHN BALTZ,            )
                            )
4        Plaintiff,         )
                            )
5        vs.                ) Cause No. 11-cv-170
                            ) JRT/AJB
6    U.S. BANCORP d/b/a U.S. )
     BANK,                  )
7                           )
         Defendant.         )
8
9
10        DEPOSITION OF STEPHANIE BUCKLEY, produced,
11   sworn and examined on February 16, 2012, between the
12   hours of eight o'clock in the forenoon and six o'clock
13   in the afternoon of that day, at the offices of US
14   Bank, 9321 Olive Boulevard, St. Louis, Missouri,
15   63132, before Amy A. Victoria, Certified Court
16   Reporter, in a certain cause now pending in the United
17   States District Court, District of Minnesota, wherein
18   JOHN BALTZ is the Plaintiff and U.S. BANCORP d/b/a
19   U.S. BANK is the Defendant.
20
21
22
23
24
25

Page 5

1        IT IS HEREBY STIPULATED AND AGREED, by and
2    between counsel for the Plaintiff and counsel for the
3    Defendant that this deposition may be taken in
4    shorthand by Amy A. Victoria, Certified Court
5    Reporter, and afterwards transcribed into typewriting;
6    and the signature of the witness is expressly waived.
7          *     *     *     *     *
8              STEPHANIE BUCKLEY,
9    of lawful age, produced, sworn and examined on behalf
10   of the Plaintiff, deposes and says:
11
12              DIRECT EXAMINATION
13   QUESTIONS BY MR. LYONS:
14       Q.  And madam, what is your full name?
15       A.  Stephanie Ann Buckley.
16       Q.  And are you older than 21 years?
17       A.  Yes.
18       Q.  And have you ever given a deposition before
19   in any circumstance?
20       A.  With you before, yes.
21       Q.  Okay.  And when was the last deposition you
22   gave in any case?
23       A.  Would have been within the last two months.
24       Q.  And what kind of a case was that?
25       A.  It had to do with a business card account.

2 (Pages 2 to 5)

Stephanie Buckley

**Page 6**

1  I don't know, I don't recall the specifics of it.
2      Q.   Now, when you give a deposition, do you
3  have the opportunity to read it after the deposition
4  is given to, is typed up in English?
5      A.   Sometimes I do, yes.
6      Q.   Okay.  And did you read that one that you
7  gave two months ago?
8      A.   No, I have not.
9      Q.   All right.  When is the last deposition
10  that you read when it was typed up in English that you
11  gave?
12      A.   Fully read?
13      Q.   Pardon me?
14      A.   Fully read, you know, I glanced at the last
15  one that we did, but the last one I fully read was
16  years ago.
17      Q.   Okay.  When did you -- when was the that we
18  did before, what month or year?
19      A.   I don't know.
20      Q.   Was it within the last year?
21      A.   I don't think so.
22      Q.   All right.  When you read these
23  depositions, do you keep them in your office or on
24  your computer or somewhere that's accessible to you?
25      A.   They are not on my computer and generally

**Page 7**

1  they are not in my office.
2      Q.   Where would they be, if you know?
3      A.   They would be in our files either here
4  on-site or off site.
5      Q.   And what site are you at right now where
6  your office is?
7      A.   The address here is 9321 Olive Boulevard,
8  St. Louis, Missouri, 63132.
9      Q.   Okay.  Now, how long have you worked at
10  USBank?
11      A.   Almost 17 years.
12      Q.   And before you worked at USBank, what
13  generally did you do between that time and when you
14  left school?
15      A.   I worked for several other financial
16  institutions.
17      Q.   Okay.  And in the work both at USBank and
18  in the other financial institutions, did you become
19  aware, as part of your work duties, become aware of
20  the Fair Credit Reporting Act?
21      A.   Yes.
22      Q.   And is there any particular part of the act
23  that is part of your job generally, or day to day, or
24  month to month work?
25      A.   Yes.  We respond to disputes received

**Page 8**

1  either from individuals or from the credit bureaus.
2      Q.   Okay.  And when it comes from the credit
3  bureau, that's, there's a law, and that is 611681S2B,
4  does that sound familiar to you?
5      A.   No.
6      Q.   Then is there a law that you're
7  familiar with about the disputes that come from credit
8  reporting agencies to USBank for you to investigate?
9          MS. SILVERMAN:  I'm going to object calls
10  that it calls for a legal conclusion but she can
11  answer, if she knows.
12      Q.   (Mr. Lyons) Go ahead.
13      A.   Well, I believe that's part of the FCRA, or
14  the Fair Credit Reporting Act.
15      Q.   And you're not sure of what particular part
16  of the Fair Credit Reporting Act I'm referring to; is
17  that correct?
18      A.   That is correct.
19      Q.   All right.  Okay.  Well, what is your
20  current position by title?  If you have a job title,
21  what is that?
22      A.   Vice president.
23      Q.   Okay.  And is it vice president of anything
24  in particular?
25      A.   Of collection support.

**Page 9**

1      Q.   And how long have you had that job?
2      A.   It's been just about two years.
3      Q.   Two years.  And is there a written job
4  description for that position?
5      A.   I don't believe that there's a job
6  description.  We have --
7      Q.   Okay.
8      A.   -- job codes that have information --
9      Q.   What would a job code be?
10      A.   A job code is just really for our HR system
11  that would describe generally the duties of a manager
12  position.
13      Q.   All right.  And are they particular to
14  collections or is it just managers have to do certain
15  things no matter what department you're in?
16      A.   In most cases, they're pretty generic
17  throughout the bank.  There may be some codes that are
18  specific to collections.
19      Q.   And in your job, do you get reviewed on an
20  annual or a semi-annual basis for your performance?
21      A.   Yes, I do.
22      Q.   And how often do you get reviewed?
23      A.   A formal review is annual.
24      Q.   All right.  And when was your last annual
25  review?

3 (Pages 6 to 9)

Stephanie Buckley

Page 10

1      A.   That would have been last year at this
2  time. So I'm expecting to get another one shortly.
3      Q.   All right. So in February 2011, did you
4  pass that review?
5      A.   Yes.
6      Q.   No negative comments that you're aware of?
7      A.   No. As a matter of fact, I'm the pinnacle
8  winner for our division for last year.
9      Q.   Okay. Did you get a promotion?
10     A.   No.
11     Q.   Okay. Did you get an increase in salary?
12     A.   For a pinnacle award, no, it's a service
13  award.
14     Q.   Okay. Did you get a bonus as part of your
15  job as a result of the review in February of 2011?
16     A.   Yes. We do have an annual bonus plan.
17     Q.   And did you get one?
18     A.   Yes.
19     Q.   Okay. Now, who does your review, what's
20  the name and position of that person?
21     A.   Last year my review was done by Dan Rose.
22     Q.   Okay.
23     A.   Senior vice president of RPS collections.
24     Q.   Okay. Give me the letters again. I didn't
25  pick it up. RPS or --

Page 11

1      A.   Oh, I'm sorry. R, like Robert, P, like
2  Peter, S, like Sam.
3      Q.   Okay. And what does that stand for?
4      A.   That for stands for retail payment
5  solutions.
6      Q.   Okay. All right. What have you reviewed
7  to prepare yourself to give your testimony at this
8  deposition?
9      A.   I have reviewed the account files since the
10  suit was filed. So the complaint. I took a look at
11  the interrogatories. I took a look at some of the
12  RMS notes, some of the letters.
13     Q.   All right. And take a look at the
14  documents that have been marked so far, there's nine
15  or eight of the nine have been -- are those the types
16  of documents that you would have reviewed to prepare
17  yourself for this testimony today?
18     A.   Yes.
19     Q.   All right. Did you interview anyone to
20  prepare for your testimony?
21     A.   I did talk to some folks, yes.
22     Q.   And let's just name of them. First name
23  that comes to mind, who did you talk to?
24     A.   Cynthia Doodah (phonetic).
25     Q.   Okay. And what?

Page 12

1      A.   Oh, I'm sorry. She is married. Cynthia
2  Hunt.
3      Q.   Cynthia Hunt. Okay. And what is her job
4  at USBank?
5      A.   She is a recovery manager.
6      Q.   Okay. What does a recovery manager do?
7      A.   They manage the process for charged off
8  credit accounts.
9      Q.   All right. And when you interviewed her,
10  did you find out that she had been participating in
11  the collection efforts against John Baltz or had she
12  just come to that job recently?
13     A.   I interviewed -- well, I didn't actually
14  interview her, that would be strong. I was asking her
15  a question about an I.D. in the RMS notes. That's
16  what we discussed.
17     Q.   Okay. Did you say a code in the RMS notes
18  or an I period D period?
19     A.   I.D., I period D period.
20     Q.   Okay. And what was that I.D. that you were
21  asking about?
22     A.   It was -- hold on, let me get that, the RMS
23  notes over here. Just a second.
24         (Plaintiff's, USBank Deposition Exhibit No.
25  4A, RMS Notes, was then marked for identification by

Page 13

1  the reporter.)
2         (Plaintiff's, USBank Deposition Exhibit No.
3  4B, More legible RMS notes, was then marked for
4  identification by the reporter.)
5      Q.   I think it's marked as Exhibit 4, the RMS
6  notes, and perhaps it's in there somewhere.
7      MS. SILVERMAN:   The court reporter has
8  them, hold on.
9      THE WITNESS:   Well, you know what, I can
10  get that from mine.
11     THE COURT REPORTER:   They're right here.
12     THE WITNESS:   Okay. Thank you.
13     A.   It was D, as in David, X, B, like boy,
14  I-L-L-I.
15     Q.   (Mr. Lyons) All right. Now, what page are
16  you on and what exhibit are you on?
17     MS. SILVERMAN:   Yeah, this is, it's going
18  to take a second, Tom, because these are the RMS notes
19  that don't have Bates numbers on the bottom.
20     MR. LYONS:   That's fine.
21     MS. SILVERMAN:   So in order to match it
22  up --
23     MR. LYONS:   Maybe give me a date that
24  you're looking at if it has a date entry on the RMS
25  notes.

4 (Pages 10 to 13)

Civil Action Group 763.576.8832

USB App 22

Stephanie Buckley

Page 14

1    A.  10-2 of 2006.
2    Q.  (Mr. Lyons) Okay.  10-2.
3    A.  And it's 000125.
4    Q.  Okay.  Good.  All right.  So on that page
5  what were you asking Cynthia about?
6    A.  I was, when I had looked over the notes,
7  the I.D. seemed very familiar to me.
8    Q.  Okay.
9    A.  So I was simply asking her, refresh my
10  memory who was this person.
11    Q.  What person?
12    A.  DXBILLI, that's a user I.D.
13    Q.  I didn't hear that.  Pardon me.  I was not
14  listening.  Who is DXBILLI?
15    A.  It's a former employee named Derek
16  Billings.
17    Q.  Okay.  And he made the entry on the RMS
18  note, Exhibit 4, page 125, correct?
19    A.  Correct.  For A, right, or, I guess, either
20  one.  They're both the same.  Sorry.
21    Q.  No.  You're right, you're right.  I
22  apologize, it is Exhibit 4A.  And when we see the
23  number pages, that's probably what we should refer to
24  for our testimony today.  Would you agree with me on
25  that?

Page 15

1    A.  Yes.
2    Q.  Okay.  Thank you.  So did you, yourself,
3  interview Derek Billings?
4    A.  No.
5    Q.  Has anybody done it on your behalf for your
6  testimony today?
7    A.  No.
8    Q.  All right.  So Cynthia told you that's who
9  it was and did Cynthia know anymore about the entry on
10  page 125 of Exhibit 4A?
11    A.  We did not specifically discuss it.
12    Q.  Okay.  Did you discuss anything about the
13  RMS notes relating to John Baltz when you spoke to
14  Cynthia?
15    A.  No.
16    Q.  Okay.  All right.  So you've looked at the
17  documents that are in front of you, the complaints,
18  some other documents, and we'll go to them one by one
19  and then you can tell me if you actually looked at it.
20    You interviewed Cynthia Hunt just for the
21  purpose that you've just told us.  Anybody else that
22  you spoke with about the collection efforts against
23  John Baltz?
24    A.  Christine Pyatt (phonetic).
25    Q.  Okay.  And what's her job title?

Page 16

1    A.  She's a support manager.
2    Q.  Okay.  What department does she work in?
3    A.  Support, collections support.
4    Q.  Okay.  Collection support.  And what would
5  her role be in this, why would you talk to her about
6  John Baltz?
7    A.  Because she manages the credit bureau
8  dispute group.
9    Q.  Okay.  And as the manager of the dispute
10  group, would she be the manager of the person at
11  USBank that responded to the ACDV's that came from the
12  various credit report agencies in this case?
13    MS. SILVERMAN:  Objection, lacks
14  foundation, but you can answer, if you know.
15    A.  Yes.
16    Q.  (Mr. Lyons) Okay.  So who did you talk to
17  Christine about in particular, if anyone?
18    A.  We didn't talk about any individual
19  employees.  I'm not sure I am following your question.
20    Q.  Okay.  Well, you interviewed Christine.
21  She's the supervisor of management collections.  She
22  supervises the dispute group.  You indicated that the
23  members that she supervises at USBank in the dispute
24  group are those who communicate by ACDV with credit
25  reporting agencies; is that true?

Page 17

1    A.  Yes.
2    Q.  Okay.  So when you spoke to Christine, what
3  did you talk about?
4    A.  I was asking her some questions about
5  credit bureau code, codes.
6    Q.  Okay.  Credit bureau codes, any ones in
7  particular that you remember?
8    A.  It was specifically in the '01 and the '02
9  in the ACDV tab.  I just wanted to confirm my under
10  understanding.
11    Q.  Okay.  '01 and '02.  Anything else that you
12  talked about in terms of responses that her department
13  based facts to ACDV or to the credit bureaus?
14    A.  Yes.  We did talk about the process of what
15  they look at and that they do verify against public
16  record.
17    Q.  Okay.  So she told you generally how they,
18  how they operate at the ACDV level; is that correct?
19    A.  Yes.
20    Q.  So you spoke generally about her work, you
21  talked about public records.  Was there anything in
22  particular about public records that you discussed
23  regarding John Baltz when you spoke to Christine?
24    A.  No.
25    Q.  Okay.  Did you discuss in particular an

5 (Pages 14 to 17)

Civil Action Group 763.576.8832

Stephanie Buckley

Page 18

1  operator by the name of Lori Hasenstab,
2  H-A-S-E-N-S-T-A-B.  Did you discuss that person?
3      A.  No.
4      Q.  Okay.  Do you know if Lori Hasenstab still
5  works at USBank?
6      A.  Yes, she does.
7      Q.  Okay.  And is that still her name, Lori
8  Hasenstab?
9      A.  Yes.
10     Q.  Okay.  She didn't get married like Ms. Hunt
11  did?
12     A.  No.
13     Q.  Okay.  Very good.  All right.  So you
14  talked to Christine, talked to Cynthia, anybody else
15  that you interviewed for the purpose of this
16  deposition?
17     A.  Corey Thompson.
18     Q.  Okay.  And what's Lori Thompson do?
19         MS. SILVERMAN:  Corey.
20     A.  Corey.  Sorry.  C-O-R-E-Y.  Corey.
21     Q.  (Mr. Lyons)  Corey Thompson.  And what did
22  you talk to her about?
23     A.  He's a man.
24     Q.  Okay.  Mister.  Okay.
25     A.  I talked to him about the process for

Page 19

1  adding users onto an account.
2      Q.  Okay.  And did you speak to him about
3  Mr. Baltz or just generally speaking about adding
4  users?
5      A.  It was a general conversation.
6      Q.  Okay.  So he did not give you any
7  information about Mr. John Baltz in particular,
8  correct?
9      A.  No.
10     Q.  All right.  When did you conduct these
11  interviews with Christine and Cynthia and
12  Mr. Thompson, is that within the last month or last
13  couple of weeks?
14     A.  Yes.
15     Q.  Okay.  And are they all there at the site,
16  9300, or are they located in other parts of the
17  country?
18     A.  Cynthia is here on-site, Christine is here
19  on-site and Corey Thompson is at a different site.
20     Q.  Okay.  Where would Corey Thompson be?
21     A.  Fargo.
22     Q.  Okay.  And Lori Hasenstab, was she, is she
23  on-site there somewhere in the St. Louis area?
24     A.  Yes, she is.
25     Q.  And did you interview them in person or did

Page 20

1  you do it by phone?
2      A.  Both.
3      Q.  The three individuals?
4      A.  Both.
5      Q.  Did you do them all by -- I'm sorry.  I
6  didn't hear you.  Did you interview them all by phone?
7      A.  No.
8      Q.  Okay.  So who did you see in person?
9      A.  Christine.
10     Q.  Okay.  And is Christine the only one you
11  interviewed in person?
12     A.  Yes.
13     Q.  All right.  Did she show you anything while
14  you were talking to her about the topics you were
15  discussing with her?
16     A.  Did she show me anything?  Well, we looked
17  at the ACDV codes.
18     Q.  Okay.  And I think you mentioned '01 and
19  '02.  Did she discuss any of the other codes with you?
20     A.  No.
21     Q.  Did she talk about her, excuse me -- strike
22  that.  Did Christine speak with you about any of the
23  response codes that USBank would use to communicate
24  back with the credit reporting agencies?
25     A.  Yes, but...

Page 21

1      Q.  Okay.  And what did she tell you about
2  those codes, response codes?
3      A.  Just that they're, you know, like the
4  response code one is the account is accurate as of
5  date reported, two means that some account information
6  was modified, just general information.
7      Q.  Okay.  And she tell you about the delete
8  code?
9      A.  We did not discuss a delete code.
10     Q.  All right.  Okay.  Anybody else that you
11  interviewed other than those three people?
12     A.  No.
13         (Plaintiff's, USBank Deposition Exhibit No.
14  1, Plaintiff's amended notice of taking telephonic
15  deposition of Defendant's Rule 30(b)(6)
16  representatives, was then marked for identification by
17  the reporter.)
18     Q.  Now, let's take a look at Exhibit Number 1.
19  And Exhibit Number 1 should be marked there so that
20  you can see it.
21     A.  Let us just flip to it.  Okay.
22     Q.  What did you say?
23     A.  We were just flipping to the page.  Sorry.
24     Q.  Okay.  Good.  So anyhow, Exhibit 1 is a
25  four pager.  Have you seen this before today?

Stephanie Buckley

Page 22

1    A.  Yes.
2    Q.  Okay.  When did you first see it?
3    A.  I'm not sure when I first saw it but I
4  looked at it yesterday.
5    Q.  Okay.  Now, let's look at the points that
6  are laid out in the exhibit.
7    MR. SILVERMAN:  For the record, Tom, we did
8  object to certain portions of the notice of taking
9  deposition.  I believe we sent that to you.  So if you
10  ask about one of those topics, I will be objecting,
11  but the witness can answer your questions for now.
12    MR. LYONS:  And that's fine, we did get
13  some objections, but let's just kind of go through
14  them and see --
15    MS. SILVERMAN:  That's fine, I just want it
16  on the record, that's fine.
17    MR. LYONS:  Okay.  And we did get your
18  objections.
19    Q.  (Mr. Lyons) All right.  So Ms. Buckley,
20  number A on page 1 of Exhibit 1 says, the facts
21  discussed in the plaintiff's complaint.  Are you ready
22  to testify on behalf of USBank regarding those facts
23  that are set out in the complaint?
24    MS. SILVERMAN:  Objection to the word facts
25  but you can answer.

Page 23

1    A.  Yes.
2    Q.  (Mr. Lyons) Okay.  And then B, all account
3  information related to USBank bank account ending in
4  2818.  Can you speak to that on behalf of USBank?
5    A.  Yes.
6    Q.  Item C, collection records, call notes and
7  history of the account ending in 2818.  Can you talk
8  about that?
9    A.  Yes.
10    Q.  Screen shots of any kind related to the two
11  accounts.  Let's break that up, this is item D.  Have
12  you looked at any screen shots to prepare yourself for
13  today?
14    MS. SILVERMAN:  We did object to the term
15  two accounts because I do not believe there are two
16  accounts at issue in this case.
17    MR. LYONS:  All right.  Good.  Just to the
18  accounts, let's leave it at that.
19    Q.  (Mr. Lyons) Did you look at any screen
20  shots?
21    A.  I did.
22    Q.  Okay.  Now, when I look at the exhibits
23  that are in front of you, what would be screen shots?
24  For instance, would they be in Exhibit 4, for
25  instance, would those be the type of screen shots that

Page 24

1  you looked at or would it be something else?
2    A.  That would be it exactly.
3    (Plaintiff's, USBank Deposition Exhibit No.
4  9, Trans Union document, was then marked for
5  identification by the reporter.)
6    Q.  Okay.  Anything else that are here on these
7  documents, or any of the letters, screen shots, or
8  Exhibit 9, which is a Trans Union document.  I'm not
9  sure whether you've ever seen that or not but take a
10  look at it.  Have you ever seen anything like
11  Exhibit 9?
12    A.  No.
13    Q.  Okay.  So we know Exhibit 4 is a screen
14  shot.  Anything else here that would be a screen shot?
15    A.  Looking through, yes.
16    Q.  Okay.  What would they be?
17    A.  Number seven.
18    (Plaintiff's, USBank Deposition Exhibit No.
19  7, Bates stamped documents USB/Baltz 000155, 156 and
20  157, was then marked for identification by the
21  reporter.)
22    Q.  All right.  Number seven.  I'm sorry.  I
23  should have included that.  Anything else?
24    MS. SILVERMAN:  Well, we don't have one of
25  the exhibits yet which was one of the letters.

Page 25

1    MR. LYONS:  Yes.
2    THE WITNESS:  So assuming that's not a
3  screen shot, right, or should we wait for that?
4    Q.  (Mr. Lyons) All right.  All right.  Then
5  let's go down to credit reporting history information.
6  Is there any kind of a credit reporting history
7  information that you could look at on John Baltz at
8  USBank?
9    A.  Yes.
10    Q.  All right.  And where would that be set
11  out?
12    A.  So within the RMS notes.
13    Q.  Okay.  All right.  RMS notes.  Anywhere
14  else?
15    A.  We did look at the ACDV line, that report
16  that just has the couple of codes on it.
17    Q.  That's --
18    A.  And within the notes.
19    Q.  That would be in Exhibit 4, correct?
20    A.  Yes, maybe.  I don't -- yes, the RMS notes
21  are Exhibit 4 so yes, and then within the notes
22  themselves.
23    Q.  Okay.  Anything in Exhibit 7 that would be
24  about credit reporting history?
25    A.  Let me look, please.  No.

7 (Pages 22 to 25)

Civil Action Group 763.576.8832

Page 26

1    Q.  Okay.  Have you looked at any AUD's or
2  ACDV's about John Baltz?
3        (An off-the-record discussion was held.)
4    Q.  So did you look at AUD's, Ms. Buckley?
5    A.  No.
6    Q.  Okay.  How about ACDV's?
7    A.  No.
8    Q.  And did you look at any of the month
9  information that was reported to any credit reporting
10  agency by USBank about John Baltz?
11    A.  Only in that I looked at RMS to see what
12  RMS is reflecting, is reporting.
13    Q.  Okay.  So if you saw something on RMS, then
14  what would you do?  Would you go outside of the RMS or
15  would you just look at what was on a particular page
16  of the RMS notes?
17    A.  I'm not, I'm not following your question.
18    Q.  This probably could have been my mistake.
19  I thought that when you looked at something in RMS
20  notes, you looked at something else besides the RMS
21  notes to confirm or explain what you saw in the RMS
22  notes, didn't you?
23    A.  No.
24    Q.  Okay.  I misunderstood.  So the things that
25  you've looked at really are essentially the documents

Page 27

1  that are in front of you, the various exhibits that we
2  see here on the table in front of you; is that
3  correct?
4    A.  Correct.
5    Q.  Okay.  Then item E on Exhibit 1, page 1,
6  copies of all written communications, payment
7  histories and charge slips for both, for, we'll just
8  say for the one account, I'm sorry, that's misleading,
9  but the one account.  Is there anything that you
10  looked at in terms of communications, payment
11  histories, and charge slips?
12    A.  I did look at letters.
13        (Plaintiff's, USBank Deposition Exhibit No.
14  6, Letter from USBank dated 6/28/05, was then marked
15  for identification by the reporter.)
16        (Plaintiff's, USBank Deposition Exhibit No.
17  8, 4 letters from USBank Bates stamped TU 000016, 15,
18  18 and 17, was then marked for identification by the
19  reporter.)
20    Q.  Okay.  The letters.  We see those here,
21  they're exhibit, I think 6 and 7, or 6 and 8 that are
22  letters from USBank, correct?
23    A.  I did look at those, yes.
24    Q.  Okay.  Did you look at any letters that
25  John Baltz sent to USBank although they're not

Page 28

1  exhibits here?
2    A.  I don't specifically recall.
3    Q.  Okay.  Did you make any inquiry into the E
4  Oscar process as to what they may have regarding John
5  Baltz and his disputes?
6    A.  Did I, no.
7    Q.  Okay.  And no one that you interviewed had
8  done it either, correct?
9    A.  No.
10    Q.  All right.  Look item G on page 2 of
11  Exhibit 1.  Policy and procedure manuals.  Did you
12  look at any of those policy and procedure manuals for
13  your testimony today?
14    A.  No.
15    Q.  Then ACDV investigations, AUD updating, you
16  didn't look at either of those, correct?
17    A.  No.
18    Q.  Then we see use of Metro II codes, that's
19  something you discussed with Christine, correct?
20    A.  Not specifically Metro II.
21    Q.  Okay.  What codes do you think you were
22  looking at?
23    A.  Oh, I'm sorry, the Metro II codes for the
24  ACDV, yes.
25    Q.  Okay.  And then, and that's, a code is

Page 29

1  method of dealing with disputes through the E Oscar
2  program, you know that generally, correct?
3    A.  Yes.
4    Q.  All right.  Then the next thing in item G
5  on page 2 is opening accounts.  Did you check with
6  Mr. Thompson about opening accounts?
7        MS. SILVERMAN:  Tom, I'm going to insert an
8  objection here.
9        MR. LYONS:  Sure.
10        MS. SILVERMAN:  You're asking about
11  policies and procedure manuals.
12        MR. LYONS:  Yeah.
13        MS. SILVERMAN:  And I think that we're
14  getting a little confused because then you're asking
15  questions that don't relate to policies and procedure
16  manuals.
17        MR. LYONS:  No, I know that.
18        MS. SILVERMAN:  You're talking about
19  conversations.  I think it's a little confusing.
20        MR. LYONS:  If she is confused or she looks
21  confused to you, then please interrupt.
22    Q.  (Mr. Lyons) I'm going onto another area and
23  that is opening accounts.  And is that what you spoke
24  to Mr. Thompson about how to open an account,
25  generally speaking?

8 (Pages 26 to 29)

Page 30

1    A.   I talked to him about adding a co-applicant
2  to an account.
3    Q.   All right.  And then was there any
4  discussion with him about without signatures of the
5  co-applicant, which is the next few words there on
6  page 2 of item G?
7    A.   No.
8    Q.   Okay.  And then how did you talk to him
9  about altering or changing account data after one of
10  the obligors on a card, a credit card, files
11  bankruptcy?
12    A.   Restate your question, please.
13    Q.   Okay.  Did you speak with Mr. Thompson or
14  anybody about altering or changing account data at
15  USBank after one of the obligors on the card files
16  bankruptcy?
17    A.   No.
18    Q.   Okay.  Okay.
19    MR. LYONS:  Get an e-mail from us yet,
20  Ellen?
21    MS. SILVERMAN:  I do.  Except we would need
22  to take a break to get that printed.
23    MR. LYONS:  Okay.  This is probably a good
24  time to get it printed because we're kind of finished
25  with Exhibit 1.  Would that be permissible with

Page 31

1  everybody?
2    MS. SILVERMAN:  That's fine.  Yeah.
3    MR. LYONS:  Good.  Let's get it.  I'll
4  leave the phone open and when you come back, say, hey,
5  I'm back.  Let's go.
6    MS. SILVERMAN:  Okay.  Sounds good.
7    MR. LYONS:  Thank you very much.
8    MS. SILVERMAN:  Thank you.
9    (A short break was then taken.)
10    (Plaintiff's, UsBank Deposition Exhibit No.
11  2, Rule 26(a)(1) Disclosures of Defendant U.S. Bank
12  National Association, was then marked for
13  identification by the reporter.)
14    Q.   (Mr. Lyons) Ms. Buckley, you're still under
15  oath and are you ready to answer some questions?
16    A.   Sure.
17    Q.   All right.  Let's take a look at Exhibit
18  Number 2.  And Exhibit Number 2, do you have it in
19  your hands?
20    A.   I literally do.
21    Q.   This is a Rule 26(a) one disclosure that
22  has been prepared by your attorney and submitted to
23  the Court and we have a copy and so let's go to
24  page 3.
25    MS. SILVERMAN:  Actually, Tom, I don't

Page 32

1  think we submit them to the Court, but we did exchange
2  them with the parties.
3    MR. LYONS:  Okay.  Good.  You're right.  We
4  didn't file it with the Court.
5    Q.   (Mr. Lyons) And Stephanie, and it's
6  Stephanie Ane Buckley, that's your middle name?  Is it
7  Stephanie Ann, did I get that right?
8    A.   Yes, you do.
9    Q.   Okay.  And let's go over to page 4, and
10  your attorney has said that there may be some
11  documents related to the plaintiff's account, which
12  include documents related to the use of the account,
13  and what would be documents that would be related to
14  the use of an account at USBank?
15    A.   Account statements and system records.
16    Q.   Okay.  Account statements, those are the
17  monthly statements to the cardholder?
18    A.   Yes.
19    Q.   And then there would be internal records,
20  which we've already marked as Exhibit 4, and exhibit,
21  excuse me, Exhibit 7, the other notes, correct,
22  USB0155?
23    A.   Yes.
24    Q.   Any other notes that I should know of
25  regarding the use of the account?

Page 33

1    A.   No.
2    Q.   All right.  Then we got the account
3  statements.  You've already told us about that.
4  Payments on the account.  How do the payments on the
5  account show up?  Would they be on the account
6  statement or on some other document?
7    A.   They would be on the account statements.
8    Q.   Okay.  Then the next thing is credit
9  reporting on the account, what would that involve?
10    A.   I'm not sure what you mean by, what would
11  that involve?
12    Q.   Well, on page 4B your attorney has said a
13  description of documents, etc. that would be available
14  or under the control of USBank.  And then it says,
15  documents related to the plaintiff's account.  We've
16  gone through that.  And then it says credit reporting
17  on the account, do you know what that means?
18    A.   Like you're referring to the RMS credit
19  reporting status codes?
20    Q.   No, no, that's collection records, that's
21  kind of the fifth item that's listed.  But just to the
22  left of that where it says, credit reporting on the
23  account comma.  Do you know what that means?
24    A.   Within the collection records are status
25  codes which indicate credit reporting.

9 (Pages 30 to 33)

Stephanie Buckley

Page 34

1      Q.   Okay.  So you're referring back then to the
2  RMS notes, right?
3      A.   Yes.
4          (Plaintiff's, USBank Deposition Exhibit No.
5  3, Summons, was then marked for identification by the
6  reporter.)
7      Q.   Okay.  All right.  Then let's take a look
8  at Exhibit Number 3.  And Exhibit Number 3 starts off,
9  it's a summons, then the next page is a complaint, and
10  on page 1 there is a list of several pages, it goes
11  from one to almost the bottom of page 4, and it's
12  paragraph 4 through 30.  So you can kind of just see
13  what I'm shooting at, and those are factual
14  statements.  So let's see what you know about the
15  facts that have been alleged.  You can look
16  paragraph four.  Do you know the birth date of John
17  Baltz?
18      A.   Do I know the birth date of him?  I think
19  that may be in our records somewhere.  Off the top of
20  my head, no.
21      Q.   Okay.  In May of 1988, was a minor.  Can
22  you agree with that or do you just not know about it?
23      A.   I'd have to look at his date of birth.
24      Q.   Okay.  Now, in May of 1988, plaintiff's
25  great aunt, Mary Kay Patterson opened an account,

Page 35

1  which is this account, I think it's 28, ending in
2  2818.  Are you aware of that?
3      A.   Yes.
4      Q.   And at that time, she has said that she
5  applied for an individual credit card.  Do you know
6  whether that is accurate or not?
7      A.   Yes.
8      Q.   Then in paragraph six, this is on page 2,
9  defendant processed Patterson's individual credit
10  application and granted her credit.  How does credit
11  get granted by USBank when someone seeks a credit
12  card?
13      A.   How does it get granted, via the credit
14  card itself.
15      Q.   Okay.  But how do you determine whether
16  that person is credit worthy to get a credit card from
17  USBank?
18          MS. SILVERMAN:  You're speaking generally,
19  not specific to Mary Patterson, right?
20          MR. LYONS:  Well, yeah, we can start
21  generally, yes.
22      Q.   (Mr. Lyons) Generally, let's talk about
23  that.
24      A.   Generally a review of the applicant's
25  credit takes place as well as a review of the

Page 36

1  application.
2      Q.   Okay.
3      A.   The address, making sure it's filled in for
4  completeness.  Do they have an income ability to
5  repay.
6      Q.   All right.  And how would you know about
7  the income, where does that, is that something that
8  the applicant has to put on the card or do you find it
9  out from some other source?
10      A.   It can be asked on the application.
11      Q.   And where else?
12      A.   It may be included in the credit file if
13  they are employed.
14      Q.   Okay.  All right.  Anything else that needs
15  to be analyzed by USBank before a credit card is
16  extended to an account holder?
17      A.   Not that I can think of, no.
18      Q.   And as, just as an aside, do you do the
19  same kind of a credit check on an authorized user who
20  is not obligated on the account?
21      A.   No.
22      Q.   Okay.  Let's go down to number seven.  In
23  1988 Mr. Baltz has indicated that he was a minor at
24  the time that Ms. Patterson applied for the card.  Let
25  me ask you:  Do you extend credit to individuals who

Page 37

1  are a minor under the age of 18 in the state in which
2  they reside?
3      A.   No.
4      Q.   Now, from the records that you have looked
5  at, there's a statement in paragraph eight that says
6  that Mary Patterson contacted the defendant, USBank,
7  and requested to add both plaintiff and his brother,
8  Patrick, as authorized users on the account.  Do the
9  records that you have looked at in any way show
10  Patrick's name on the account as an authorized user?
11      A.   There are notes that indicate Patrick was
12  removed as an authorized user.
13      Q.   Okay.  I notice the removed part but is
14  there anything about adding him as an authorized user?
15      A.   I don't recall seeing that.
16      Q.   Okay.  And then how about John, is there
17  any document that shows how John was added either as
18  an authorized user or as an obligor on the card?
19      A.   I do not have a document in front of me
20  that indicates that, no.
21      Q.   Okay.  Would it be true that at some point,
22  USBank issued cards to both Patrick and plaintiff to
23  use credit sponsored by USBank?
24      A.   Yes.
25      Q.   Okay.  And what kind of numbers would those

10 (Pages 34 to 37)

Civil Action Group 763.576.8832

Page 38

1  cards bare?  Would they have different numbers or the
2  same number that Ms. Patterson had?
3       A.  It's one account, all the credit cards
4  would have the same number on them.
5       Q.  Okay.  Now, from the records that you've
6  looked at, did Patrick Baltz, that's the brother of
7  John Baltz, did he appear to use the card over the
8  years following the issuance of the card to him as an
9  authorized user?
10      A.  I don't know.
11      Q.  Okay.  There aren't any records that show
12  that, correct?
13      A.  None that I have in front of me, no.
14      Q.  Okay.  And the only record that you really
15  have is that he was removed as an authorized user at
16  some point shown in the RMS notes, correct?
17      A.  Correct.
18      Q.  Paragraph number 11, were accounts sent to
19  Peterson in her name and at her address in Roseville,
20  Minnesota?
21      A.  What are you asking me?
22      Q.  Have the account statements been sent to
23  Mary Patterson on account ending in 2818 in her name
24  only and to her address in Roseville, Minnesota?
25      A.  No.

Page 39

1       Q.  Okay.  To whom were they sent?
2       A.  I believe they were sent to both her and
3  John Baltz.
4       Q.  Were you aware that John has stated
5  that he has never lived in Roseville, Minnesota?
6       A.  No.
7       Q.  Do you know anything about what John has
8  told USBank regarding where he lives and has lived?
9       A.  Yes.  I know that there are some notes
10  related to that.  I can't recall specifically off the
11  top of my head what each one says though.
12      Q.  Okay.  They would be shown in the RMS
13  notes?
14      A.  Correct.
15      Q.  Okay.  Now, at some point with respect to
16  credit reporting, did the USBank report that Mary
17  Patterson was an obligor on the credit card ending in
18  2818?
19          MS. SILVERMAN:  Could you repeat that?  I'm
20  sorry.
21          MR. LYONS:  Go ahead, Amy, read that back.
22  Amy, would you, please, read that back.
23          THE COURT REPORTER:  Yes.
24          (Whereupon, the last question was then read
25  by the reporter as follows:  "Okay.  Now, at some

Page 40

1  point with respect to credit reporting, did the USBank
2  report that Mary Patterson was an obligor on the
3  credit card ending in 2818?"
4       A.  Yes.
5       Q.  (Mr. Lyons) Okay.  And would that be
6  revealed in any records that you've looked at other
7  than the RMS notes?
8       A.  Well, by virtue of the fact that her name
9  is on the statements, she would have been reported to
10  the credit reporting agency each month.  So I did
11  review statements.
12      Q.  Okay.  And are you aware that USBank has
13  the opportunity to access the credit history of those
14  persons who have credit from USBank?
15      A.  Yes.
16      Q.  And do you know if that's done on a regular
17  basis, is it done monthly, or quarterly, or annually?
18      A.  There are periodic credit bureau checks for
19  line increases.  So for changes to the account.  It
20  then, not on a regular basis, but it would also be
21  done as part of collection efforts or could be done as
22  part of collection efforts.
23      Q.  Okay.  Do you know if any such credit
24  checking was done by USBank after the card ending in
25  2818 was opened by Mary Patterson?

Page 41

1       A.  I did not specifically look for that.
2       Q.  Okay.  Would it be set out in the RMS
3  notes?
4       A.  If as part of the collection efforts a
5  credit bureau was pulled, it could be in the RMS
6  notes, yes.
7       Q.  Okay.  Is there anywhere elsewhere it would
8  be located if a matter was not in collection at the
9  time the credit was reviewed?
10      A.  I don't know the answer to that.
11      Q.  Okay.  Who would know?
12      A.  Someone in our account initiation
13  department or potentially in our risk area.
14      Q.  Would that be in, would that be Corey
15  Thompson's department or somebody else?
16      A.  Corey Thompson might be able to answer that
17  question, yes.
18      Q.  Okay.  Because he works in Fargo and he
19  understands about the process of the adding users to
20  accounts, correct?
21      A.  Yes.
22      Q.  Okay.  Now, would there be separate records
23  showing separate from the RMS records?
24          MS. SILVERMAN:  Showing what?  I'm sorry.
25  Objection, vague.

11 (Pages 38 to 41)

Stephanie Buckley

Page 42

1      Q.   (Mr. Lyons) Okay.  Do you understand it,
2  Ms. Buckley?
3      A.   No.
4      Q.   Well, RMS is recovery management, and
5  that's usually when an account is late or unpaid,
6  correct?
7      A.   Correct.
8      Q.   All right.  So is there another set of
9  records that show what happens to an account, account
10 gets open, somebody gets added, somebody gets
11 withdrawn, etc., other than the RMS notes themselves?
12     A.   Yes.
13     Q.   Okay.
14     A.   Exhibit 7 would also show that.
15     Q.   All right.  Say that again, I was getting
16 ready to talk and I was not listening with my mouth
17 open.  I'm sorry.  What did you state?
18     A.   Exhibit 7 would also show that.
19     Q.   Oh, okay.  Exhibit 7.  Anything else
20 besides that?
21     A.   Ask your question again.
22     Q.   Okay.  In terms of adding or changing an
23 account, other than what is set out in the RMS notes,
24 are there other notes that would contain that kind of
25 information of adding, or withdrawing, or whatever in

Page 43

1  terms of an account that is not subject to the RMS
2  process, which is recovery management, correct?
3      A.   Correct.
4      Q.   Okay.  So when we look at Exhibit 7, what
5  is the title of that?  It says at the top it's an
6  untitled document but in reality, what do you all call
7  it at USBank?
8      A.   I would call it an ICS screen print.
9      Q.   Okay.  ICS, and what does the I stand for?
10     A.   Integrated.
11     Q.   Integrated.  What's the C stand for?
12     A.   Card.
13     Q.   And the S is what?
14     A.   System.
15     Q.   And when would the ICS screen shot that we
16 see here in Exhibit 7, when would that be created?
17          MS. SILVERMAN:  Sorry, Tom, are you
18 referring to this specific Exhibit 7?
19          MR. LYONS:  Yes.
20     Q.   (Mr. Lyons) Exhibit 7, does that exist
21 without being reduced to a hard copy that we see here
22 as Exhibit 7 or does it have to be created at some
23 particular time?
24     A.   No, that's, that's a screen shot of the
25 system.

Page 44

1      Q.   Okay.  And this is a screen shot of the
2  system and why does it exist for John Baltz, can you
3  tell us that?
4      A.   Yes, because he's an obligor on the
5  account.
6      Q.   Okay.  He's an obligor on the account.  So
7  when was this created?
8      A.   I'm not sure what you mean by created.
9      Q.   John Baltz has been in the ICS system since
10 when?  When would be the start date, when he became,
11 when he was on the card, or when the payments went
12 late, or when Mary Patterson became bankrupt, or what
13 would be the triggering date that would get Mr. Baltz
14 onto the ICS system?
15     A.   The triggering event would have been when
16 he became a co-applicant on the account.
17     Q.   Okay.  So when you look at Exhibit 7, can
18 you tell when he became a co-applicant?
19     A.   No.
20     Q.   Pardon me?
21     A.   No.
22     Q.   Okay.  Is there some document somewhere
23 that would show when he became a co-applicant?
24     A.   There probably was a document but the
25 document does not exist anymore.

Page 45

1      Q.   All right.  Are you acquainted with the
2  retention policy at USBank?
3      A.   We do have a retention policy, yes.
4      Q.   So if someone applies for credit as an
5  account holder, an obligor on the account, what is the
6  time period during which that document exists, is it,
7  you know, one year, two years, 85 weeks, is there
8  some --
9      A.   Generally, I believe, it's 27 months.
10     Q.   Okay.  27 months.  And that's, if someone
11 applies, it requires a signature, I think you said
12 that earlier, correct?
13          MS. SILVERMAN:  I don't believe she did,
14 but she can testify to it if you'd like.
15     Q.   (Mr. Lyons) Okay.  Does the application as
16 an obligor require a signature of some kind?
17     A.   Yes, but you can also apply for an account
18 online now.  I don't think back in 1988 that that was
19 available.
20     Q.   When do you think that apply online took
21 place?
22     A.   I honestly don't know.
23     Q.   All right.  So in terms of the obligation
24 that would be held for 27 months, let's say it was a
25 written application, would there be a credit report,

12 (Pages 42 to 45)

Civil Action Group 763.576.8832

Stephanie Buckley

**Page 46**

1  or is it a one sheet paper where someone signs for and
2  applies it, and then the bank checks the credit and
3  confirms the credit, is that all on a sheet, or two
4  sheets, or how many sheets would be involved in that
5  application process before a card is issued?
6      A.  All right.  So generally speaking, a credit
7  card application is a single page.
8      Q.  All right.  And does the credit, does the
9  approval of credit also get affixed to that page by
10  someone at USBank or is there a separate page that
11  grants credit to the applicant for credit?
12      A.  I don't know.
13      Q.  All right.  So the application is usually
14  one page?
15      A.  Yes.
16      Q.  All right.  And are you aware of why the
17  retention is 27 months on such a credit application?
18      A.  No.  The retention periods are set by
19  USBank's legal department and corporate.
20      Q.  Okay.  Okay.  All right.  Let's take a look
21  at the next exhibit.  Okay.  Sorry.  Let's just stay
22  with Exhibit 3 again.  Turn over to page 3 out of
23  exhibit, it's actually, it's actually the fourth page
24  of Exhibit 3, but it's got number three at the bottom
25  and it starts up at the top with paragraph number 18.

**Page 47**

1  Do you have that in front of you?
2      A.  Yes.
3      Q.  If we look at Exhibit 7, which is the ICS
4  system, what we -- let's go down line by line on
5  Exhibit 7.  So we were on Exhibit 3 and now let's go
6  to Exhibit 7.  We've got John Baltz.  We got bad debt,
7  and we got DRS on that line.  Who puts that
8  information onto the ICS, someone at USBank or is it
9  outside of USBank?
10      A.  Well, it's, they're USBank records so it
11  would be USBank.
12      Q.  Okay.  And bad debt means what?
13      A.  Means the account has been charged off,
14  that's a systemic status code changed to the account.
15      Q.  Okay.  And then DRS what does that mean?
16      A.  DR and S are aux codes.  I would have to
17  look up specifically what that means.
18      Q.  Is that a code used within the ICS system?
19      A.  Yes.
20      Q.  And generally, what does it refer to?
21      A.  I can't answer that generally.  There are
22  at least a hundred aux codes.  I would have to look
23  these up to see what they mean systemically.
24      Q.  You say office code, O-F-F-I-C-E?
25      A.  No, I'm sorry.  It's an aux code, A-U-X or

**Page 48**

1  auxiliary code, but we call it aux code.
2      Q.  Okay.  I got it.  Then under bad debt, it
3  says MC-G what is that?
4      A.  MasterCard Gold.
5      Q.  MasterCard Gold.  And MasterCard Gold means
6  what, does that talk about credit limit, or years of
7  service, or what would that be?
8      A.  Really?  A MasterCard is a type of account.
9  So revolving cards are generally Visa and MasterCard.
10  This was a MasterCard account and it was a gold card.
11      Q.  And what does the gold mean?
12      A.  It means you're a gold customer.
13      Q.  And further than that, what does it mean?
14  Does it mean that you have a higher credit rate or a
15  lower interest rate?
16      A.  Generally, it's based on your credit score,
17  yes.
18      Q.  Okay.
19      A.  Or what you applied for.
20      Q.  Okay.  And is that shown anywhere on this
21  document, any one of these pages, there's three pages
22  here?
23      MS. SILVERMAN:  Objection.  Is what shown?
24      MR. LYONS:  Yes, credit score.  What credit
25  score?

**Page 49**

1      MS. SILVERMAN:  Oh, okay.
2      Q.  (Mr. Lyons) Is there any credit score
3  information on here?
4      A.  Just a moment, please.  I don't believe the
5  specific credit score is shown on here.
6      Q.  Is there anything with respect to his
7  credit worthiness that's on Exhibit 7?
8      A.  John Baltz's credit worthiness?
9      Q.  Yes.
10      A.  No.
11      Q.  Okay.  So we've got his address, his
12  apartment, zip code, and all that down at the
13  left-hand margin, and then going over to the center it
14  says, location, 06245 member.  What does that mean?
15      A.  Location code sometimes refers to how the
16  account was opened or where the account was opened.
17  So if they went into a specific branch, the location
18  code would indicate that branch number.
19      Q.  Okay.  So finding out that location, I'd
20  have to talk to who?
21      A.  I would have to look that up.
22      Q.  Okay.  Is that something you can look up
23  right where you are now or how would you have to go
24  about that?
25      A.  I could not do it from here, no.  I'm in a

13 (Pages 46 to 49)

USB App 31

Page 50

1   conference room and I don't have a computer terminal
2   in front of me.
3       Q.  Okay.  But can you do it from your desk?
4       A.  Yes.
5       Q.  Okay.  And then a member, what does the
6   member mean?
7       A.  It's the member since 05 of '88.
8       Q.  Okay.  And whose the member referring to,
9   is that referring to John Baltz?
10      A.  The member is referring to the account has
11  been opened since 1988.
12      Q.  Okay.  So member means account, doesn't
13  mean an individual; is that correct?
14      A.  Yes.
15      Q.  Let me go down to the next line.  There's a
16  phone number and then there's opened 10-01, and what
17  does that mean?
18      A.  That looks like there may have been a lost
19  or stolen on this account in which the credit card
20  number was, had to be changed.  But I'd have to look
21  in more detail on that.
22      Q.  Okay.  But if the credit card, when we look
23  at RMS, I think the same card has been collected on as
24  2818, and it was also opened originally from the
25  account notes that you looked at, it's always been

Page 51

1   2818, the ending numbers, correct?
2       A.  Yes.
3       Q.  Okay.  And usually when there's a lost or
4   stolen credit card, there is a change in the number,
5   correct?
6       A.  Usually, yes.
7       Q.  All right.  And if there isn't a change in
8   the number, is there some explanation made why there
9   is no change in the number when it's lost or stolen?
10      A.  I believe sometimes if the entire balance
11  is based on that and the customer doesn't want an
12  account reissued, they may not provide a new account
13  number.  But I'd have to consult with our front area
14  for more specifics.
15      Q.  And then the opened in 10-01, what does
16  that mean?
17      A.  I believe that that's referencing the, this
18  particular account number as a change from prior, but
19  I'd have to look that up to be...
20      Q.  So the 10-01 opened would relate to reason
21  EST, lost or stolen, correct, that all go together?
22      A.  I have to verify that to be a hundred
23  percent sure.
24      Q.  All right.  What does the EST mean in that
25  line?

Page 52

1       A.  I do not know.  I think it means
2   established but I do not know for sure.
3       Q.  All right.  And established means that
4   someone notified USBank of a lost or stolen credit
5   card, would that be true?
6       A.  Yes.
7       Q.  And then below stolen there's a word CIT,
8   do you know what that means?
9       A.  CIT generally refers to change in terms.
10      Q.  Change in terms.  Now, what does that
11  usually imply, change in terms?
12      A.  It usually implies that some disclosure was
13  sent out, something changed on the account.
14      Q.  Okay.  Change on the account or would there
15  be an increase in rates or is that not part of the
16  change in terms?
17      A.  That could be part of a change in terms.
18      Q.  Okay.  And limit on the card, would that
19  also be a part of change in terms?
20      A.  It could, in fact, be, yes.
21      Q.  And if you added an authorized user, would
22  that also be a change in terms?
23      A.  No.
24      Q.  Why not?
25      A.  Because the terms on the account have not

Page 53

1   changed.
2       Q.  But the authorized user who can use the
3   card, that is a change, correct?
4       MS. SILVERMAN:  Objection, asked and
5   answered.
6       Q.  (Mr. Lyons) Okay.  Go ahead, ma'am, an
7   authorized user would be a change in terms; is that
8   correct?
9       A.  No.
10      Q.  How would it be possible for Patrick, for
11  instance, Patrick Baltz to use the card, would that
12  require some kind of a change in the way that the
13  cards are processed or no?
14      A.  Well, he could not use this account, it's
15  charged off as a bad debt.
16      Q.  Well, okay, at that time, but this says --
17  I'm sorry.  I'm a little bit confused.  Let's go back
18  to opened.  10-01, reason, established, lost or
19  stolen, was the card closed at 10-01?
20      A.  I don't have that information in front of
21  me.
22      Q.  Okay.  Would, does the RMS code tell us
23  when the account went late or was not being paid or
24  got charged off?
25      A.  Yes, it could tell us that.  I don't know

14 (Pages 50 to 53)

Stephanie Buckley

Page 54

1  specifically which screens are there, but, yes, it
2  could tell us that.
3      Q.  Okay.  Then let's take a look through
4  there.  I don't know how far back this RMS goes.
5  Looks like it's back in '03.
6          MS. SILVERMAN:  Are you looking at
7  Exhibit 4 now, Tom?
8          MR. LYONS:  Yeah, Exhibit 4.
9          MS. SILVERMAN:  Okay.
10     Q.  (Mr. Lyons) Look at 154 and 153.
11  Would it seem to you that this thing was created back
12  in '03 or '04, this RMS?
13     A.  I'm not sure what you mean when you say
14  created.
15     Q.  Well, there doesn't seem -- we know that
16  the card was open in 1988, correct?
17     A.  Uh-huh.
18     Q.  Are there any -- is there any RMS that
19  exist between '88 and 2003, which is an entry shown on
20  00154?
21     A.  I'm not following what he's saying, but I
22  don't -- no, I don't think so.  But I'm not completely
23  following what you're looking at and what you're
24  asking me.
25     Q.  Okay.  Well, let's look at USBaltz-000154,

Page 55

1  which is part of Exhibit 4, the last page.  There's
2  some entries there from April of 2004 and May of 2003.
3      A.  That's not my last page.
4          MS. SILVERMAN:  Hold on.  We're looking at
5  two different exhibits to try to connect them.  So it
6  takes a couple of seconds.  Sorry.
7          MR. LYONS:  4A is kind of illegible.
8          MS. SILVERMAN:  Right, right.
9          MR. LYONS:  4B might show the page.
10         MS. SILVERMAN:  All right.  We've got it.
11     Q.  (Mr. Lyons) Okay.  When you look at the
12  page that's got the date on it of 5-07-03, do you see
13  that?
14     A.  Yes.
15     Q.  And then another entry is 4-26-04.  I don't
16  see anything in the RMS notes that I have, which is
17  Exhibit 4A, or 4B, I don't have 4B, but I'm assuming
18  it's similar, I don't see anything that marks earlier
19  than '03, do you?
20     A.  No, not with what I'm looking at, no.
21     Q.  Okay.  So when we look at Exhibit 7, and it
22  talks about opened '01, reason EST, lost or stolen,
23  change in terms, what would the meaning of that be?
24  That card was not a bad debt in 10,000 or in October
25  of 2001, was it, the card number, or ending in 2818?

Page 56

1      A.  No.
2      Q.  All right.  So at some point, it became a
3  bad debt card, correct?
4      A.  Yes.
5      Q.  And when it became a bad debt card, is that
6  when these entries were made in the ICS system?
7      A.  What entries?
8      Q.  The entries we're looking at in Exhibit 7?
9      A.  No.
10     Q.  Okay.  So what was entered first, and based
11  on your experience, what year was entered first in the
12  ICS system?
13     A.  I'm very sorry.  I am not following what
14  you're asking me.
15     Q.  Okay.  We're looking at a hard copy here of
16  Exhibit 7, which is part of the ICS system, correct?
17     A.  Correct.
18     Q.  All right.  When would the first entry into
19  the ICS system on John Baltz be made?
20     A.  When he was added as a co-applicant.
21     Q.  And when was that?
22     A.  I do not have that date.
23     Q.  Okay.  What, when you look at Exhibit 7,
24  what would be the first entry that was made in the ICS
25  system on John Baltz shown in Exhibit 7?

Page 57

1      A.  I'm sorry.  I'm still not following what
2  you're trying to ask me here.
3      Q.  Okay.  How does a person -- how does John
4  Baltz get entered into the ICS system?
5      A.  Oh, how does he get entered?
6      Q.  Yes.
7      A.  Okay.  When we received the form for him to
8  be added as a co-applicant or joint owner of the
9  account, he would have been entered into the system.
10     Q.  Okay.  Now, knowing that, is there anywhere
11  on Exhibit 7 that tells you when that occurred?
12         MS. SILVERMAN:  Objection, asked and
13  answered.  Go ahead.
14     A.  No.
15     Q.  (Mr. Lyons) All right.  Do you know a
16  reason why it's not something that you can see on
17  Exhibit 7?
18     A.  It's not a field on the system.
19     Q.  Okay.  So looking at this, and there's
20  another record in here that says apparently Mr. Baltz
21  was added before 2003.  Were you aware of that?
22         MS. SILVERMAN:  Are you referring to
23  another exhibit?
24         MR. LYONS:  Yes.  Somewhere.
25     Q.  (Mr. Lyons) But based on your experience

15 (Pages 54 to 57)

Stephanie Buckley

**Page 58**

1 looking at this account, looking at these records,
2 Mr. Baltz was added at sometime before 2003; is that
3 correct?
4    A.   Based on the information in the letter,
5 yes.
6    Q.   Okay.  Now, having that in mind, what would
7 be the first entry on ICS that is shown on Exhibit 7
8 either by a line, or a page, or something that shows
9 when an entry was made in the ICS system for John
10 Baltz?
11    A.   I don't understand what you're asking.
12    Q.   Okay.  Well, his name and address
13 apparently was entered in the ICS system when he
14 became a joint holder according to USBank; is that
15 true?
16    A.   Yes.
17    Q.   The bad debt that we see at the top, that
18 wasn't put on when he first was added to the ICS
19 system, correct?
20    A.   No, that was added when he stopped paying.
21    Q.   All right.  And then the 10-01, opened 10
22 slash 01, reason, lost or stolen, and change in terms.
23 When would that have been entered into the ICS system?
24    A.   In 10 of '01.
25    Q.   Pardon me?

**Page 59**

1    A.   In 10 of '01.
2    Q.   All right.  Is there anything on this
3 document, ICS system regarding John Baltz that
4 indicates that anything was added before 10, excuse
5 me -- strike that.  Is there anything on Exhibit 7
6 that shows any entry earlier than October of 2001?
7        MS. SILVERMAN:  Objection, I think she's
8 already testified to that.
9        MR. LYONS:  Well, it's okay.
10    Q.   (Mr. Lyons) Go ahead.
11    A.   I don't know if I have or haven't.  I'm
12 very confused.  I apologize.  I just don't...
13    Q.   Well, does this get, does this IC system
14 get amended or added to from when it is first created?
15    A.   Yes.
16    Q.   Okay.  Now, you believe that this was
17 created in October of 2001, correct?
18    A.   No.
19    Q.   You think it was created when he became a
20 holder of the account, correct?
21    A.   No.  The screen would have existed from
22 when the account was opened.
23    Q.   So that would be back in May of 1988?
24    A.   Right.
25    Q.   Okay.  And John Baltz's name got on that

**Page 60**

1 account at some time, but USBank does not know when he
2 was added to this account, correct?
3    A.   Correct, sometime prior to 2003.
4    Q.   Okay.  And that's based on one of the
5 letters that we'll look at in a second; is that true?
6    A.   Yes.
7    Q.   Okay.  So let's go down, we've got a
8 previous production on, under the phone number, it
9 says:  PREV PROD 744.  Do you know what that means?
10    A.   Looks like it's referring to the previous
11 product code.
12    Q.   And what would a previous product code be?
13    A.   744.
14    Q.   And what does that mean?
15    A.   I would have to look it up.
16    Q.   And is that on the auxiliary code or some
17 other code?
18    A.   That's a product code, it's not an aux
19 code.
20    Q.   Okay.  And just off the top of your head,
21 you can't make out what 744 means?
22    A.   No.
23    Q.   What generally would it mean in terms of
24 what products were available?
25    A.   It generally refers to the terms of the

**Page 61**

1 account.  So the interest rate, the fees that would be
2 applicable on the account, that type of thing, that's
3 what the product code represents.
4    Q.   And would an authorized user be part of a
5 previous code?
6    A.   I don't know what you mean by that.
7    Q.   Well, you said the terms, that would be the
8 interest rate, limit, and all that.  Would a person
9 who is an authorized user, would that be part of the
10 product 744 or whatever number might apply to that?
11    A.   Your question doesn't make sense.  I'm
12 sorry.
13    Q.   Okay.  Previous product has nothing to do
14 with an individual using the card; is that your
15 testimony?
16    A.   Correct.
17    Q.   Okay.  Then let's go down to card active
18 5-25-2004.  What does that mean?
19    A.   I believe that refers to the active date of
20 the last cards that were mailed.
21    Q.   Okay.  And do you know if that was mailed
22 to Patrick or to John Baltz or to Mary Patterson?
23    A.   Well, if each of them were listed on the
24 account, they would have each gotten one.
25    Q.   All right.  But do you know the reason why

16 (Pages 58 to 61)

Civil Action Group 763.576.8832

USB App 34

Stephanie Buckley

Page 62

1  5-25-04 appears, we know that that's because a card
2  was issued, but do we know why?
3      A.  My assumption would be that cards expire
4  periodically and new ones are sent.
5      Q.  Okay.  Any other one besides a new one was
6  sent, would there be any other reason?
7      A.  Not that I'm aware of.
8      Q.  All right.  Then below that is SRC05001.
9  What does that mean?
10     A.  I am not familiar with that code.
11     Q.  All right.  Then the next line is SS number
12  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, and that is a Social Security Number
13  that's associated with John Baltz?
14     A.  Yes.
15     Q.  Okay.  Then there's a word next to it, it
16  says unknown.  What does that field usually have in it
17  if not the word unknown?
18     A.  Actually it usually has unknown because we
19  don't usually populate the income in there, which is
20  what the INC means immediately following the unknown.
21     Q.  All right.  So that's income?
22     A.  Yeah.
23     Q.  And usually that's something that is
24  determined when an obligor applies for a card; is that
25  correct?

Page 63

1      A.  That's something usually provided.
2      Q.  Okay.  And then we've got the next thing is
3  unknown, does that go with DEPS?
4      A.  That might go with dependents, I would have
5  to clarify that.
6      Q.  Okay.  What does the unknown mean?
7      A.  It might mean we don't know if there's any
8  dependents.
9      Q.  And then the zero goes with what?
10     A.  It may go with age or it may go with
11  dependents.  I would have to do some verification on
12  that.
13     Q.  Then we go over to age and there's an
14  unknown there.  What, why would age be important to
15  USBank?
16     A.  We don't generally populate this field,
17  it's a field that was created when the system was made
18  or programmed years ago.
19     Q.  Okay.  And I suppose you don't want to
20  issue a card to a minor, correct?
21     A.  Correct.
22     Q.  I didn't hear your answer, excuse me.  Is
23  that correct?
24     A.  I said correct, yes.
25     Q.  Okay.  And then we've got another unknown

Page 64

1  next to it and what would that apply to?
2      A.  I'm not sure.  I would have to...
3      Q.  Look that up?
4      A.  Yep.
5      Q.  Okay.  Then we go down to the next, we go
6  to number card, three, fee.  What does that mean,
7  number card, three, fee?
8      A.  The number of cards issued was three.
9      Q.  Okay.  And then the fee, what does the fee
10  mean?
11     A.  In that particular area, I'm not sure.
12     Q.  Okay.  And then it says waive?
13     A.  Waived zero.
14     Q.  What does that mean?
15     A.  Yeah, it seems to be indicating that
16  there's no need to waive a fee but I would have to
17  verify that information.
18     Q.  Then we have statement X, what does that
19  mean?
20     A.  I am not sure what the X means, but the C
21  is referring to the default design of the statement.
22     Q.  Okay.  Okay.  So the C design, what is C
23  design, do you know what that means?
24     A.  It's the default design of the statement.
25     Q.  Okay.  Is there only one form of statement

Page 65

1  or would there be other reasons for having different
2  forms of the statement design?
3      A.  There would be other reasons for having
4  different designs on the statement.
5      Q.  So that would be like for a business card
6  or something like that?
7      A.  Correct.
8      Q.  Okay.  Anything else besides business or
9  personal?
10     A.  It could be an alawn (phonetic) account,
11  which are issued by USBank.
12     Q.  Okay.  Anything else?
13     A.  It could be a joint issuance partner, it
14  could be an affinity account, any of those things.
15     Q.  A joint issuance partner, would be what?
16  There would be USBank and some other entity?
17     A.  Yes.
18     Q.  Like what, a college?
19     A.  It could be a college, sure.
20     Q.  All right.  Then let's go to ESOM, do they
21  go together?
22     A.  I don't know what the ESO stands for.  So I
23  can't say for sure.
24     Q.  Okay.  Then the letter DU, or the words DUN
25  do you know what that means?

17 (Pages 62 to 65)

USB App 35

Stephanie Buckley

**Page 66**

1   A.   No.
2   Q.   Okay.  Filmed number, does that mean
3   anything?
4   A.   No.
5   Q.   Let's go down to the next level.  We've got
6   pin, P-I-N, what does that mean?
7   A.   I believe it's referring to the pin
8   associated with an account for if you wanted to make
9   cash advances.
10   Q.   Okay.  And then EA means what?
11   A.   I don't know.
12   Q.   Okay.  And then TYP, what does that mean?
13   A.   I believe it means type.
14   Q.   And then IC, what does that mean?
15   A.   I believe it's referring to the overdraft,
16   there may have been an overdraft product on this
17   account.  I would have to look.
18   Q.   All right.  And that's, IC overdraft is
19   behind it, correct?
20   A.   Yes.
21   Q.   The next word I mean.  And IC, do you know
22   what IC means, those letters?
23   A.   No.  I'd have to look that up.  I believe
24   that refers to some type of an overdraft product but
25   I'd have to inquire.

**Page 67**

1   Q.   And then there's a 0 behind it.  So does
2   that mean that there would be no such overdraft
3   product?
4   A.   I could not confirm that.  So I would have
5   to look it up.
6   Q.   All right.  Then next thing is cash Y, what
7   does that mean?
8   A.   Were they available to take cash advance.
9   Q.   All right.  And then the bank number, what
10   does that refer to?
11   A.   It can refer to a branch that the account
12   is affiliated with.
13   Q.   Okay.  And that would be a USBank branch?
14   A.   Yes, generally speaking.
15   Q.   Okay.  And then MONREJ, what does that
16   mean?
17   A.   I do not know.  I'd have to find out.
18   Q.   All right.  And then DCN, do they go
19   together DC space N?
20   A.   I don't know.
21   Q.   And we are looking at 0155 of Exhibit 7,
22   just to keep the record current.  All right.  Then we
23   go down to the next line part and there's a
24   percentage.  What does that mean?
25   A.   That would refer to a participating

**Page 68**

1   financial institution, if there was one, that was
2   participating with us on the account.
3   Q.   Okay.  And then we see 00.  So there
4   probably is no partnership, correct?
5   A.   Correct.
6   Q.   And then CUR 15,858.84, what does that
7   mean?
8   A.   It's referring to the balance.
9   Q.   Then high credit, or HICR, what does that
10   mean?
11   A.   High credit.
12   Q.   And what is the high credit on this card?
13   A.   $19,484.
14   Q.   All right.  And then LST ACT 1/31/06, what
15   does that mean?
16   A.   Last activity.
17   Q.   Okay.  And what would the last activity
18   have been, a charge or a payment?
19   A.   I don't know.  I'd have to look at
20   statements.
21   Q.   And then we go over to CRSCR 1000, what
22   does that mean?
23   A.   I do not know.
24   Q.   Okay.  Then we go back to the left margin,
25   available credit, what is that, 674, what does that

**Page 69**

1   mean?
2   A.   647.
3   MS. SILVERMAN:  647.
4   A.   It's referring to how much available
5   credit, how much available is in the credit line.
6   Q.   (Mr. Lyons) Okay.  And what, can you tell
7   from looking at that where the credit line is?
8   A.   What the credit line was because right now
9   they can't use the account.
10   Q.   Okay.  What was the credit line?
11   A.   It was a credit line of 1,600, excuse me,
12   $16,500.
13   Q.   Okay.  And then the RIP, what does that
14   mean?
15   A.   I don't know.
16   Q.   CURARR, what does that mean?
17   A.   I do not know.
18   Q.   And then we've got 0 expiration date 5 of
19   '07, what does that mean?
20   A.   The expiration date was 5 of '07.
21   Q.   But at that time, the card can't be used
22   after 5 of '07.  But right now, because it's not being
23   timely paid, it can't be used either, correct?
24   A.   Right.
25   Q.   Okay.  Then we've got CRSCR 2000, what does

18 (Pages 66 to 69)

Civil Action Group 763.576.8832

USB App 36

Stephanie Buckley

Page 70

1 that mean?
2     A.  I do not know.
3     Q.  Okay.  Then we go down to the left, or the
4 left margin on the next line, CR, what does that mean?
5     A.  Where is he?  I lost you.  I'm sorry.
6     Q.  The next line.
7         MS. SILVERMAN:  CR limit.
8     A.  CR limit, is that what you're referring to?
9     Q.  (Mr. Lyons) Yes, ma'am.
10    A.  That means credit limit.
11    Q.  Okay.  And then there's nothing in there
12 after credit limit, correct?
13    A.  It's located below.
14    Q.  Okay.  All right.  So now, these are
15 headings for credit limit is sixteen five, eleven
16 five, and origin, are those all three credit limits
17 that were applied to this card at one time?
18    A.  Yes.
19    Q.  So there could have been some change in
20 terms between eleven five and sixteen five?
21    A.  There could have been, yes.
22    Q.  All right.  So then let's go to the next
23 line over, or the next thing over.  You've got a total
24 of 15,853.84 that is the current outstanding balance,
25 correct, or at that time?

Page 71

1     A.  At that time, yes.
2     Q.  Okay.  Then below that, CAB, what does that
3 mean?
4     A.  I don't know what CAB means.
5     Q.  Okay.  And then below that, DT06012000,
6 what does that mean?
7     A.  Date.
8     Q.  Okay.  It says 06-01-2000, how does that
9 get into this IC system, as far as you know?  What
10 does it refer to?
11    A.  I believe that it's referencing the
12 previous credit limit but I'd have to verify that.
13    Q.  Okay.  So if it's a date, and then when we
14 go to the left, we see previous eleven five hundred,
15 correct?
16    A.  Right.
17    Q.  And somehow it got changed from eleven five
18 to sixteen five for the use of this card if, in fact,
19 it was timely paid, correct?
20    A.  Correct.
21    Q.  Now, would that be out of the ICS somewhere
22 or an RMS listing somewhere showing that effort to
23 increase the credit line?
24    A.  It's showing it right there, I'm not sure
25 what...

Page 72

1     Q.  Okay.  It's showing it here, but is there a
2 CIT related to that, or is that the CIT we see above
3 on the right-hand margin, which is CIT change in
4 terms.  Does that have a particular date associated
5 with that CIT?
6     A.  It would have to be looked up.
7     Q.  Okay.  And where would you look this up?
8     A.  I would start by calling some different
9 folks at the bank.
10    Q.  Okay.  Then we go over to date of last, and
11 looking at date of last, and then there are some
12 entries below that line starting from the left margin,
13 it says delinquent 30, 60, 90, etc. is that read from
14 left to right on each line or is it read up and down?
15 Can you tell me how this ICS is read from that point
16 going on, that point, date of last it the bottom of
17 the sheet, 0155?
18    A.  So you're looking at it, it's, you know,
19 there's payment, there's purchase, there's
20 transaction, and then the dates associated with those.
21    Q.  Right.  So what happened beneath date of
22 last COL, is that a collection call or what would that
23 be, COL?
24    A.  No, it would not refer to a collection
25 call, it may have been the date it entered

Page 73

1 collections.  I'd have to verify that.
2     Q.  Okay.  Then below that there's a payment,
3 that would be a payment on the card?
4     A.  Yes.
5     Q.  And then purchase, what does that mean,
6 06/03/05?
7     A.  It means the last time somebody used the
8 card.
9     Q.  All right.  And then trans 01/ 31/06?
10    A.  Some type of transaction.
11    Q.  All right.  And then NONMOM 05/01/08.  What
12 does that mean?
13    A.  It's referring to a non-monetary activity
14 on the account.
15    Q.  What would that be?  What would be an
16 example of that?
17    A.  A customer service note could be a
18 non-monetary activity.
19    Q.  Okay.  Would that be in the RMS area?
20    A.  It does transfer to RMS at the time the
21 account is charged off.
22    Q.  All right.  Okay.  And then we have, back
23 up a few lines where it says NO and amount of, what do
24 those relate to?
25    A.  Number and amount of.

19 (Pages 70 to 73)

Civil Action Group 763.576.8832

Page 74

1    Q.   And so there was no payment, no return, no
2  credit attachment, no direct adjustment?
3    A.   Well, this account is charged off so...
4    Q.   Okay.  And then let's go over to the
5  left-hand margin.  We've got delinquent, 30, 60, 90,
6  12, 15, and then below that is open.  What does open
7  mean 11111?
8    A.   It's referring to when they -- I'm not sure
9  the difference between open and issued -- but it
10 refers to the number of months delinquent.
11    Q.   Okay.  So would this be reported to a
12 credit reporting agency or do you know?
13    A.   We report monthly to the credit reporting
14 agency based on the payments and activity of the
15 account.
16    Q.   Would this ICS figure into the reporting on
17 John Baltz?
18    A.   Any delinquency or nonpayment would have
19 been reported to the credit bureaus, yes.
20    Q.   All right.  Then let's go over to the next
21 page.  Is that one the purposes of the ICS, that it
22 does report or is it a separate operation from credit
23 reporting?
24    A.   I'm not sure that I'm completely following
25 you but credit reporting is derived from the system of

Page 75

1  record.
2    Q.   And this is one of the records --
3    A.   This would be --
4    Q.   -- this ICS?
5    A.   ICS is the system of record prior to charge
6  off, yes.
7    Q.   All right.  So then we go over to the
8  second page, 0156, and generally speaking, what is
9  shown here?
10    A.   The balance, you have a last statement
11 balance, you have a payment due date that was showing.
12    Q.   And then let's go over to page 3, this is
13 0157 of Exhibit 7.  What does this show?
14    A.   Well, it doesn't really show anything
15 because this account is charged off.  Had this account
16 been a good account, it would show you by month like
17 the total dollars of purchases, the total dollars of
18 cash advance, the interest billed, the fees billed,
19 and the payments applied against it.
20    Q.   Okay.  And this says no history found for
21 this account, correct?
22    A.   Correct, because it's charged off.
23    Q.   All right.  Okay.
24    MR. LYONS:  Any time anybody wants to
25 stretch their legs, go ahead and say so and we'll

Page 76

1  accommodate; otherwise, we're going to kind of press
2  on.
3    Q.   (Mr. Lyons) Let's go back to Exhibit 3.
4    A.   Okay.
5    Q.   And let's then look at in June of 2005,
6  plaintiff, John Baltz and Patterson, began to dispute
7  the appearance of the account on plaintiff's credit
8  profile with the defendant.  Are you aware of any type
9  of dispute that was made in 2005 to USBank by
10 Mr. Baltz?
11    MS. SILVERMAN:  I'm going to object to the
12 word dispute but you can answer the question.
13    MR. LYONS:  Okay.
14    A.   I know that there were some phone calls and
15 letters.  I'd have to look at the RMS notes for
16 specific information.
17    Q.   (Mr. Lyons) All right.  Well, let's start
18 in June of 2005.  Let's see if we can find that in
19 Exhibit 4 and see what the RMS shows us.  So let's go,
20 let's take a look at Exhibit 4 and direct my attention
21 to this disputing matter.
22    A.   Are you asking me a question or are you
23 taking me to another exhibit to ask me a question?
24    Q.   You said it would be in the RMS.
25    A.   Okay.

Page 77

1    Q.   And I'm curious as to where that would be?
2    A.   It would be within the notes section.
3    Q.   Okay.  And what page would it be on?
4    MS. SILVERMAN:  We have to correlate them.
5    A.   I don't know that we can do the pages yet
6  so hold on.
7    Q.   (Mr. Lyons) Okay.
8    A.   And there are notes on September 28th of
9  2005, is that what you're referring to?
10    Q.   Well, it shows, yes, yes, June 28th --
11 actually in June, paragraph 20 of the complaint, it
12 says that plaintiff and Patterson began to dispute the
13 appearance of the account on plaintiff's credit
14 profile with the defendant directly.  So is there any
15 note RMS where something was brought to the attention
16 of USBank in June of 2005 regarding this account?
17    A.   Let me go to June.  Sorry.  I was in
18 September.
19    Q.   Okay.
20    A.   There is a note in June on June 18th.
21    Q.   All right.  And I'm looking at 4A, and it
22 says USBaltz 0148.  Can you look at 4A, take a look at
23 0148 and see if that is similar to the page that you
24 are reading on 4B?
25    A.   Yes, I can do that, just a moment.  Yes, it

Stephanie Buckley

**Page 78**

1    is.

2    Q.   So what happens in June shown on an RMS,
3    what happened there?

4    A.   So on June 18th, there was a supervisor
5    escalation where the cardholder insists the secondary
6    cardholder was never a joint owner only an authorized
7    user.  Sending requests to service to research and
8    send copy of form to cardholder.

9    Q.   Okay.  What is the form that's being
10   discussed there?

11   A.   Where he was added onto the account.  Where
12   he signed to be a liable party.

13   Q.   And was there an account, or excuse me, was
14   there a form found at that time when they were looking
15   for it --

16   A.   No.

17   Q.   -- in June of 2005?

18   A.   No, there was not one at that time.

19   Q.   And you believe that that's because of the
20   retention policy for the one sheet application had
21   come and gone and that sheet was most likely
22   destroyed; is that your testimony?

23   A.   I don't know if it was because of retention
24   or another reason but...

25   Q.   Okay.  Now, that 6-18, let's go back down

**Page 79**

1    to 6-03, on the same page, 4A, and it says the code is
2    90LPR, what does that mean?  Does that mean a letter
3    went out, a letter came in?

4    A.   It doesn't actually mean that at all, it's
5    the status code at the time that the notes from ICS
6    were applied to the RMS system when the account
7    charged off.

8    Q.   Okay.  So automatic transfer from 0L1 to
9    0L001, what does that mean?

10   A.   That refers to que changes within the
11   collection system.

12   Q.   Okay.  So was the card charged off at that
13   time?

14   A.   Hold on just a moment, please.  No, in
15   2005, no.

16   Q.   Okay.  So what would the automatic transfer
17   be for from 0L1 to 0L001?

18   A.   Since the account was delinquent, I believe
19   the 0L1 to the 0L011 may have referred to an over
20   limit status within the account.

21   Q.   Okay.  Then let's go to 0147, which is in
22   July.

23   A.   Hold on, hold on, because I've got to match
24   the two documents.  So give me just a second.  Okay.

25   Q.   All right.  Let's go, I'm sorry, let's go

**Page 80**

1    back to 148, which we were just looking at as part of
2    Exhibit 4.

3    A.   Okay.

4    Q.   Okay.  Looks like a letter was sent to the
5    shareholder, and it says unable to find shareholder at
6    per time.  Do you see that letter that I'm looking?

7    A.   Yes, but that is referring to the secondary
8    cardholder, not a shareholder.

9    Q.   Okay.  Sorry.

10   A.   That's okay.

11   Q.   I misspoke.  So the S is the secondary
12   cardholder.  So you were unable to find that card at
13   that time, or find, able to find the application,
14   correct?

15   A.   Correct.

16   Q.   And then when we look at Exhibit Number 6,
17   that is a letter that was sent in June of 2005 to Mary
18   Patterson and John Baltz, correct?

19   A.   Correct.

20   Q.   Okay.  Now, having Exhibit 6 there, then
21   take a look at Exhibit 8.

22   MS. SILVERMAN:  Hold on.

23   A.   Hold on, we're not there.

24   Q.   (Mr. Lyons) Exhibit 8 is letters.

25   A.   Okay.

**Page 81**

1    MS. SILVERMAN:  Yeah.

2    Q.   (Mr. Lyons) Now, these documents were
3    produced by Trans Union, and that's why they have the
4    Trans Union numbers down in the lower right-hand
5    corner.

6    A.   What?

7    Q.   They appear to be from USBank to Mary
8    Patterson.  Does that appear to you to be the case
9    when you look at Exhibit 8 TU0016?

10   A.   On 0016, yes, that is a communication with
11   Mary Patterson, yes.

12   Q.   Okay.  So that's September 2nd, 2005, and
13   then we have September 7th, 2005, as TU0015, then we
14   have TU018, still again part of Exhibit 8, that's to
15   Mary Patterson, and then there is a October 4th, 2005,
16   letter sent to Mary Patterson.  And it says:  Dear
17   Mary K. Patterson -- this is TU0017, the fourth page
18   of Exhibit 8 -- we are currently in the process of
19   searching and verifying any property that is owned by
20   you.  Now, do you know of any letters like we see here
21   in Exhibit 8 being sent to Patrick Baltz who was an
22   authorized user on this card?

23   A.   No.

24   Q.   And have you seen any letters sent by
25   USBank to John Baltz similar to what we see here in

21 (Pages 78 to 81)

Civil Action Group 763.576.8832

Stephanie Buckley

Page 82

1  Exhibit 8?
2      A.   I did not specifically look for them.
3      Q.   Okay.  If the letter that we see as
4  Exhibit 6 sent in June of 2005, it was sent both to
5  Mary Patterson and John Baltz at Roseville address, do
6  you know why there would not have been the same
7  addressees including John Baltz on the letters that
8  are shown in Exhibit 8?
9      A.   Yes, I do.
10     Q.   Okay.  And what is that reason?
11     A.   Because these letters were generated from
12 two different systems.  Our collection system only
13 sends letters to the primary account holder on the
14 account, which is our pre-charge up collection system
15 which is the letters that are here referenced in
16 Exhibit 8.  The letter referenced in Exhibit 6 came
17 from our card member services department out of Fargo,
18 and Fargo uses our ICS system, which would have
19 included both responsible parties on the account.
20     Q.   Okay.  And the difference between coming
21 from Fargo to both card members and the collection
22 department, which is in Exhibit 8, that comes from a
23 different office, where would that collection
24 department be in Exhibit 8?
25     A.   St. Louis.

Page 83

1      Q.   Okay.  And you say that even though the
2  card is late, not being paid, and searching for
3  property, which is the subject of the October 4th,
4  2005 letter, that would only be sent to whom?
5      A.   That would have been sent to the primary
6  cardholder.
7      Q.   And nothing would be sent, as you
8  understand it, to any secondary holder of the card,
9  correct?
10     A.   The automated letters go out to the primary
11 account holder.
12     Q.   Is there a reason for that that you're
13 aware of?
14     A.   Yes, our system needs enhancements.
15     Q.   Your what?
16     A.   Yes, our system needs enhancements.
17     Q.   Oh, it does need enhancement?
18     A.   Yes.
19     Q.   Is that what you -- okay.  Has it been
20 enhanced now in the year 2012, would it go to both?
21     A.   No.
22     Q.   Pardon me?
23     A.   No.
24     Q.   Okay.  Now, back on 148, with this one
25 we're sending the request to service to research and

Page 84

1  send copy.  Where would that request be sent back?
2      A.   Mr. Lyons, I'm sorry?
3           MS. SILVERMAN:  Where are you?
4      A.   Where are you?  Because I have so many
5  documents in front of me.  I'm sorry.
6      Q.   (Mr. Lyons) I'm in Exhibit 4A.
7      A.   Okay.  RMS notes.
8      Q.   Yeah.  And I'm going to 0148, which has
9  the, you know, looking for the application form on
10 June 18th of '05.
11     A.   Okay.
12     Q.   So if you can't find it on 4A then take a
13 look at 4B and see if --
14     A.   Yeah, and we still have those opened to the
15 same pages.  We're good.  I'm with you now.
16     Q.   Where would the research department be or
17 the area that the application would be kept?
18     A.   Fargo, North Dakota, or on an imaging
19 system, or it could be off site at a storage facility.
20     Q.   Okay.  So one of those was the area where
21 the request was sent, and then we see on 6-28, same
22 page, 0148, and they were unable, between 6-18 and
23 6-28, none of the sources were able to produce the
24 application that put John Baltz as the secondary
25 obligor on the card, correct?

Page 85

1      A.   Correct.
2      Q.   Okay.
3      A.   So...
4      Q.   All right.
5           MR. LYONS:  Let's stretch our legs.
6           THE WITNESS:  Thank you.
7           MR. LYONS:  And take a break.  We'll come
8  back in about five minutes, 10 minutes.  Would that be
9  okay?
10          MS. SILVERMAN:  Yes.  Tom, can you give us
11 some kind of estimate of time.
12          MR. LYONS:  I think we're going to speed up
13 here for another couple of hours.  What is it, 12:30
14 or more?  No, it's 12:30.  Yeah, I think, you know,
15 we'll be done by 3 o'clock.  Is that okay with
16 everybody?
17          MS. SILVERMAN:  I have a flight at 4:30,
18 could we maybe do 2:30, if we speed?
19          MR. LYONS:  I'll try to hurry up.  I have
20 to stretch my legs.  Okay.  I'm going to leave the
21 phone open.  I'll be back.
22          MS. SILVERMAN:  Okay.
23          (A short break was then taken.)
24          MR. LYONS:  Well, I want the original, and
25 I need a word finder for that, key word index.  Then

22 (Pages 82 to 85)

Stephanie Buckley

Page 86

1  I'm going to take an electronic form.  You're going to
2  be the custodian of the exhibits and send with both
3  the original and also with the condensed copy.  The
4  condensed copy, four on a page.
5      Q.   (Mr. Lyons) Ms. Buckley, we're back on the
6  record.  You're still under oath and let's resume.
7  Exhibit 3, which is the summons of complaint.
8          MS. SILVERMAN:  Yeah.
9      Q.   (Mr. Lyons) And let's take a look at
10 paragraph 21 of Exhibit 3 on page 3, and then let's
11 look at page 6 and --
12         MS. SILVERMAN:  Page 6 of what?
13     A.   Exhibit 6 or.
14     Q.   (Mr. Lyons) Exhibit 6, TU0014
15         MS. SILVERMAN:  Oh, okay.
16     Q.   (Mr. Lyons) So when you look at 21 on
17 Exhibit 3 it says on 2-28-2005, defendant sent to
18 plaintiff and Patterson a letter which admitted that
19 the defendant did not know how, when or under what
20 circumstance plaintiff was added to the account.  Then
21 I look at Exhibit 6, and I want you to look at
22 Exhibit 6, and would you agree that the defendant did
23 not know when, or how, or under what circumstances
24 plaintiff was added to the account; is that a correct
25 statement?

Page 87

1      A.   No.
2      Q.   Okay.  What is incorrect about it?
3      A.   What the letter is indicating was that the
4  account was open since May of '88.
5      Q.   Okay.
6      A.   And we don't have the exact date when
7  Mr. Baltz was added to the account; however, he had
8  been added prior to 2003.
9      Q.   And why would it be prior to 2003?  Why is
10 that stated in this letter?
11     A.   Because I believe there was a review of
12 statements, which indicated that his name was on them
13 as early as 2003.
14     Q.   Okay.  So that would just be the statements
15 that were mailed; is that correct?
16     A.   Correct.
17     Q.   Okay.  But there's no other application or
18 any, however it was done, by letter, or online, or
19 telephone, or anything of that nature, correct?
20     A.   We do not have that document today.
21     Q.   Okay.  And do you believe it exists today?
22     A.   No.
23     Q.   Okay.  And has it been your experience that
24 in the efforts over the years by the millions of
25 applicants to USBank to apply for credit cards, that

Page 88

1  there have been some errors made where authorized
2  users have been identified as actual obligors on the
3  credit card?
4      A.   Not to my knowledge.
5      Q.   Okay.  No one has ever said that to you or
6  you've never discovered that from anybody that you're
7  aware of at work, correct, is that your testimony?
8      A.   Not to my knowledge, yes.
9      Q.   Okay.  Now, did you, yourself, actually
10 interview Ms. Hasenstab?
11     A.   No.
12     Q.   And did her, did her supervisor interview
13 Lori Hasenstab before you talked to her?  I think her
14 name was Christine.  Was Christine her supervisor?
15     A.   Christine is the manager of that
16 department.
17     Q.   Okay.  Did Christine tell you that she had
18 interviewed Lori?
19     A.   No.
20     Q.   All right.  Now, when I'm looking at
21 Exhibit 4.
22     A.   Hold on.
23     Q.   There are a couple of entries on the first
24 and second page of Exhibit 4A and take a look at 4B
25 where there is an LBHASEN on 1-20 and 1-21, and would

Page 89

1  that be, is that Lori Hasenstab that's referred to?
2      A.   I don't have where you're looking at yet.
3      Q.   Okay.  On Exhibit 4A, 120 and 21, and then
4  on 4B, it would be the first two pages.
5      A.   So, yes, if you're referring to the user
6  I.D. LDHASEN, then, yes, that would be Lori.
7      Q.   Okay.  And then on the first page of
8  Exhibit 4, TSWILL3 above LDHASEN, is that a person or
9  who would that be?
10     A.   Yes, that would be a person.
11     Q.   And what does that person do?  There was an
12 audit of some kind, I'm not sure.  Do you know what an
13 audit was that was done on this account?
14     A.   They reviewed the work that Lori did with
15 the ACDV.
16     Q.   Okay.  And so is Swill supervisor of Lori
17 Hasen?
18     A.   TSWILL 3 is Tiffany Williams, and yes.
19     Q.   And is Tiffany Williams still working at
20 USBank?
21         MS. SILVERMAN:  In fact, you have deposed
22 her before, Tom.
23     Q.   (Mr. Lyons) Okay.  Is she working in
24 St. Louis?
25     A.   Yes.

23 (Pages 86 to 89)

Stephanie Buckley

Page 90

1    Q.  All right.  Same building that Lori Hasen
2 is in, or Hasenstab is?
3    A.  Yes.
4    Q.  And did you interview Tiffany Williams
5 before you gave your testimony today?
6    A.  No.
7    Q.  Now, is it the normal course of events for
8 the use of an RMS system for Lori Hasen to make notes
9 on the RMS system as we see on the first two pages of
10 Exhibit 4B?
11    A.  Are you asking is it part of her regular
12 job duties to note RMS?
13    Q.  Yes, ma'am.
14    A.  Yes.
15    Q.  Okay.  So the RMS, the RMS screen is
16 available to her for her to review and look at it, in
17 fact she's doing an investigation, correct?
18    A.  Yes.
19    Q.  Okay.  Now, were you aware -- let's turn
20 over to page 4 -- that, were you aware that USBank had
21 reported to Experian that this account was in
22 bankruptcy?
23    MS. SILVERMAN:  Objection, no foundation.
24 You can answer, if you know.
25    Q.  (Mr. Lyons) Go ahead.  Were you aware of

Page 91

1 that?
2    A.  Page 4 of what, what are you referring to?
3    Q.  When you're looking at Exhibit 3.
4    A.  Exhibit 3.
5    Q.  Page 4, very top.
6    A.  Hang on, hold on, hold on, let me get to
7 Exhibit 3.  Sorry.  I want to be following you.  Okay.
8    Q.  Okay.  Were you aware, you, yourself, were
9 you aware that USBank has reported this account as
10 being in bankruptcy, 2818, for John Baltz?
11    A.  No.
12    Q.  Okay.  Now, let's take a look at Exhibit 6
13 and again.  We've looked at them but let's get them
14 together.  These are the letters.
15    A.  Uh-huh.
16    Q.  Okay.
17    A.  Yes.
18    Q.  So one came from Fargo, that's Exhibit 8,
19 apparently from card member services.  It says Fargo
20 up at the top, correct?
21    A.  No.  Exhibit 6, that says Fargo up at the
22 top.
23    Q.  You're right.  Sorry.  I didn't mean to
24 mislead you.  Exhibit 6 says that it came from Fargo,
25 and then the others that are laid out in Exhibit 8

Page 92

1 come from St. Louis, Missouri; is that correct?
2    A.  Correct.
3    Q.  All right.  Have you seen any similar
4 letters such as the documents set out at Exhibit 8
5 that were sent directly to Mr. Baltz?
6    A.  I have not seen them, no.
7    Q.  And apparently when we look at Exhibit 4,
8 and let's look at 4B, and let's take a look at the one
9 without any page numbers at the bottom.
10    A.  Okay.
11    Q.  I'm trying to get a date, excuse me.  Let's
12 look at the dates of September 29th and
13 September 28th, they would be on the same page.
14    MS. SILVERMAN:  What year, Tom?
15    MR. LYONS:  2005.
16    A.  Of 2005, is that what you're saying?
17    Q.  (Mr. Lyons) That's kind of towards the back
18 of Exhibit 4B and it's also shown on Exhibit 4A at
19 143.
20    A.  Okay.  I'm on 143.
21    Q.  Okay.  So can you read that at all?
22    A.  I think so.  We're trying to find the page
23 on the more readable copy but I have pretty good eyes.
24    Q.  It looks like the bank became aware that
25 customer one filed a chapter seven on September 22nd.

Page 93

1 Can you see that?  Can you make that out on page 143?
2    A.  Yes.
3    Q.  Okay.  And chapter, when that kind of a
4 filing is done then, what is the, what is USBank's
5 responsibility regarding that cardholder?  Can they
6 continue to contact them or do they have to stop?
7    A.  We obey the bankruptcy laws and we stop
8 calling them.
9    Q.  Calling them, correct?
10    A.  We do not call them.
11    Q.  Okay.  But how about writing them?
12    A.  When you say writing them, what do you mean
13 by that?
14    Q.  Sending a letter?
15    A.  Generally we do not send letters to an
16 account after the account has gone bankrupt.
17    Q.  Okay.  And then you take a look at
18 Exhibit 8 and we see TU0017, a letter dated
19 October 4th, 2005, from the --
20    A.  Correct.
21    Q.  It looks like it's from the collection
22 department dated October 4th, 2005, and it's directed
23 to Mary K. Patterson, correct?
24    MS. SILVERMAN:  Which one are you on, Tom?
25 I'm sorry.

24 (Pages 90 to 93)

Civil Action Group 763.576.8832

Stephanie Buckley

Page 94

1       MR. LYONS:  Exhibit 8.
2       MS. SILVERMAN:  Yeah.
3       MR. LYONS:  Fourth page, TU0017.
4       MS. SILVERMAN:  Yeah, got it.
5       Q.  (Mr. Lyons) Dated October 4th, 2005, and
6   that was sent to Mary K. Patterson by the collection
7   department, correct?
8       A.  Correct.
9       Q.  And the collection department has the RMS
10  notes available to it when it is dealing with a
11  cardholder, correct?
12      A.  The answer to that is really no.
13      Q.  Okay.
14      A.  But I'd like you to give me a moment to
15  explain that.
16      Q.  Sure.  Yeah, go right ahead.
17      A.  So the note that you are looking at from
18  September 28th on Exhibit 4A.
19      Q.  Yes.
20      A.  Is actually a note from the collection
21  system itself, which was transferred to RMS at the
22  time the account charged off.  So if a pre-charge off
23  collection department is looking at notes, they will
24  see the notes within the pre-charge off system.  Once
25  the account is charged off, those notes are

Page 95

1   transferred to RMS so that the history remains with
2   the account.
3       Q.  All right.  So where are these notes kept
4   then if they're not on the RMS system before the
5   charge off?  Where would these be?
6       A.  They would be in the TCS system, which is
7   stands for the collection system.
8       Q.  Okay.  And did those notes exist at this
9   time on this account?
10      A.  Yes.
11      Q.  But they're not in any of the documents
12  that you see in front of you, correct?
13      A.  Well, the notes are in the documents that
14  I'm looking at in Exhibit 4A and B.
15      Q.  Okay.  Those are the RMS collection,
16  correct?
17      A.  No.
18      Q.  What are the USBank Baltz numbers at the
19  bottom of the pages that you're looking at?
20      A.  00143.
21      Q.  Okay.  And okay, even though it says RMS at
22  the top, that's part of the collection system?
23      A.  No.  Tom, I think you're misunderstanding.
24  I don't know if I can call you Tom, I apologize.  But
25  what happens is is when an account is delinquent prior

Page 96

1   to charge off, the account is, for collection
2   purposes, within our TCS system.  When the account
3   transfers, when the account charges off and transfers
4   to RMS, those notes follow the account.  Hence the
5   reason if you look at the user I.D. with those notes,
6   it indicates batch, which means that it came over at
7   the time that the account was moved into RMS.  Does
8   that help?  So the way you're asking the question is
9   what's making me answer that way.
10      Q.  All right.  At what time did it get turned
11  over to the batch system?  Is that January of '06,
12  which is shown on page 133 of Exhibit 4?
13      A.  Correct.  That is the date it was received
14  in RMS.
15      Q.  All right.  Where does collection, where
16  does the collection department sit when it writes the
17  letter of October the 4th, 2005, this card member
18  service letter, which is TU0017, which is part of
19  Exhibit 8?
20      A.  But I missed the very first part of that,
21  where does the collection department what?
22      Q.  Where does it sit, is it part of the people
23  doing the RMS or is it some other area within the
24  USBank?
25      A.  Prior to the account charging off, it is

Page 97

1   the pre-charge off collection area, in this case,
2   located here in St. Louis.
3       Q.  Uh-huh.
4       A.  Using the TCS, the collection system, and
5   noting through that system.
6       Q.  Okay.  And so when the whole thing gets
7   turned over to, as it did in January of '06.
8       A.  Uh-huh.
9       Q.  The TCS notes are transferred to the RMS
10  system, correct?
11      A.  Correct.  As well as any notes within the
12  ICS system.
13      Q.  And the TCS system exists, the way that we
14  see it here, with these various dates and information
15  back and forth between the cardholder and USBank,
16  correct?
17      A.  Yes.
18      Q.  Okay.  So the collection department knew in
19  September of 2005 that Mary Patterson had filed a
20  chapter seven, correct?
21      A.  The collection department knew that there
22  was a possible chapter seven related to this account.
23      Q.  And they had known that because they had
24  looked at Lexus, correct?
25      A.  I don't know where it indicates Lexus

USB App 43

Stephanie Buckley

Page 98

1  here.  Let me read it more closely.
2      Q.  It's in the September notes.
3      Q.  Okay.  What I'm seeing here on the 29th,
4  yes.
5      Q.  That's where Lexus is shown.  And then on
6  the 28th there's actually a case number 053687
7  associated with the bankruptcy, do you see that?
8      A.  Yes, that was before we had verified it,
9  and then it was verified, yes.
10     Q.  All right.  Okay.  And just to follow-up to
11  make it clear, the letters that we see contained in
12  Exhibit 8, especially TU00117, sent from the
13  collection department on October 4th, 2005, to Mary
14  Patterson, there is no similar letter sent to John
15  Baltz; is that true?
16     A.  I do not have a letter similar to that sent
17  to John, no.
18     Q.  And you've looked for it and you can't find
19  it, correct?
20     A.  Yeah, I do not have it.
21     Q.  Okay.  And do you believe that it does not
22  exist?
23     A.  Yes.
24         (Plaintiff's, USBank Deposition Exhibit No.
25  5, USBank's objections and answers to plaintiff's

Page 99

1  first set of interrogatories, was then marked for
2  identification by the reporter.)
3      Q.  All right.  Okay.  Now, let's take a look
4  at Exhibit 5, and Exhibit 5 is the objections and
5  answers to plaintiff interrogatories.
6      A.  Okay.  I have Exhibit 5.
7      Q.  Okay.  And I think when we go back all the
8  way to page, well, it's the last page of the document,
9  it's a verification page, and that's your signature on
10  it; is that correct?
11     A.  Yes.
12     Q.  Okay.  And does Angela Swallow work in your
13  office?
14     A.  Yes.
15     Q.  All right.  Now, let's go to page 5.
16     A.  Okay.
17     Q.  Question number three, we say, we request
18  describe in detail what actions you took including but
19  not limited to the investigation of the various
20  disputes that were filed by Mr. Baltz regarding his
21  credit report.  Do you understand that?
22     A.  Yes.
23     Q.  That's the question.
24     A.  Okay.
25     Q.  All right.  And then you answer at the

Page 100

1  bottom of page 5 of Exhibit 5, the last two sentences,
2  it says -- this is actually, here, the easiest way is
3  to look at it from the fourth line up, it says:
4  USBank states that on September 22nd, 2010, USBank
5  received an online dispute from Equifax regarding the
6  plaintiff, and that's true, correct?
7      A.  Can you repeat that?
8      Q.  Okay.  USBank states that on September
9  22nd, 2010, USBank received an online dispute from
10  Equifax regarding the plaintiff, correct?
11     A.  Yes.
12     Q.  Okay.  Then the dispute listed, the dispute
13  code one, which means that is not hers period.  Do you
14  see that?
15     A.  Yes.
16     Q.  Then you say:  USBank conducted a timely
17  and reasonable investigation related to the alleged
18  dispute, and then verified the appropriate information
19  and provided a timely instruction to Equifax.  This is
20  over at the top of page 6.  Okay?
21     A.  Uh-huh.  Yes.
22     Q.  And then it says:  It responded with a code
23  two, which means modified.  Now, is it your
24  understanding that when USBank responds to an ACDV
25  of a dispute by a consumer, that there are some choices

Page 101

1  available to USBank, is that your understanding?
2         MS. SILVERMAN:  Objection to the term
3  choices.  Can you be more specific.
4      Q.  (Mr. Lyons) Well, Ms. Buckley, do you
5  understand what I'm talking about?
6      A.  You mean choices in how to respond, is that
7  what you're asking?
8      Q.  Yes, ma'am.
9      A.  Then yes.
10     Q.  Okay.  And among the choices that USBank
11  has is that it can either modify the information on
12  the ACDV that came from the credit reporting agency,
13  that's one of the choices, correct?
14     A.  Correct.
15     Q.  And you can delete information on the trade
16  line, that's a choice that USBank has, correct?
17     A.  Correct.
18     Q.  And you can verify information that comes
19  from the credit reporting agency; is that true?
20     A.  By verify do you mean account information
21  accurate as of the date it's reported?
22     Q.  Yeah.
23     A.  Yes.
24     Q.  Bottom of page 5 of Exhibit 5, you verified
25  the appropriate information and provided a timely

26 (Pages 98 to 101)

Civil Action Group 763.576.8832

Page 102

1   response, correct?
2       A.  Yes, correct.
3       Q.  But you also had choices at the same,
4   USBank had choices that they could either delete it,
5   or they could have modified it, or they could have
6   verified it depending on the circumstances, correct?
7       A.  Correct.
8       Q.  Now, in this case, where there had been
9   some question about whether or not Mr. Baltz was a
10  cardholder and the primary cardholder had also
11  indicated that it was not her intention that
12  Mr. Baltz, her nephew, be a primary cardholder, and
13  the fact that there was no application signed by
14  Mr. Baltz in your own records, it was possible for
15  USBank to delete the trade line, correct?
16      A.  If you're asking me if it was possible to
17  delete the trade line, the answer is, yes, it is
18  possible.
19      Q.  Okay.  All right.  Based on that
20  information, the information that I supplied in the
21  question?
22      A.  Now, I'm not following your question.
23      Q.  Okay.  In this circumstance when this
24  dispute came, there were traces available to USBank
25  and you have identified those as being to modify,

Page 103

1   verify, or delete, correct?
2       A.  Correct.
3       Q.  All right.  And based on the circumstance,
4   what we see in the RMS notes, which were available for
5   Lori Hasenstab, there was some question about whether
6   the Mary Patterson wanted her nephew, John Baltz, to
7   be a primary, or an obligated cardholder, and quite a
8   few entries about that, correspondence back and forth,
9   as well as the fact that we saw in Exhibit 6 that
10  there was no signed application that was available for
11  any investigator at USBank.  Given that information,
12  it was possible that USBank could have deleted the
13  trade line, correct?
14      A.  That possibility existed, yes.
15      Q.  Now, what you did do was enter a code two,
16  which was to modify, and can you tell me what the
17  modification was that you reported back to Experian?
18      A.  No, I can't, it's too old.
19      Q.  Okay.  And since the bank is only required
20  to keep the ACDV for 120 days, you don't know exactly
21  what was modified, correct?
22      A.  Correct.
23      Q.  That's what your answer says on page 6?
24      A.  Correct.
25      Q.  Okay.  And you did not go to E Oscar to

Page 104

1   determine what was actually in the ACDV that you
2   returned to Experian, correct?
3       A.  That information wouldn't have existed
4   within E Oscar after all this time.  So your answer is
5   correct.
6       Q.  All right.  And E Oscar, they only keep the
7   information for how long?
8       A.  I want to say it's 60 or 90 days.
9           (An off-the-record discussion was held.)
10          MR. LYONS:  All right.  So we're back on
11  the record.
12          MS. SILVERMAN:  Yes.
13          THE WITNESS:  Yes.
14      Q.  (Mr. Lyons) And let's go down to page 6 of
15  Exhibit 5, and it's states that, we were asking how do
16  you assure the accuracy of information within your
17  database, that's what interrogatory number four is.
18  And you answer that USBank states that, in general, it
19  receives an account application.  In this case, there
20  is no account application that you have found,
21  correct?
22      A.  Yes.
23      Q.  Okay.  Then insuring that the person is
24  qualified for credit, there's no proof anywhere that
25  any kind of a credit check was done on Mr. Baltz

Page 105

1   either showing a score or other credit worthiness; is
2   that correct?
3       A.  Not anymore.
4       Q.  No, but I'm talking about right now, that
5   you don't, it doesn't exist anywhere that you have
6   searched and have found it?
7       A.  Not today, no.
8       Q.  Okay.  Or any time that you tried to look
9   for it, correct?
10      A.  Well, I've only tried to look for it fairly
11  recently.  So in these last few days, no.
12      Q.  Well, there's nothing in the RMS notes from
13  Lori Hasenstab or Cynthia that, that there was any
14  investigation that they did that they found credit
15  worthiness on the behalf of John Baltz to be a joint
16  holder of the card, correct?
17      A.  Correct.
18      Q.  And then at the bottom of page 6 on the
19  right-hand corner it says:  Among other things.  So
20  I'm kind of wondering, I think you talked about income
21  at some point, correct?
22      A.  Correct.
23      Q.  And then when we look at Exhibit 7, there
24  is no income set out there, correct?
25          MS. SILVERMAN:  Exhibit 7.

27 (Pages 102 to 105)

Stephanie Buckley

Page 106

1        MR. LYONS:  Exhibit 7, that's the ICS.
2        A.  Correct.
3        Q.  (Mr. Lyons) His age and date of birth,
4   they're not indicated on Exhibit 7, correct?
5        A.  Correct.
6        Q.  Whether or not he has any dependents,
7   that's not known, correct?
8        A.  Correct.
9        Q.  And when you go over to the top of page 7,
10  it says, it says at the bottom of page 6, among other
11  things verifying the applicant's information with a
12  credit reporting agency, we don't see any evidence
13  that any credit reporting agency was checked with
14  regarding John Baltz at the time he supposedly applied
15  for credit as a joint cardholder, correct?
16       A.  That would have been done at the time that
17  he was added to the account.
18       Q.  Okay.  But there's nothing to show any
19  record that you currently have at USBank that shows
20  that there was anything done that you can say was
21  done?
22       A.  Correct.
23       Q.  Okay.  Then your answer goes on at the top
24  of page 7, it says:  Once a consumer's application is
25  approved, and we don't have any sign of approval by

Page 107

1   any individual at USBank that he was credit worthy for
2   a joint cardholder position, correct?
3        A.  Not at this time, right.
4        Q.  Okay.  And then USBank is suppose to put
5   in, it's the next line, says the name, the address,
6   date of birth.  There is no date of birth, correct,
7   that you can see anywhere here?
8        A.  Correct.
9        Q.  All right.  And then issue statements to
10  the cardholder, correct?
11       A.  Correct.
12       Q.  And there have been statements that have
13  been issued to the cardholder, John Baltz, at the
14  address in Roseville, correct?
15       A.  Correct.
16       Q.  And we know that John, going further down
17  in your answer on page 7, answer number six, if a
18  consumer disputes the information associated with his
19  or her account, USBank investigates that dispute in a
20  matter that depends on the exact nature and timing of
21  the dispute.  Now, you say that USBank investigated.
22  When the dispute was made directly to the bank, we see
23  that in the RMS notes back in 2005, that's true,
24  correct?
25       A.  Correct.

Page 108

1        Q.  Is there any separate investigation notes
2   other than what we see in Exhibit 4, 4A and 4B?
3        A.  Not that I'm aware of.
4        Q.  All right.  Then there was an investigation
5   was made when the disputes came from the credit
6   reporting agencies in 2010, correct?
7        A.  Correct.
8        Q.  And the only response that we have from
9   there, from that investigation are some notes in the
10  Exhibit 4A and 4B, and then whatever the credit
11  reporting agencies will show in terms of the ACDV's
12  that they sent to USBank, correct?
13       A.  I'm not sure I completely followed that but
14  correct.
15       Q.  Well, is there any other investigation?
16       A.  No.
17       Q.  Any other notes kept anywhere?
18       A.  No.
19       Q.  Do you know specifically how much time Lori
20  Hasenstab spent investigating any one of the disputes
21  that Mr. Baltz made through the credit reporting
22  agencies?
23       A.  She would have spent as long as it took to
24  verify the information.
25       Q.  Okay.  And you know what the length of time

Page 109

1   was that she spent on any one of the investigations
2   she made responsive to the ACDV that came from either
3   Experian or Trans Union?
4        A.  No.
5        Q.  Do you know what her quota is for how many
6   ACDV's she's suppose to process either in an hour, or
7   a quarter of an hour, or a day?
8        A.  We don't have a quota.
9        Q.  And what do you base that on, who have you
10  asked about a quota?
11       A.  I'm telling you, we don't have a quota.
12       Q.  Okay.  But do you supervise the people that
13  are in that department?
14       A.  Yes.
15       Q.  Okay.  So have you reviewed Lori Hasenstab?
16       MS. SILVERMAN:  Objection to the term
17  reviewed.  Do you mean annual review?
18       Q.  (Mr. Lyons) Well, or any other type of
19  performance review.  Sorry.
20       A.  That would be done by her direct supervisor
21  who reports to her manager who reports to me.
22       Q.  Okay.  Now, let's go down on page 8 of
23  Exhibit 5.  We're looking -- I'm asking, the question
24  is -- well, here let me go back up to number six.  I'm
25  asking in that interrogatory, which you answered, I

28 (Pages 106 to 109)

Civil Action Group 763.576.8832

Stephanie Buckley

Page 110

1  asked:  Identify all documents and correspondence from
2  January 2009 to the present that would verify or put
3  into dispute that you reasonably and completely
4  reinvested and reverified all information disputed by
5  plaintiff in a timely manner.  Then your last sentence
6  is, in your answer it says:  It conducted, it being
7  USBank, it conducted a complete investigation in
8  response to plaintiff's disputes.  And based on your
9  testimony today, this is the extent of the dispute
10 that Lori Hasenstab got the ACDV and made her notes in
11 the RMS sheet, especially page 1 and 2 of Exhibit 4A
12 and 4B; is that true?
13      A.  No, I'm not sure that I'm following exactly
14 what you're asking for there so...
15      Q.  Okay.  Well, Lori says she checked the SSN
16 matches.  Did she do anything more than that that's
17 not reflected in the RMS notes?
18      A.  Well, yes, she would have checked the
19 system records, looked at the name, the social, the
20 address, checked public record.
21      Q.  Okay.  Why isn't that listed in the RMS
22 records if she did it?
23      A.  Well, because at that time, the notes
24 weren't very complete on that, but that is the process
25 that she would go through.

Page 111

1      Q.  All right.  And is that written down in
2  some manual somewhere that I could look at?
3      A.  Not in a manual, no.
4      Q.  Is it written in any procedure or any
5  checklist for Lori to perform her job?
6      A.  Not a checklist, but there is, there is a
7  paper that describes that.
8      Q.  Okay.  And what is that paper called?
9      A.  I'd have to get the one specifically in
10 front of me and I do not have that.
11     Q.  Does it have a title?
12     A.  Yes, hold on a second.  Procedures for
13 researching credit bureau disputes.
14     Q.  Okay.  Now, let's go down to the next
15 interrogatory, interrogatory number eight.  I ask:
16 Please specify all facts each document the person
17 prepared and testified on which USBank relied to
18 assert the affirmative defenses that are listed in the
19 complaint.  We don't have to go to that right now.
20 Let's just go down to your answer, and at the second
21 line from the bottom, it says:  USBank records
22 indicate that plaintiff is a joint holder.  So I'm
23 wondering what is joint holder, is that an industry
24 term, a USBank term, a made up term, what does joint
25 holder mean?

Page 112

1          MS. SILVERMAN:  I'm going to object to the
2  characterization of made up, but she can answer it.
3          MR. LYONS:  All right.
4      A.  Yes, I have heard that term in the
5  industry.  Yes, it is a USBank bank term.
6      Q.  (Mr. Lyons) And what does a joint holder
7  refer to?
8      A.  A liable party.
9      Q.  A liable party.  Okay.  Are there any other
10 terms that are used by USBank to describe a liable
11 party on a credit card?
12     A.  To describe a liable party, sure, there's
13 the primary applicant, the secondary applicant,
14 sometimes it's called the co-ap, the primary, the
15 cardholder, card member.
16     Q.  And joint holder is one of those terms?
17     A.  Sure.
18     Q.  Okay.  Is there a written retention policy
19 that you're aware of for USBank in terms of credit ap,
20 or credit card applications?
21     A.  There is a corporate retention policy, yes.
22     Q.  Is that written?
23     A.  Well, yes, it is written as it is on the
24 computer, yes.
25     Q.  Okay.  Is there someone in your department

Page 113

1  or an associated department to yours that is an FCRA
2  compliance officer or person in that job?
3      A.  There is no one who has that title at the
4  bank, no.
5      Q.  Okay.  Just to wrap this up so that
6  everybody can move on, let's take a look at page 13 of
7  Exhibit 5, and I ask at interrogatory 14, and in that
8  I say:  Identify specifically all the facts in each
9  document and the person prepared to so testify upon
10 which you relied to assert the affirmative defenses.
11 And rather than ask what facts do you have, I'm going
12 to ask you if the following set of facts are facts
13 that you do not have and do not have a document for
14 it.  So will you go along with me on that?
15         MS. SILVERMAN:  Are we asking about whether
16 the fact exist or whether the document exist to
17 support the fact, those are two different things?
18         MR. LYONS:  Facts and/or documents.  We're
19 going to assume that Ms. Buckley can testify as a
20 person about facts unless she tells me otherwise.
21 Okay?
22         MS. SILVERMAN:  Okay.  As long as you
23 distinguish between the two, I'm fine.
24     Q.  (Mr. Lyons) All right.  Fact or document.
25 Now, the facts that you don't have or any document

29 (Pages 110 to 113)

Stephanie Buckley

Page 114

1  that you don't have, you being USBank, is the date of
2  any application by John Baltz to be an obligor on the
3  credit card ending in 2818; is that true?
4      A.  We know it was before 2003.  We do not have
5  the document.
6      Q.  And you have no date either?
7      A.  No specific date, correct.
8      Q.  Okay.  No month, no year, it's just before
9  2003?
10     A.  Correct.
11     Q.  Two, means of application.  You don't know
12  whether it was done online, by phone, or in a written
13  application, is that true?
14     A.  The original application, no, I do not
15  know.
16     Q.  Yeah.  Okay.  Whether or not you have a
17  signature from John Baltz?
18     A.  That signature does not exist today.
19     Q.  And by whom the application was made,
20  either by Mr. Baltz, or Ms. Patterson, or somebody
21  else, do you know anything about that?
22     A.  I'm not sure what you're asking me there.
23     Q.  Well, is it, perhaps I'm mistaken, is it
24  true that the only way a person can become a joint
25  holder on a card is that that person must apply to

Page 115

1  become the joint holder of the credit card?
2      A.  Correct.
3      Q.  Okay.  We have no indication in any regard
4  that you have seen or has been produced that indicates
5  that Mr. Baltz's credit worthiness was examined,
6  correct?
7      A.  Correct, those records we do not have
8  today.
9      Q.  All right.  And there is no date on which
10 there was an issuance of an obligor card to Mr. Baltz,
11 correct?
12     A.  I don't know what you mean by that.
13     Q.  Well, when you send an obligating credit
14 card out, is there some method by which USBank can
15 keep track of that card being issued to that obligor?
16     A.  I'm not completely sure that I'm following
17 you.  We do have the date that the last card that was
18 sent out became active, which was on Exhibit 7.  The
19 first page, card active date of 5-25-of '04, but that
20 would have been last physical plastic mailed out.
21     Q.  Okay.
22     A.  I'm just not sure if I'm following what
23 you're asking.  And we know that three cards were
24 mailed at that time.
25     Q.  Okay.  And were all three cards then mailed

Page 116

1  to John Baltz?
2      A.  Each card would have had the individual's
3  name on it, and would have been mailed to the address
4  on the system.
5      Q.  So that would be John Baltz at 1620 Highway
6  36, Roseville, Minnesota, 55113?
7      A.  I believe at that time -- what is her name?
8  Hold on.  What is the aunt's name because she would
9  have been on that as well, Mary Patterson.
10     Q.  All right.  Cards were sent to Mary
11 Patterson?
12     A.  Cards were sent to each of the people
13 listed on the account to the address on the system.
14     Q.  All right.  And one of those persons,
15 Patrick, was removed when we look at the RMS notes.
16 Let me just take a quick look here.  Okay.  Let's look
17 at the last page of Exhibit 4.  4B is legible one but
18 you can also look at 4A.
19     A.  Okay.
20     Q.  And it appears that advise cardholder,
21 Mary, that she was able to remove authorized user,
22 Pat, but not joint.  Okay?
23     A.  Correct.
24     Q.  Both nephews cardholder thought were
25 authorized users.  Advised cardholder only can remove

Page 117

1  by closing the account and reopening on her own, and
2  that's what she was told back in April of 2004?
3      A.  And also advised that John shares
4  responsibility.
5      Q.  So that would be -- so the three cards that
6  we see on Exhibit 7, there's no distinction between
7  the three cards that are listed in the middle of the
8  printed part of Exhibit 7, page 0155, just three cards
9  were issued and sent to John Baltz at the address in
10 Roseville, correct?
11     A.  They would have been sent to John and Mary
12 at the address, three cards with all three
13 individual's names on them, yes.
14     Q.  All right.  And the last thing that we know
15 for sure is that no request was made to John Baltz
16 similar to the letter sent in Exhibit 8 asking for
17 payment after the card went late and after
18 Ms. Patterson filed bankruptcy, which we discussed
19 earlier, correct?
20     A.  Correct.
21     Q.  Okay.  Well, given all the information that
22 we've just discussed, do you believe that USBank has
23 conducted a reasonable investigation of the dispute
24 that Mr. Baltz filed with the credit reporting
25 agencies in 2010?

30 (Pages 114 to 117)

Civil Action Group 763.576.8832

Stephanie Buckley

Page 118

1   A.  Yes.
2       MR. LYONS:  I don't have any further
3   questions.  Thank you.
4       MS. SILVERMAN:  Thank you.  I just have a
5   few quick questions, if you don't mind.
6               CROSS-EXAMINATION
7   QUESTIONS BY MS. SILVERMAN:
8       Q.  You were just testifying that you don't
9   have, USBank doesn't have any document to connect John
10  Baltz to account 2818 currently, correct?
11      A.  We don't have the original document, yes,
12  that's correct.
13      Q.  Does that mean that that document never
14  existed?
15      A.  No.
16      MR. LYONS:  Objection, form of the
17  question.  Go ahead, you can answer.
18      A.  No, that does not mean it never existed.
19      Q.  (Ms. Silverman) So what would USBank have
20  had to have at the time John Baltz was added as a
21  joint owner of the account?
22      A.  We would have had to have had his signature
23  on a form with, that would have been mailed back to
24  us.
25      Q.  Turning to USBank Depo Exhibit Number 8,

Page 119

1   Mr. Lyons just asked you some questions about this,
2   and you said that there were no letters similar to
3   Exhibit 8 sent to John Baltz.  Why is that?
4       A.  Because our collection system only sends it
5   to the primary cardholder.
6       MS. SILVERMAN:  Thank you.  I don't have
7   anything else.
8               REDIRECT EXAMINATION
9   QUESTIONS BY MR. LYONS:
10      Q.  Okay.  And that's even true even when
11  you're trying to have Mr. Baltz be the primary
12  cardholder because Mary Patterson had filed
13  bankruptcy, is that USBank's position?
14      A.  No.  But I'm not sure I'm following exactly
15  the way you're asking that.  I'm sorry.
16      Q.  Okay.  What don't you understand about it?
17      A.  The question.
18      Q.  Well, Mary Patterson filed bankruptcy,
19  correct?
20      A.  Correct.
21      Q.  So you can't contact her.  Who then becomes
22  the primary cardholder in terms of trying to get the
23  account paid?
24      A.  John Baltz.
25      Q.  Okay.  Did you send him any letters?

Page 120

1       A.  I believe some letters probably went out
2   from our RMS system once her name was removed from the
3   account.
4       Q.  And so no letters went to John Baltz,
5   correct?
6       A.  No, that's not what I just said.
7       Q.  Okay.  Do you have any letters that you
8   have seen that were sent to John Baltz, other than --
9       A.  We have letters that were requested through
10  the system, but the actual letter is not maintained.
11      Q.  Well, can you recreate the letter?
12      A.  Manually we could.  I could...
13      Q.  Where would we see that the letter was
14  sent, is it in the RMS note somewhere?
15      A.  Yes.
16      Q.  Okay.  Why don't you direct us, using 4A,
17  direct us to where that was done.
18      A.  You're going to have to give me a few
19  minutes because I am reading through 4A.
20      Q.  Go ahead.
21      MS. SILVERMAN:  You can't read 4A.
22      THE WITNESS:  Well, I can, I mean it's just
23  more challenging, but you know.
24      Q.  (Mr. Lyons) 4B, try to do 4B and see if you
25  can --

Page 121

1       A.  Well, but it's not in the same order.  So
2   if you don't mind, I'd prefer to stick with 4A and get
3   us there.
4       Q.  Okay.  Go right ahead, it's up to you.
5   You're testifying.
6       A.  So a letter was sent on 2-3 of '06.
7       Q.  Okay.  And where was that sent, what
8   address?
9       A.  It would have been sent to the address on
10  the account at that time, and I know that the Florida
11  address shows on the account now, but I don't know
12  which address showed at that time.  That would take a
13  little bit of research to try and conduct that.
14  Additionally, there was a letter sent on 2-14 of '06.
15      Q.  And where was that sent?
16      A.  It would have been sent to the address on
17  the account at that time.
18      Q.  Okay.  That's the Roseville account?
19      A.  My guess is that it would have gone to that
20  address, yes, Roseville address because I'm not
21  exactly sure right now when the address changed to the
22  Florida address.  I'd have to dig through.
23      Q.  You don't know.  Okay.  Keep looking.  Go
24  ahead.
25      A.  There was another letter sent on 4-3 of

31 (Pages 118 to 121)

Civil Action Group 763.576.8832

Stephanie Buckley

Page 122

1  '06.
2     Q.   And where was that sent?
3     A.   It would have been sent to the address on
4  the account at that time.  There's a letter sent, I'm
5  sorry, proceeding that one on March 13th of '06.
6     Q.   Again, that was sent to Roseville?
7     A.   I don't know the address at this time.  I'd
8  have to research that to tell you what address was on
9  the account.
10    Q.   Okay.
11    A.   There was a letter sent on 4-25 of '06,
12 another letter on 5-9 of '06, and it looks like that's
13 the last of the letters.
14    Q.   And the letters that were sent, do you know
15 if they were any one of the letters shown in Exhibit 8
16 of the deposition, or do you know?
17    A.   No, they were not the letters shown in
18 Exhibit 8 of the deposition.
19    Q.   Okay.  What kind of letters were they?
20    A.   They would have been letters from the RMS
21 system not from TCS or ICS.
22    Q.   And what would the content have been?
23 Would it have been similar to the documents in
24 Exhibit 8 or would it have said things like the last
25 letter, TU, excuse me, TU00117, searching, verifying,

Page 123

1  looking for any property owned by you?
2     A.   There may have been a letter similar to
3  that.
4     Q.   Okay.
5     MR. LYONS:  Okay.  Thank you.
6     THE WITNESS:  Okay.
7     MS. SILVERMAN:  Thank you.
8     (Signature waived.)
9     (WHEREIN, the deposition was concluded at
10 1:55.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 124

1         CERTIFICATE OF REPORTER
2
3     I, Amy A. Victoria, MO CCR, within and for
4  the State of Missouri, do hereby certify that the
5  witness whose testimony appears in the foregoing
6  deposition was duly sworn by me; that the testimony of
7  said witness was taken by me to the best of my ability
8  and thereafter reduced to typewriting under my
9  direction; that I am neither counsel for, related to,
10 nor employed by any of the parties to the action in
11 which this deposition was taken, and further that I am
12 not a relative or employee of any attorney or counsel
13 employed by the parties thereto, nor financially or
14 otherwise interested in the outcome of the action.
15
16
17       _____
18          MO CCR #556
19
20
21
22
23
24
25

32 (Pages 122 to 124)

Civil Action Group 763.576.8832

```
 1              UNITED STATES DISTRICT COURT
 2                DISTRICT OF MINNESOTA
 3            COURT FILE NO. 11-CV-170 JRT/AJB
 4
 5    JOHN BALTZ,                    )
                                     )
 6          Plaintiff,               )
                                     )
 7    vs.                            )
                                     )
 8    U.S. BANCORP d/b/a             )
      U.S. BANK,                     )
 9                                   )
            Defendant.               )
10
11
12
13
14
15        TELEPHONE DEPOSITION OF LORI HASENSTAB
16          TAKEN ON BEHALF OF THE PLAINTIFF
17                 MARCH 26, 2012
18
19
20
21
22
23
24
25
```

COPY

Lori Hasenstab

Page 2

```
 1              I N D E X
 2            WITNESSES
 3  ALL WITNESSES                    PAGE
 4  LORI HASENSTAB FOR PLAINTIFF
 5      Examination by Mr. Lyons      5
        Examination by Ms. Silverman  59
 6      Examination by Mr. Lyons      60
 7
 8            EXHIBITS
 9  NO.                            PAGE
10  Exhibit 1   Notice of Deposition    29
11  Exhibit 2   Screen shot of ACDV dispute   31
12  Exhibit 3   Trans Union ACDV       41
13  Exhibit 4   ACDV Operators Manual,
14              Policy and Procedure Guide   30
15
16
17  (Exhibits attached to transcript.)
18
19
20
21
22
23
24
25
```

Page 4

```
 1  APPEARANCES
 2  FOR THE PLAINTIFF: (via telephone)
 3      Thomas J. Lyons, Esq.
 4      367 Commerce Court
 5      Vadnais Heights, Minnesota 55127
 6      (651) 770-9707
 7      tommycjc@aol.com
 8
 9  FOR THE DEFENDANT: (via telephone)
10      FAEGRE BAKER DANIELS, LLP
11      2200 Wells Fargo Center
12      90 South Seventh Street
13      Minneapolis, Minnesota 55402-3901
14      (612) 766-7000
15      by: Ellen B. Silverman, Esq.
16      ellen.silverman@faegrebd.com
17
18  ALSO PRESENT:
19
20      711 North 11th Street
21      St. Louis, Missouri 63101
22      (314) 644-2191
23      1-800-280-DEPO
24      By: Ms. Tara Schwake, CRR, RPR
25      tschwake@midwestlitigation.com
```

Page 3

```
 1          UNITED STATES DISTRICT COURT
 2            DISTRICT OF MINNESOTA
 3          COURT FILE NO. 11-CV-170 JRT/AJB
 4
 5  JOHN BALTZ,              )
                            )
 6      Plaintiff,           )
                            )
 7  vs.                      )
                            )
 8  U.S. BANCORP d/b/a       )
    U.S. BANK,               )
 9                          )
        Defendant.           )
10
11
12          TELEPHONE DEPOSITION OF WITNESS,
13  LORI HASENSTAB, produced, sworn and examined on
14  the 26th day of March, 2012, between the hours of
15  eight o'clock in the forenoon and six o'clock in
16  the afternoon of that day, at the offices of U.S.
17  Bank, 9321 Olive Boulevard, St. Louis, Missouri,
18  before Tara Schwake, a Certified Realtime
19  Reporter and Notary Public within and for the
20  State of Illinois, in a certain cause now pending
21  in the United States District Court, District of
22  Minnesota, wherein John Baltz is Plaintiff and
23  U.S. Bancorp is Defendant.
24
25
```

Page 5

```
 1          IT IS HEREBY STIPULATED AND AGREED
 2  by and between Counsel for the Plaintiff and
 3  Counsel for the Defendant that this deposition
 4  may be taken by Tara Schwake, Notary Public and
 5  Certified Realtime Reporter, thereafter
 6  transcribed into typewriting, with the signature
 7  of the witness being expressly reserved.
 8            LORI HASENSTAB,
 9  Of lawful age, having been produced, sworn, and
10  examined on the part of the Plaintiff, testified
11  as follows:
12              * * * * *
13      (Exhibits 1 through 4 marked for
14  identification by the court reporter.)
15      (Deposition commenced at 9:47 a.m.)
16            EXAMINATION
17  QUESTIONS BY MR. LYONS:
18      Q    Good morning.  Can you state your
19  full name for the record, spelling your last?
20      A    Lori Hasenstab, H-a-s-e-n-s-t-a-b.
21      Q    And your home address?
22      A    2771 Cliffwood Trail, St. Louis,
23  Missouri, 63129.
24      Q    And ma'am, what year were you born?
25      A    1977.
```

2 (Pages 2 to 5)

Civil Action Group 763.576.8832

Lori Hasenstab

Page 6

1    Q    And have you ever had your
2  deposition taken before?
3    A    Yes.
4    Q    On how many previous occasions?
5    A    One.
6    Q    And do you remember when that was?
7    A    A few months back.
8    Q    And was it on a personal matter or
9  was it did it have to do with your employment?
10   A    Can you state what you mean by
11 "personal"?
12   Q    Yeah, I didn't know if it had to do
13 -- if it was work-related like it is today, or if
14 it had to do with something with your personal
15 life.
16   A    Oh. Work-related.
17   Q    And were you giving testimony on
18 behalf of the bank?
19   A    Yes.
20   Q    And what was the name of the case,
21 if you remember?
22   A    I wouldn't remember.
23   Q    Do you remember the name of the
24 person that was suing the bank?
25   A    No.

Page 7

1    Q    Okay. And have you ever been an
2  expert witness before?
3    A    No.
4    Q    Have you yourself ever been a
5  plaintiff or sued someone before?
6    A    No.
7    Q    Has anyone ever sued you before
8  personally?
9    A    No.
10   Q    Have you ever filed bankruptcy?
11   A    No.
12   Q    Have you ever been arrested?
13   A    No.
14   Q    Have you ever been fired from a
15 job?
16   A    Once.
17   Q    Okay. Tell me about that. When
18 was that?
19   A    That was, let's see. I was in
20 between jobs -- I couldn't tell you the exact
21 year.
22   Q    Okay. And what -- where were you
23 working when you were fired?
24   A    At Nu Way Concrete.
25   Q    Okay. And why were you fired?

Page 8

1    A    I'm not sure what you mean. I
2  mean, I was just basically laid off slash fired
3  but -- it didn't work out.
4    Q    Okay. Have you ever served in the
5  military?
6    A    No.
7    Q    Where did you go to high school?
8    A    Ursuline Academy.
9    Q    And what year did you graduate?
10   A    1996.
11   Q    Where is that located?
12   A    Kirkwood, Missouri.
13   Q    Did you go on to college after
14 that?
15   A    Yes.
16   Q    Where did you go to school?
17   A    I went to SIU-E and then UMSL.
18   Q    And did you receive your degree
19 from college?
20   A    Yes.
21   Q    In what year?
22   A    2001.
23   Q    And did you go to any other post-
24 secondary school after college?
25   A    No.

Page 9

1    Q    And your current title at US Bank
2  is what?
3    A    Account processor.
4    Q    Tell me what your job
5  responsibilities are as an account processor.
6    A    Responding to correspondence,
7  completing ACDVs and AUDs, backup for the phones.
8    Q    When you say "backup for the
9  phones," what does that have to do?
10   A    Just customers calling for either
11 credit bureau disputes or other disputes that
12 they may have resolution needed for.
13   Q    And then you said you did something
14 with responding to or writing letters, did you
15 say that?
16   A    Basically responding back to
17 customers' letters that they mail in to our
18 department.
19   Q    And what is the department that you
20 work for?
21   A    Credit bureau disputes.
22   Q    Okay. And how long have you been
23 an account processor?
24   A    Since 2009.
25   Q    And before 2009, what was your

3 (Pages 6 to 9)

Civil Action Group 763.576.8832

USB App 53

Page 10

1  position?
2      A    I was at the US Bank downtown
3  location as an admin assistant.
4      Q    Downtown in what city?
5      A    US Bank in St. Louis.
6      Q    Okay.  And did you work in credit
7  at the downtown branch?
8      A    No.
9      Q    Okay.  So it was a completely
10  different job?
11      A    Yes.
12      Q    And how did you find out about the
13  account processing position that you currently
14  hold?
15      A    When I was laid off at the US Bank
16  St. Louis in downtown, and then I transferred to
17  Olivette.
18      MS. SILVERMAN:  For the record,
19  Tommy, Olivette is the location that she is at
20  right now.
21      Q    (BY MR. LYONS)  Okay.  And did you
22  have to go through a interview or review process
23  in order to get the job as the account processor?
24      A    Yes.
25      Q    Who did you meet with in your

Page 11

1  interview?
2      A    Tiffany Williams, Juanita Roland.
3  Basically the support group heads.
4      Q    Okay.  And what's Tiffany Williams'
5  title?
6      A    She is my supervisor.  They just
7  recently changed their titles I believe to
8  operations supervisor.
9      Q    Okay.  And how about Juanita?
10      A    Oh, I don't know.
11      Q    And is Juanita above or below or
12  equal with Tiffany Williams in terms of job
13  ranking?
14      A    I don't know.
15      Q    Okay.  And did you -- in 2009 when
16  you started as the processor, did you go through
17  some kind of a training program?
18      A    Yes.  Well --
19      Q    How many -- I'm sorry, I didn't
20  mean to cut you off.  Go ahead.
21      A    Oh.  Well, it was basically one on
22  one training with other co-workers.
23      Q    How many other account processors
24  are there in your department?
25      MS. SILVERMAN:  Objection, vague.

Page 12

1  Currently?  Or at this time in 2009?
2      MR. LYONS:  That's good.  That's
3  good.
4      Q    (BY MR. LYONS)  Let's start in
5  2009.  How many were there?
6      A    I'd say -- I'm not really sure what
7  the phone group considers their title so I'm not
8  sure to consider their number or just my
9  immediate group, which they would be --
10      Q    Let's talk about ACDV processors.
11  How many were there in 2009?
12      A    I don't know.
13      Q    More than ten?
14      A    Probably not.  No, not that many.
15      Q    Okay.  So some number less than
16  ten?
17      A    Yes.
18      Q    All right.  And how about today?
19  How many are there?
20      A    Probably around ten.
21      Q    Okay.  And are -- in your current
22  capacity, do you supervise anyone?
23      A    No, I'm not a supervisor.
24      Q    Okay.  So is it fair to say that
25  you are on the same level with the other ACDV

Page 13

1  processors?
2      A    Yes.
3      Q    And do you all work generally in
4  the same room?
5      A    Yes.
6      Q    Okay.  And tell -- explain to me
7  the, or describe to me your work environment.  Is
8  it cubicles, are you all at desks, are you at a
9  telephone bank?  Describe for me your work
10  environment.
11      A    Oh, we are in cubicles.
12      Q    Okay.  And in your cubicle, you
13  have a telephone and a computer; is that correct?
14      A    Yes.
15      Q    Any other resources that are
16  available to you?  Whether it's hardware or
17  software or anything else other than what I have
18  described in that there is a computer and a
19  telephone?
20      MS. SILVERMAN:  Objection, I think
21  "computer" encompasses software and hardware, but
22  you can answer the question if you understand it.
23      A    We have calculators and, I mean,
24  I'm not quite sure what other devices you're
25  looking for.  We have a fax machine.

Lori Hasenstab

Page 14

1    Q    (BY MR. LYONS)  Okay.  So at your
2  work station, you have a computer that has access
3  to certain systems, certain data systems that the
4  bank has.  Correct?
5    A    Yes.
6    Q    Okay.  And do those systems include
7  account information on US Bank customers?
8    A    Yes.
9    Q    Okay.  So tell me what systems you
10  have access to.
11    A    E-oscar, and then mainframe screens
12  and RMS.
13    Q    Any other ones that you can think
14  of?
15    A    Well, we can use Hogan and
16  Lexis-Nexis.
17    Q    Any others that you can recall?
18    A    No.
19    Q    So the E-oscar system, that's how
20  you respond to the ACDVs.  Correct?
21    A    Yes.
22    Q    All right.  And we'll get to that
23  in a minute.  Tell me about mainframe.  What does
24  that mean?
25    A    Oh, those are the systems that we

Page 15

1  use to look up current credit cards that possibly
2  have delinquent marks but aren't charged off to
3  the RMS screen.
4    Q    Okay.  So RMS is the recovery or
5  the -- like collection information?
6    A    Well, yes.  The charge-off screen.
7    Q    And mainframe is the -- is -- how
8  do you distinguish that between RMS?  Those are
9  accounts that have not been charged off?
10    A    Right.
11    Q    Do you have access to any image
12  documents?  For example, credit applications or
13  anything like that?
14    A    No.
15    Q    Do you understand what I mean when
16  I say that?
17    A    Credit applications from customers?
18    Q    Right.
19    A    That, if I could pull the credit
20  report to see what, how their credit is
21  reporting?
22    Q    No, I'm thinking about it more like
23  on the -- and you can tell me whether this is
24  wrong or right, but on the mainframe system do
25  you have access to, for example, Tommy Lyons's

Page 16

1  original US Bank credit card application?
2    A    No.
3    Q    Okay.  Do you have access to any
4  original customer account application?
5    MS. SILVERMAN:  Just for the record
6  I'm going to object to the term "original," but
7  you can answer the question if you understand it.
8    A    Basically customer service can pull
9  all that information, and it's not necessary
10  normally for us to pull that original application
11  for our customer.
12    Q    (BY MR. LYONS)  In the credit
13  dispute area it's not?
14    A    Right.  If we can find it.  But
15  normally we cannot find them because they're
16  imaged and they're in archives.
17    Q    And that's kind of what I was
18  referring to.  So there are -- if you had to look
19  for something like that, an old credit
20  application --
21    A    Yeah, I wouldn't have access
22  myself, but we did have somebody that was able to
23  pull them for us if we needed them.
24    Q    Okay.  Who would that person be?
25    A    I don't know because they're not

Page 17

1  normally -- they're not the person doing -- I
2  don't know their name right now because that was
3  a while back when we used to have somebody pull
4  them for us.
5    Q    Okay.  And did you have anybody
6  pulling them back in 2010 for you?
7    A    No.
8    Q    Okay.  So we talked about
9  mainframe, we talked about RMS, that's the system
10  that has the charge-off accounts, then you
11  mentioned something about credit reports.  What
12  system would you access to obtain credit reports?
13    A    Those are the actual Equifax, Trans
14  Union, and Experian credit bureau websites that
15  we have access to.
16    Q    So you would go onto those websites
17  and pull them or review them that way, correct?
18    A    Yes.
19    Q    And then tell me about, what's
20  Hogan?
21    A    We can look up to see if they have
22  another account besides a credit card.  For
23  example, a checking account.
24    Q    Okay.  So that's, Hogan is a system
25  that you would look at that would examine

5 (Pages 14 to 17)

Civil Action Group 763.576.8832

Page 18

1 internally whether or not there were other
2 accounts besides an account that was in dispute?
3      A    Or -- yes.
4      Q    And then tell me about Lexis.
5 What's that?
6      A    To see if the person's Social is in
7 there just for reference. Sometimes we have to
8 look up information just for verification
9 purposes.
10     Q    What system do you use to find out
11 whether or not a person's filed bankruptcy?
12     A    We can either call bankruptcy or we
13 can look on Lexis-Nexis, but I trust the
14 bankruptcy department more than I do Lexis.
15     Q    Okay.
16     A    But sometimes that is also notated
17 in the RMS screen itself.
18     Q    Whether or not they filed
19 bankruptcy?
20     A    Yes.
21     Q    Okay. Now, after taking on the
22 position in 2009 as a account processor, did you
23 receive any training related to the Fair Credit
24 Reporting Act?
25     A    I'm sorry, can you say what that

Page 19

1 Fair Credit Reporting Act is?
2      Q    Sure. Have you ever heard of the
3 Fair Credit Reporting Act?
4      A    Yes, but we don't receive training.
5 We take online like scenarios for processing
6 that, but we don't actually get any training in
7 person for that.
8      Q    So it's done online is what you're
9 saying?
10     A    Right.
11     Q    So is it done through E-oscar, or
12 is it done through another system at the bank?
13     A    It's done through another system.
14     Q    And what's that system called?
15     A    We just have to take online courses
16 each year. So it's through the bank.
17     Q    Okay. And is it like a multiple
18 choice test or is it -- you said something about
19 online scenarios. Explain what you mean by that.
20     A    Yes. Well, it's just little
21 scenarios about a customer. It, it's basically
22 we just have to finish the courses. And then
23 they give synopses.
24     Q    Lori, did you take the online
25 courses in 2009?

Page 20

1      A    We take courses each year, so yes.
2      Q    Did you take one in 2009?
3      A    Yes.
4      Q    And then you would have taken one
5 in 2010?
6      A    Right. But they have different
7 courses each year. They're not always the same
8 courses.
9      Q    Okay. And so how do you know what
10 course to take? Or does the bank tell what you
11 course they want you to take?
12     A    Right. They're already assigned
13 for each one of us to complete.
14     Q    Okay. So you took a course in
15 2009, you took a course in 2010. Correct?
16     A    Right.
17     Q    And did you take one in 2011?
18     A    Yes.
19     Q    Okay. And have you taken one yet
20 in 2012?
21     A    No.
22     Q    And are you scheduled to take
23 another test in 2012?
24     A    Yes, we will be, but I haven't
25 taken one yet because we're not opted to do so

Page 21

1 quite yet this early in the year.
2      Q    Okay. And then after those tests
3 are completed by you in each of those years, are
4 they, do you get the results?
5      A    They're already automatically
6 calculated as soon as we submit them online.
7      Q    So do you receive the results
8 immediately after you complete the test?
9      A    Yes.
10     Q    Was that a yes?
11     A    Yes.
12     Q    And then do you go over the test
13 results with supervisors or any other staff at
14 the bank?
15     A    No.
16     Q    Okay. In addition to the tests
17 that you take, is there any other time, or have
18 there been any other times since you started in
19 2009 where you had some kind of performance
20 review or audit of your work product?
21          MS. SILVERMAN: Objection, I'm just
22 going to object to the extent that I think
23 there's a difference between an audit and a
24 performance review, but you can answer the
25 question.

Lori Hasenstab

Page 22

1    A    Work does get audited by our
2  supervisor, and then we do have yearly reviews.
3    Q    (BY MR. LYONS)  Okay.  So those are
4  two separate things?
5    A    Yes.
6    Q    Okay.  So yearly review, you have
7  those once a year and you meet with your
8  supervisor; is that correct?
9    A    Yes.
10    Q    And are you provided with any
11  written results of the performance review?
12    A    Yes.
13    Q    Okay.  And then what do you do with
14  those?
15    A    I filed some of them and then I
16  also took some home as well.
17    Q    And for the most part, since 2009
18  how have your performance reviews been?
19    A    Solid performance.
20    Q    No discipline or reprimands about
21  how you're doing your job?
22    A    Correct.
23    Q    And then separate and apart from
24  that, are these -- are the audits that I was
25  speaking of, are you aware of when you're audited

Page 24

1    Q    Okay.  And during those times,
2  those occasions since 2009, were those times
3  where US Bank supervisors were pointing out to
4  you things that they wanted you to do
5  differently?
6    A    Yes.
7    Q    Okay.  So without being too harsh,
8  I guess what I'm saying, are they, are they more
9  like critiques where they say, "Okay, Lori, we
10  reviewed some things that you have done last week
11  and here's how we'd like you to do them
12  differently"?
13    A    Right.  Because they could be
14  audited, audits on phone calls or other
15  performance.
16    Q    Other job, other jobs that you're
17  doing.  Right?
18    A    Right.
19    Q    So have you ever had an audit or a
20  critique on your ACDV processing?
21    A    Well, not -- I mean, I am sure they
22  have been audited, but not a critique.
23    Q    Okay.  No one's pulled you aside
24  and said, "Hey, Lori, we've looked at your ACDVs
25  that you did," either yesterday or last week or

Page 23

1  or not?
2    A    No.
3    Q    Okay.  So those happened
4  independently without your knowledge?
5    A    Yes.
6    Q    And then are -- during the
7  performance review, is, are any of the audits
8  that have been conducted on your work reviewed
9  with you at that time?
10    A    Reviewed at the same time, no.
11    Q    Is there a separate time when,
12  after the audit occurred, that someone comes up
13  to you and says, "Hey, look, last week we spent
14  some time and did a couple audits on your work
15  performance and we'd like to talk about it?"  Is
16  that how that goes, or not?
17    A    Yes.
18    Q    Have you ever had any examples of
19  times when your work has been audited and then
20  someone came and approached you from the bank to
21  talk about it?
22    A    Yes.
23    Q    How many occasions has that
24  happened since you started in 2009?
25    A    Maybe twice or three times.

Page 25

1  whenever, "and we'd like to you do them
2  differently, this is what we think you should do
3  in the future"?
4    A    Right.
5    Q    Never had an occasion like that?
6    A    No.
7    Q    And what is the -- since 2009 --
8  strike that.
9        In 2009, what was your compensation
10  package as an account processor?
11    MS. SILVERMAN:  Objection.  I'm not
12  going to let her testify to what she makes.  It's
13  not relevant to anything here.
14    Q    (BY MR. LYONS)  Lori, do you make
15  an annual salary?
16    A    We actually are compensated by an
17  hourly rate.
18    Q    Okay.  So it's an hourly, you work
19  by the hour?
20    A    Yes.
21    Q    Okay.  And are there any bonuses
22  that you can achieve in your employment based on
23  how many ACDVs you process?
24    A    No.
25    Q    Okay.  And is there a quota system

7 (Pages 22 to 25)

Civil Action Group 763.576.8832

Lori Hasenstab

Page 26

1 or a requirement that you need to process so many
2 ACDVs per day, per hour?
3      A      Well, we just have a requirement of
4 so many numbers we have to complete for our whole
5 I guess day of items that we touched.  You know,
6 if we spend so much time on each item, so not
7 ACDVs in particular.
8      Q      So the way I understand it is there
9 may be some numbers that you're trying to meet
10 per day.  Correct?
11      A      Yes.
12      Q      And is that individually, or is
13 that as a team?
14      A      Individually.
15      Q      Okay.  And so give me an example of
16 what you're, what you're talking about
17 individually.
18      A      Normally 75 items a day.
19      Q      Okay.  And those could be telephone
20 calls, letters, or ACDVs.  Correct?
21      A      Yes.
22      Q      All right.  And so 75 items per
23 day, and you work, what, eight hours a day?
24      A      Yes.
25      Q      But is one of those hours lunch?

Page 27

1      A      Yes.
2      Q      So it's really seven hours that
3 you're actually spending working, right?
4      A      Yes.
5      Q      All right.  And if you don't meet
6 the 75 items per day, is there some consequence?
7      A      I'm sorry, can you repeat that?
8      Q      Sure.  If you don't hit your
9 number, if you don't hit 75 items per day, is
10 there some consequence?
11      A      Oh, no.
12      Q      Does that come up in your reviews
13 if you're consistently not hitting your number?
14      A      Well, it hasn't came up in my
15 review.
16      Q      Okay.  How do you measure how many
17 items a day you are working?  Do you have to keep
18 a log?  Or what do you do?
19      A      Yes.
20      Q      All right.  And is it, is it
21 handwritten, or is it computerized?
22      A      Both.
23      Q      Explain that to me.
24      A      I handwrite my own, and then at the
25 end of the day I log it in to the computer for

Page 28

1 the supervisors to view.
2      Q      So you keep like a daily sheet?
3      A      Yes.
4      Q      And is it, can you explain to me
5 what that sheet looks like?  Is it simply just
6 like three columns that say ACDV, telephone, and
7 letter, and then you just put hash marks next to,
8 under each column?
9      A      Right.  Or at the -- well, I use my
10 sheet plus the spreadsheet.  So for the ones that
11 I put on the log, maybe letters, because we type
12 letters for any responses that we make, send
13 letters for a person who submits an AUD over the
14 phone and then they also want a letter, and I
15 would type up the letter and put a hash mark for
16 the letters that I do for that day.
17            And then for ACDVs I can look those
18 numbers up on E-oscar, so I would just put that
19 in the spreadsheet.  So sometimes I just write it
20 down on my log, so then when I enter those
21 numbers in I can put them in the spreadsheet
22 quickly.
23      Q      Got it.  Thank you.  Let me ask you
24 one more question about your employment.  Since
25 2009 have you received a increase to your hourly

Page 29

1 wage?
2      A      Yes.
3      Q      And at any time since 2009 has
4 there been a time where your hourly rate was
5 reduced?
6      A      No.
7      Q      Okay.  I think the court reporter
8 has marked as Deposition Exhibit No. 1 a document
9 that she will hand to you and I would like for
10 you to review.
11      A      Okay.
12            MS. SILVERMAN:  For the record, is
13 this the Notice of Deposition?
14            MR. LYONS:  Yes.
15            MS. SILVERMAN:  Thank you.
16      Q      (BY MR. LYONS)  Lori, do you have
17 that document in front of you?
18      A      Oh, yes, I'm reviewing it.
19      Q      Okay, good, I was going to ask you
20 to do that next.  Have you seen this document
21 before?
22      A      Yes.
23      Q      All right.  In this, in the
24 deposition notice which is what we call Exhibit
25 1, it asks that you bring to the deposition any

8 (Pages 26 to 29)

Civil Action Group 763.576.8832

Page 30

1    copies of any ACDV operators manual that you use.
2    Do you see that in Exhibit 1?
3            MS. SILVERMAN: Just for the
4    record, it doesn't say that she uses it, it just
5    says a manual.
6            MR. LYONS: Oh, you're right.
7        Q    (BY MR. LYONS) Lori, do you use a
8    ACDV operators manual or policy and procedure
9    guide in your work?
10       A    No.
11       Q    Okay. So there is no manual that
12   you refer to if you have questions or if you are
13   confused about steps to take in processing ACDVs?
14       A    Well, we could use one, but I don't
15   use one.
16       Q    Okay. And have you ever used one?
17       A    Yes. For guidance.
18       Q    Okay. So you have used a manual
19   before?
20       A    Yes.
21       Q    All right. And now I'm going to
22   show you what's been marked as I think Deposition
23   Exhibit No. 4. Lori, do you see what's been
24   marked as Deposition Exhibit No. 4?
25       A    Yes.

Page 31

1        Q    Okay. This is what has been
2    produced by your attorney as responsive to No. 1
3    in Exhibit No. 1 about the ACDV operators manual,
4    policy and procedure guide. Do you see that?
5        A    Yes.
6        Q    Okay. And is this the manual or
7    guide that you were referring to when you said
8    that you had used a manual in the past?
9        A    Yes, but some of the items, they
10   look a little more scrunched up than the actual
11   manual itself, and all of it doesn't really look
12   familiar.
13       Q    Okay. So Exhibit No. 4 is Bates
14   labeled US Bank/Baltz 159 through 175, I'm going
15   to ask you some questions about this in a minute,
16   Lori, but for now just set it aside.
17       A    Okay.
18       Q    Then what I'd like to mark as
19   Deposition Exhibit No. 2 is the Experian/Baltz
20   confidential document 0110.
21       A    Okay, I have it.
22       Q    And can you identify it for me?
23       A    It looks like the copy of the
24   E-oscar screen print of his dispute.
25       Q    Okay. Of an ACDV dispute?

Page 32

1        A    Yes.
2        Q    All right. And you see your name
3    is listed over on the right hand side of the page
4    under Authorized Verifier. Do you see that?
5        A    Yes.
6        Q    Kind of middle of the page on the
7    right?
8        A    Yes.
9        Q    And then you see the phone number,
10   314-996-0833. Do you see that?
11       A    Yes.
12       Q    And is that your direct dial?
13       A    No.
14       Q    Whose telephone number is that?
15       A    That was my old number.
16       Q    Okay. And was it your telephone
17   number in October of 2010?
18       A    It should have been. I don't
19   remember.
20       Q    Okay. But you have a different
21   telephone number now?
22       A    Yes.
23       Q    And do you normally put your direct
24   dial on your ACDV responses?
25       A    We don't type it in, it's just

Page 33

1    automated.
2        Q    Okay. That field is automatically
3    populated?
4        A    Yes.
5        Q    All right. Now, have you read the
6    complaint that was filed by Mr. Baltz against US
7    Bank?
8        A    Are you referring to the dispute
9    reason?
10       Q    No, I'm talking about the lawsuit
11   that he filed against US Bank.
12       A    Did I read the actual suit?
13       Q    Yeah.
14       A    No.
15       Q    Okay. And in preparation for your
16   deposition today, did you review any documents?
17       A    Yes.
18       Q    What did you review?
19       A    The Exhibit 1.
20       Q    Okay. Anything else?
21       A    Well, and the Exhibit 4.
22       Q    Okay. That's the manual that we
23   talked about before. Right?
24       A    Right.
25       Q    And did you get a chance to look at

9 (Pages 30 to 33)

Page 34

1  Exhibit No. 2, this ACDV from Experian?
2      A   No.
3      Q   Okay.  So take a minute and look at
4  it, and I understand that this is, this is like a
5  screen shot.  Right?
6      A   You said it is a screen shot?
7      Q   I'm asking you if that's what you
8  understand it is.
9      A   Yes.
10     Q   Does US Bank save the ACDVs that it
11 processes in the normal course of business?
12     A   Yes.  For a period of time.
13     Q   And how long is that?
14     A   I don't know.
15     Q   And does that just happen
16 automatically, or do you need to do something to
17 make that happen after you complete an ACDV?
18     A   No, it's automatic.
19     Q   Okay.  So as you look at Exhibit 2,
20 you understand that the dispute that Mr. Baltz
21 was raising is listed as a dispute reason field
22 kind of at the top of the page.  Right?
23     A   Right.
24     Q   And it was coded as a, "Not his or
25 hers, provide complete ID, account belongs to my

Page 35

1  Aunt Mary Patterson, I was given card for
2  emergency use, not liable for account."  Do you
3  see that?
4      A   Yes.
5      Q   So do you specifically remember
6  processing this ACDV back in October of 2010?
7      A   No.
8      Q   Okay.  And that doesn't surprise
9  me.  How many ACDVs do you usually process in a
10 day?
11         MS. SILVERMAN:  Objection, calls
12 for speculation.  You can answer if you know.
13     A   I don't know.
14     Q   (BY MR. LYONS)  Well, it could be
15 up to 75, right?
16     A   Or more.  Yes.
17     Q   Okay.  So you don't remember this
18 one specifically.  Right?
19     A   No.
20     Q   Okay.  But looking at it now, do
21 you know what steps you would have taken to
22 process this ACDV, given what's in the dispute
23 reason field?
24         MS. SILVERMAN:  Objection, calls
25 for speculation, but you can answer if you know.

Page 36

1      A   Yes.
2      Q   (BY MR. LYONS)  Okay.  And in fact,
3  some of your work product is right on this page.
4  Correct?  Some of what you did is right here in
5  front of us on Exhibit 2.  Right?
6      A   Yes.
7      Q   Okay.  So in reviewing the ACDV, it
8  appears that you changed or modified some
9  information.  Correct?
10     A   Yes.
11     Q   And can you explain to me what
12 information you modified?
13     A   I can explain possibly some of it,
14 but basically it's fill in the blank.  Like the
15 special comment code, O means that it's sold, so
16 I would have put that in there.  But since it's a
17 screen printout, I don't really know what was
18 already populated and what I would have put in
19 there.
20     Q   Okay.  So where it says "subscriber
21 response," do you understand that that's the
22 information that US Bank responded with in the
23 bold on the left?
24     A   The dispute reason?  Or -- oh, the
25 response, 02 modify, yes, that's what I would

Page 37

1  have put in there.
2      Q   Okay.  So that means you modified
3  this trade line in some way.  Correct?
4      A   Yes.
5      Q   All right.  And do you understand
6  that the information that's in bold under the
7  column "subscriber response" is the information
8  that you modified?
9         MS. SILVERMAN:  Objection.  I think
10 there's a distinction between what she actually
11 modified and what might have been modified by US
12 Bank.
13     Q   (BY MR. LYONS)  Is that what your
14 understanding is, Lori?
15     A   Yes.  Some of the information is
16 already on the screen when you pull up the
17 E-oscar screen print, so some of it needs to be
18 modified and other fields don't need
19 modification.  So by looking at this, I'm not
20 really able to see which ones --
21     Q   Which ones the bank did
22 automatically and which ones you had to do
23 manually?
24     A   Yes.
25     Q   How would you have investigated the

**Page 38**

1  issue of his, Mr. Baltz's, claim that he was not
2  liable for the account?
3      MS. SILVERMAN: Objection again,
4  just for the record, calls for speculation. She
5  doesn't remember this particular ACDV. But she
6  can answer.
7      A   Well, basically to me it looks like
8  it was a chargeoff account because of the special
9  comment code that it was sold, so I would have
10  went to the RMS system and looked up the
11  information and compared John Baltz's information
12  with the RMS screen in comparison to his E-oscar
13  online dispute. And modified any incorrect
14  information that may have been on the E-oscar
15  screen.
16     Q   (BY MR. LYONS) And typically would,
17  where someone says that they're not liable on the
18  account, do you make any effort to request the
19  original account application?
20     MS. SILVERMAN: Objection, again,
21  calls for speculation, but you can answer.
22     A   No.
23     Q   (BY MR. LYONS) Now, I know that
24  you don't recall what you did specifically with
25  Exhibit 2, but now I'm going to ask you just

**Page 39**

1  generally, if someone says, or if you receive an
2  ACDV where the, where the customer is saying
3  look, I'm not liable on this account, it was
4  somebody else's, is there ever a time that you
5  recall requesting a copy of the original
6  application to see whether or not the consumer
7  was properly on the card?
8      A   No.
9      Q   Okay. So that's just something
10  that you don't do?
11     A   No.
12     Q   Okay. Now, from your review of
13  Deposition Exhibit No. 2, do you see anything in
14  here about bankruptcy? About Mr. Baltz filing
15  bankruptcy?
16     MS. SILVERMAN: Objection. Are you
17  asking her to just read the screen print in front
18  of her?
19     MR. LYONS: I am, yes, that's
20  exactly what I'm doing.
21     MS. SILVERMAN: Okay. Just
22  clarifying.
23     MR. LYONS: Yep.
24     A   I don't see any information.
25     Q   (BY MR. LYONS) Okay. And do you

**Page 40**

1  see any information that would indicate that this
2  was a joint account?
3      A   I'm looking for the actual joint
4  modification code. I don't see it on here, but I
5  could be overlooking it. It's usually under the
6  E -- go ahead.
7      Q   I was going to tell you, the ECOA
8  field is the field you're looking for, right?
9      A   Right. That's where I don't see
10  anything marked in there.
11     Q   On the -- see where it says on
12  profile? In the middle of the page? That middle
13  column?
14     A   Yes.
15     Q   Do you see where the ECOA field is
16  two lines down from that?
17     A   With the 1 in there?
18     Q   Yeah.
19     A   Oh, okay. Yeah.
20     Q   Okay. So would that be the
21  individual account?
22     A   I think so.
23     Q   Okay. But you're not sure?
24     A   Not positive.
25     Q   All right. What do you -- how --

**Page 41**

1  in the "subscriber response" field, how or what
2  would you do to indicate that it was a joint
3  account?
4      MS. SILVERMAN: Objection, calls
5  for speculation. You can answer.
6      A   Well, really it's the job down
7  field, sometimes it's already in there, and other
8  times you can choose to drop down -- I think
9  number 2 is for a joint, but I would have to see
10  the E-oscar actual screen.
11     Q   (BY MR. LYONS) To see what the
12  options are?
13     A   Right.
14     Q   All right. Let's take a look at
15  Deposition Exhibit No. 3, which is the TU0032
16  document. Lori, I'm showing you what's been
17  marked as Deposition Exhibit No. 3. Have you
18  seen this document before?
19     A   No.
20     Q   All right. This is an ACDV that
21  was produced by Trans Union that has your name on
22  it kind of in the middle of the page under
23  "authorized phone number." Or "phone and name."
24  Do you see that, kind of in the middle?
25     A   Yes.

11 (Pages 38 to 41)

Page 42

1    Q    All right.  Do you see your name
2  there?
3    A    Yes.
4    Q    All right.  And that, this one has
5  a different telephone number on it, 314-216-4015.
6  Do you know whose telephone number that is?
7    A    Yes.
8    Q    Whose is that?
9    A    That's mine.
10   Q    That's yours currently?
11   A    Yes.
12   Q    Okay.  And the date of this ACDV
13 appears to be sometime in September of 2010, I
14 think if you look up at the middle top portion of
15 the page, right below the control number?
16   A    Oh, okay.  The date that it was
17 entered.
18   Q    There's actually two dates.
19 There's another one kind of kitty corner up to
20 the left that says "subscriber response date
21 10/4/2010," that's probably your, that's probably
22 the date that you're the subscriber, US Bank is
23 the subscriber, so maybe that's the right date.
24 Do you know?
25   A    Do I know what?  I'm sorry.

Page 43

1    Q    Well, which date is correct?
2    A    Well, I see the response is
3  required by day and a response date.
4    Q    Okay.  And the response date is
5  10/4/2010?
6    A    I'm not sure what the -- it's a
7  little unclear.  US subscriber response date, I
8  guess that's the response date that I responded
9  on.
10   Q    Okay.
11   A    Or I can't read the -- but I'm not
12 really sure.  That looks like the date that I
13 would have responded on.
14   Q    Okay.  So now this ACDV has a
15 dispute that says -- it's kind of towards the
16 middle of the page, it says, "not liable for
17 account, i.e. ex-spouse, business," do you see
18 that?
19   A    Yes.
20   Q    And then it says, "If liable,
21 provide complete ID and ECOA code.  Claims
22 company will delete.  Verify all account
23 information."  Do you see that?
24   A    Yes.
25   Q    So it's similar to the Exhibit 2,

Page 44

1  except it looks like it's asking US Bank for more
2  information.  Would you agree with that?
3        MS. SILVERMAN:  Objection.  You can
4  answer that question, but I think it calls for a
5  legal conclusion.
6    A    Yeah, I don't know what they're
7  asking.  I would have verified that on the Oscar
8  screen when he was submitting his dispute.
9    Q    (BY MR. LYONS)  Okay.  But am I
10 right, when I read this, is this something that
11 says to you that Trans Union is asking US Bank to
12 verify information and provide information?
13   A    I really don't know what this
14 screen is right here that I'm -- or this exhibit
15 that I'm looking at.  I guess this is another
16 version of what he's asking?
17   Q    I'll represent to you that this is
18 an ACDV that was produced by Trans Union, and
19 Trans Union is representing that this is the ACDV
20 that you completed and sent back to them in
21 October of 2010.
22   A    Right, but --
23        MS. SILVERMAN:  For the record, I
24 think she's testified that she's never seen this
25 and she's not familiar with this format.  So to

Page 45

1  the extent she can answer, she can answer.
2        MR. LYONS:  Okay.
3    A    I mean, because you're stating that
4  I would have submitted this, but it looks pretty
5  vague as far as what I would submit.  I don't see
6  any, anything that looks like the other exhibit,
7  the E-oscar screen.
8    Q    (BY MR. LYONS)  The Exhibit 2?
9    A    Yes.
10   Q    All right.  I think that Exhibit 2
11 is Experian's form and Exhibit 3 is Trans Union's
12 form.  As far as I can tell, US Bank doesn't have
13 a, their version that was produced because it was
14 too late.  Unless you can tell me different,
15 Lori, did you see a US Bank screen shot of any
16 ACDVs related to John Baltz?
17   A    No.
18   Q    Okay.  In reviewing Exhibit 3, can
19 you tell me what information you -- or what
20 investigation you performed, if you recall?
21        MS. SILVERMAN:  Objection.  She's
22 already testified she's never seen this before
23 and it calls for speculation.  You can answer.
24   A    No.
25   Q    (BY MR. LYONS)  Okay.  So you

12 (Pages 42 to 45)

Page 46

1  can't, you don't recall what you did with regard
2  to the dispute that you received, the ACDV -- the
3  ACDV that you received from Trans Union in
4  October of 2010 related to John Baltz. Correct?
5      A   Correct.
6      Q   All right. If Trans Union had
7  asked you to provide information to it, it being
8  Trans Union, would you have provided that
9  information to them in the normal course of
10  responding to ACDVs?
11      MS. SILVERMAN: Objection, vague.
12  I don't know what information we're talking
13  about, and calls for speculation. But you can
14  answer.
15      A   Well, any information that I could
16  provide based on the system information, I would
17  have submitted to all of the credit bureaus.
18  Because the subscriber codes are already on the
19  E-oscar screen.
20      Q   (BY MR. LYONS) Sure. But if Trans
21  Union -- and I understand you don't recall, you
22  don't even have to look at Exhibit 3 or 2, I'm
23  just asking you a general question. If Trans
24  Union asks you to provide specific information to
25  it in response to an ACDV, would you do that in

Page 47

1  the normal course of your business?
2      A   Right. But they don't actually
3  ever call us or anything to ask us to provide
4  specific information.
5      Q   Well, if -- they don't call you on
6  the phone to ask you that?
7      A   No.
8      Q   Okay. So the only way that you
9  communicate with Trans Union is through ACDV.
10  Right?
11      A   Right.
12      Q   Okay. And that's done through the
13  E-oscar system. Correct?
14      A   Yes.
15      Q   Okay. So if there's a typewritten
16  instruction in the E-oscar on an ACDV to provide
17  specific information to Trans Union, you would do
18  that. Correct? In response, generally?
19      A   It just depends on whatever the
20  person wants to type in there in the field, the
21  relevant information field. We can use that as a
22  guideline. But we always respond accurate
23  information to the credit bureaus.
24      Q   Okay. But -- and maybe we are
25  talking about the same thing but I just want to

Page 48

1  make sure because I think it's important. If
2  Trans Union or any other credit reporting agency
3  gives you a specific instruction, so, "US Bank,
4  we want you to provide the Social Security
5  number," do you actually provide and type in the
6  Social Security number?
7      A   If it's correct, we would just
8  submit the box on the E-oscar screen. We don't
9  always type it in. If it's unknown, we put
10  "unknown" in the field. So we modify it if it's
11  incorrect. If it's not, we leave it as it is.
12      Q   Okay. So you don't -- if it -- if
13  it's correct, you don't type it in?
14      A   Right. It just depends.
15      Q   Depends on what?
16      A   Basically on the actual ACDV. If
17  you can tell that they're stating like he's
18  stating, it's not his account, and we can type it
19  in, that the Social compared to the screen that
20  we're seeing RMS matches, we can type it in.
21  Just depends on how much work you want to add to
22  the E-oscar screen. But most of the time you
23  would just hit the same or fill it in and keep
24  moving, to each location screen, either the
25  name, the Social, and the address would match.

Page 49

1  So I don't know what you're asking about the
2  specific information. We verify information. If
3  it's different, we modify it.
4      Q   Okay. But if they ask you to
5  actually provide it, you don't type it in?
6      A   But Trans Union doesn't ask us,
7  it's normally the customer's information that
8  would be on the screen. You're saying if Trans
9  Union would ask us to provide information? I'm
10  not sure why you're saying --
11      Q   Let me ask you differently.
12      A   Okay.
13      Q   Let me ask it a different way.
14  When you get an ACDV, do you understand that
15  that's from the credit reporting agencies? Or
16  that's from the consumer?
17      A   I'm not sure.
18      Q   Okay. Now, let me ask you another
19  question. Have you ever seen a field in the
20  E-oscar system that says "consumer message"?
21      A   Well, the relevant information
22  screen, I'm not sure if it says "consumer
23  message."
24      Q   Okay. You're familiar with the
25  relevant information field on E-oscar?

13 (Pages 46 to 49)

Lori Hasenstab

Page 50

1      A    Yes.
2      Q    Okay.  If in the relevant
3  information field you saw the following text, I
4  want you to tell me what you would do.  Okay?
5      MS. SILVERMAN:  Objection, calls
6  for speculation.
7      MR. LYONS:  I haven't even finished
8  the question.
9      MS. SILVERMAN:  I know.
10     MR. LYONS:  Can I finish the
11 question?
12     MS. SILVERMAN:  You can finish the
13 question, and then I'll object.
14     MR. LYONS:  Okay.  If you saw the
15 text, Lori, in the FCRA relevant information
16 field in E-oscar that says, "unable to
17 authenticate documentation dated 6/8/05," what
18 would you do with that information?
19     MS. SILVERMAN:  Objection, calls
20 for speculation.  If that's on a document, why
21 can't we show that document to her?
22     MR. LYONS:  Sure, we can.  But you
23 objected to the document and said she didn't
24 understand it, so.  But you can sure look at it,
25 Lori, it's Deposition Exhibit No. 3.

Page 51

1      A    Well, I wouldn't know what that
2  comment would mean.
3      Q    (BY MR. LYONS)  Okay.  Let's take a
4  look at Deposition Exhibit No. 4.  Do you have
5  that in front of you?
6      A    Yes.
7      Q    Thank you.  If you turn to the
8  second page, which is USB/Baltz Bates number 160,
9  the second paragraph talks about the systems that
10 are needed for the process of ACDV are the ones
11 that you had mentioned earlier I think in the
12 deposition.  There's ICS, that's, I think you
13 referred to that as mainframe.  Correct?
14     A    Yes.
15     Q    Okay.  And then there's RMS, we
16 talked about that, and E-oscar.  So there is a
17 system, though, I think you testified earlier,
18 and you please correct me if I'm wrong, that will
19 allow the bank, maybe not your credit department,
20 but the bank to pull up images of account credit
21 applications or original credit documents that
22 open the account.  Do you remember me asking
23 about that?
24     A    Yes.
25     Q    Okay.  And am I right that none of

Page 52

1  the systems that we see listed on the, on the
2  USB/Baltz Bates number 160 in Exhibit No. 4, none
3  of those systems provide those account
4  applications that we were talking about?
5      A    Yes.
6      Q    And then you testified that if you
7  wanted to get or wanted to retrieve an account
8  application, you would want to make some kind of
9  a special request to somebody.  Is it somebody in
10 credit or somebody outside of credit?
11     A    Within my department?
12     Q    Yeah.
13     A    We do have someone in my department
14 that can pull them.
15     Q    Okay.  And is that a supervisor?
16 Or who, who would that be?
17     A    A co-worker.
18     Q    Okay.  And is it another ACDV
19 processor, or somebody else?
20     A    Another ACDV processor.
21     Q    Okay.  And why does that person
22 have access but you don't?
23     A    Because she responds to
24 correspondence, and she might need those in order
25 to respond to correspondence.

Page 53

1      Q    And that's kind of part of her job
2  but not part of yours?
3      A    Well, yes.  They gave her access
4  because she does it the majority of the time.
5      Q    I follow what you're saying.  And
6  sometimes you respond to correspondence.
7  Correct?
8      A    Yes.
9      Q    And then you have to sit at a
10 different work station to do that?  Or not?
11     A    Can you specify what you mean by
12 "different work station"?
13     Q    Yeah.  I mean, you're telling me
14 that there is someone, someone in your department
15 that can access the system that would allow you
16 to look at account applications.  Right?
17     A    Yes.
18     Q    And I think probably the easiest
19 thing to do is what -- do you remember the name
20 of the last person that could do that in your
21 department?  Who was that?
22     A    Elaine.
23     Q    Do you have a last name too?
24     A    Rapkin.  R-a-p-k-i-n.
25     Q    Okay.  So Elaine has the ability to

14 (Pages 50 to 53)

Page 54

1  do that from her desk or her computer or her work
2  station, right?
3       A    Yes.
4       Q    So on the day that you do what
5  Elaine does in responding to correspondence, do
6  you have to change desks with Elaine so that you
7  have access to that same information?
8       A    No.
9       Q    Okay. You just do it from your
10  desk?
11       A    No, I don't do that. She does
12  that. As far as pulling up applications?
13       Q    Okay. I guess that's what I was
14  asking. Is there ever an occasion when you are
15  required to pull up an application in responding
16  to correspondence?
17       A    No. Well, no. I don't. I could
18  ask Elaine to do it for me.
19       Q    Okay. So Elaine is the only one
20  that has access to that?
21       A    Yes.
22       Q    All right. And how long have you
23  and Elaine been working together?
24       A    Well, we're in the same department.
25       Q    Right.

Page 55

1       A    Since, since I've been here.
2       Q    That's 2009?
3       A    Yes.
4       Q    And I think you testified before
5  that it wasn't always Elaine that was the one
6  that had access to the system that allows you to
7  pull up applications, correct?
8       A    Yes.
9       Q    There was somebody before Elaine?
10       A    Yes.
11       Q    And you don't remember that
12  person's name?
13       A    No.
14       Q    Okay. But since you've started
15  there, there has never been an occasion that you
16  can recall when you made the request to either
17  Elaine or whoever Elaine's predecessor was to
18  make a request to have access to the system to
19  get account applications. Correct?
20       MS. SILVERMAN: Objection, asked
21  and answered.
22       Q    (BY MR. LYONS) You can answer it,
23  Lori.
24       A    I'm sorry, can you repeat the
25  question?

Page 56

1       Q    Sure. Madam Court Reporter, can
2  you read it back for her?
3       THE REPORTER: "But since you've
4  started there, there has never been an occasion
5  that you can recall when you made the request to
6  either Elaine or whoever Elaine's predecessor was
7  to make a request to have access to the system to
8  get account applications. Correct?"
9       A    To actually get the system on my
10  computer? Or to --
11       Q    (BY MR. LYONS) No, no, no. To
12  actually retrieve an original application. An
13  image of it.
14       A    Oh, yes, I have requested one
15  before.
16       Q    Oh, you have.
17       A    Yes.
18       Q    And on how many previous occasions?
19       MS. SILVERMAN: Objection, she said
20  she doesn't remember.
21       A    I wouldn't know. I don't know.
22       Q    (BY MR. LYONS) Well, less than
23  five?
24       A    No, more, more than five, but it
25  was more so in the past.

Page 57

1       Q    Okay. And why has that changed?
2  What has changed in your employment scenario that
3  would require you to request less?
4       A    We had a procedure change in
5  responding to correspondence.
6       Q    Okay. Now, let me ask you
7  basically the same question, just with a little
8  different twist. Have you ever requested from
9  Elaine or Elaine's predecessor an account
10  application or an image of such related to a
11  credit bureau dispute or an ACDV dispute?
12       A    Not for an ACDV dispute. We don't
13  use application references for ACDV responding.
14       Q    Thank you. Then if you can turn to
15  page 174 in Exhibit No. 4?
16       A    Okay.
17       Q    Are you there?
18       A    Yes.
19       Q    Okay. These are what? This list
20  of codes, what are these? If you know.
21       A    I don't know all the codes.
22       Q    But generally what are they? Do
23  you recognize any of them?
24       A    Codes that the customer could use
25  to dispute their claim.

15 (Pages 54 to 57)

Page 58

1     Q     Okay.  So you believe these are
2   codes that the customer would send in to US Bank
3   to describe his dispute?
4     A     Possibly.
5     Q     And does the number of the code
6   trigger a different type of investigation by you
7   or the other ACDV processors?
8     A     I don't know if these codes are
9   updated, but I guess they could.  But I don't, I
10  don't know.
11    Q     Okay, let me ask the question a
12  different way.  You're familiar with some of the
13  codes on here.  Correct?
14    A     Mostly just 1 and 2.
15    Q     Okay.  Are those the ones you're
16  mostly familiar with?
17    A     Yes.
18    Q     Okay.  Have you ever had to process
19  a code 101?
20    A     Right, but I'm not sure where these
21  would be on the E-oscar screen.
22    Q     The codes, or the texts?
23    A     Well, I'm not sure what you mean by
24  would I process one.  Would I respond to somebody
25  saying it's not liable for the account?

Page 59

1     Q     Right.  Have you ever seen that
2   dispute before?
3     A     I might have seen it typed in
4   before, yes.
5     Q     And if you have, I'm just asking
6   you if that triggers a different type of
7   investigation than, say, a not his or hers?
8     A     No, because we always verify the
9   Social on each claim.
10    Q     Okay.  So what I'm asking you is,
11  is the investigation procedure the same,
12  regardless of the code?
13    A     Yes.
14          MR. LYONS:  Lori, thank you.  I
15  have no further questions.
16          MS. SILVERMAN:  Can we take like a
17  two minute break, and then I have like one or two
18  questions?
19          MR. LYONS:  Sure.
20          MS. SILVERMAN:  Great.  Thank you.
21          (Off the record.)
22          EXAMINATION
23  QUESTIONS BY MS. SILVERMAN:
24    Q     All right, are we back on the
25  record?  Lori, I just have one question for you.

Page 60

1   If you would, I'd like you to turn to Exhibit No.
2   3 for me?
3     A     Okay.
4     Q     And Mr. Lyons was asking you about
5   a certain section of the Trans Union ACDV
6   response, it says "consumer message"?  And I just
7   wanted you to clarify for the record, when you're
8   looking at your ACDV screen, do you see something
9   that says "consumer message" on it?
10    A     No.
11          MS. SILVERMAN:  Okay.  That's all I
12  have.
13          EXAMINATION
14  QUESTIONS BY MR. LYONS:
15    Q     I have one followup question.
16  Lori, this is Mr. Lyons again.  You said earlier
17  that there is a field that you're aware of called
18  the FCRA relevant information field.  Correct?
19    A     Yes.
20    Q     Okay.  And sometimes that's
21  populated with text.  Correct?
22    A     Yes.
23          MR. LYONS:  Thank you.  No further
24  questions.
25          MS. SILVERMAN:  We'll read and

Page 61

1   sign, please.
2           THE REPORTER:  Okay, that's fine.
3   Ellen, what format would you like your transcript
4   in?
5           MS. SILVERMAN:  Electronic and
6   condensed.
7           THE REPORTER:  Thank you.  And Mr.
8   Lyons, you said you just needed the electronic?
9           MR. LYONS:  Yeah, that -- well,
10  I'll have the condensed too, that's fine.
11          THE REPORTER:  Okay.  Thank you
12  both very much.
13          (Wherein, the taking of the instant
14  deposition ceased at 11:10 a.m.)
15          (Deposition to be read and signed
16  by the witness.)
17
18
19
20
21
22
23
24
25

16 (Pages 58 to 61)

Jason Scott

1

1          IN THE UNITED STATES DISTRICT COURT
                 DISTRICT OF MINNESOTA
2
      JOHN BALTZ,                    )
3                                    )
                      PLAINTIFF,     )
4                                    )
      VS.                            )  COURT FILE NO.:
5                                    )  11-cv-170 JRT/AJB
                                     )
6     U.S. BANCORP d/b/a U.S.        )
      BANK,                          )
7                                    )
                      DEFENDANT.     )
8
9
10            ORAL AND TELEPHONIC DEPOSITION OF
11                      JASON SCOTT
12                    MARCH 27, 2012
13                      Volume 1
14        ORAL AND TELEPHONIC DEPOSITION OF JASON SCOTT,
15     produced as a witness at the instance of the PLAINTIFF,
16     and duly sworn, was taken in the above-styled and
17     numbered cause on the 27th of March, 2012, from 10:11
18     a.m. to 11:11 a.m., via telephone, before Gwendolynn R.
19     Murphy, CSR in and for the State of Texas, reported by
20     machine shorthand, at the offices of Experian
21     Information Solutions, Inc., pursuant to the Federal
22     Rules of Civil Procedure.
23
24
25

Civil Action Group 763.576.8832

Jason Scott

2

```
1                    A P P E A R A N C E S
2
3      FOR THE PLAINTIFF:
4           MR. THOMAS J. LYONS, JR., ESQ.  (Via Telephone)
            LYONS LAW FIRM, P.A.
5           367 Commerce Court
            Vadnais Heights, MN 55127
6           (651) 770-9707
            FX fx (651) 770-5830
7           Tlyons@lyonslawfirm.com
8      FOR THE DEFENDANT U.S. BANCORP d/b/a U.S. BANK:
9           MS. ELLEN B. SILVERMAN, ESQ. (Via Telephone)
            FAEGRE, BAKER & DANIELS, LLP
10          2200 Wells Fargo Center
            90 S. Seventh Street
11          Minneapolis, MN 55402-3901
            (612) 766-7462
12          FX (612) 766-1600
            Ellen.silverman@faegrebd.com
13
       FOR THE EXPERIAN:
14
            MR. MATTHEW R. JOLSON, ESQ. (Via Telephone)
15          JONES DAY
            325 John H. McConnell Blvd.
16          Suite 600
            Columbus, OH 43215-2673
17          (614) 281-3892
            FX (614) 461-4198
18          Mrjolson@jonesday.com
19
20
21
22
23
24
25
```

Civil Action Group 763.576.8832

Jason Scott

3

```
 1                          INDEX
 2                                                PAGE
 3    Appearances......................................... 2
 4    JASON SCOTT
           Examination by Mr. Lyons......................... 4
 5         Re-Examination by Mr. Lyons.................... 28
           Examination by Ms. Silverman.................. 29
 6         Re-Examination by Mr. Lyons.................... 30
 7    Signature and Changes...............................31
 8    Reporter's Certificate..............................33
 9
10                         EXHIBITS
11    NO.   DESCRIPTION                              PAGE
12    Exhibit 1  ACDV Response                        6
      Exhibit 2  Investigation Results, 10/05/10     19
13    Exhibit 3  Personal Credit Report, John Baltz,
                 11/17/11                            23
14    Exhibit 4  Personal Credit Report, Mary Kay
                 Patterson, 11/16/11                 24
15
16
17
18
19
20
21
22
23
24
25
```

4

```
 1                    (Exhibits 1-4 marked)
 2                        JASON SCOTT,
 3     having been first duly sworn, testified as follows:
 4                        EXAMINATION
 5     BY MR. LYONS:
 6          Q.  Sir, can you state your full name for the
 7     record, spelling your last name?
 8          A.  Certainly.  My name is Jason Michael Scott,
 9     S-C-O-T-T.
10          Q.  And, Mr. Scott, what is your current job title
11     at Experian?
12          A.  Senior regulatory affairs specialist, I
13     believe.  I have not looked at it in -- in a while, so I
14     believe that's what it is.
15          Q.  All right.  And can you tell me what job
16     responsibilities you have as a senior regulatory affairs
17     specialist?
18          A.  Certainly.  I act as a liaison between
19     Experian's internal and external counsel.  I review
20     certain cases to check for any liability.  Just,
21     basically, act as a liaison between our external
22     counsel, Jones Day.
23          Q.  Okay.  And how long have you been with
24     Experian?
25          A.  Since January of 2003.
```

5

```
1          Q.  And have you been in the same capacity or have
2     you -- has your job title switched over the years?
3          A.  No, I've had many job titles over the years.
4          Q.  Okay.  Tell me what the original job title was
5     that you had when you started in January of 2003.
6          A.  In January of 2003, I would have been a dispute
7     agent.  I'm not certain of the exact phrasing of the
8     title, but I'm sure you are familiar with the position.
9          Q.  Yeah, and that's what I kind of wanted to get
10    into next.  You -- do you have a working knowledge of
11    ACDVs?
12         A.  I can explain the fields on the ACDV form.  But
13    as far as what an agent might do if they were going to
14    process one, I have no experience actually processing
15    ACDVs.
16         Q.  But you can read them?
17         A.  Yes.
18         Q.  Okay.  And in your tenure at Experian, how many
19    ACDVs do you think you have reviewed?
20         A.  Too many to count, to be honest.  I have no
21    idea.  Just a lot.
22         Q.  Well, like over a hundred?
23         A.  Yes.
24         Q.  Over a thousand?
25         A.  Well, I have been here, you know, quite some
```

6

```
1    time, so perhaps.
2        Q.  All right.  And do you have a working knowledge
3    of Experian credit reports and investigation results?
4        A.  As in being able to read a CDF form?
5        Q.  Yes.
6        A.  Yes, sir.
7        Q.  Okay.  And have you -- how many CDF forms do
8    you think you have reviewed over your tenure of
9    approximately nine years at Experian?
10       A.  Again, sir, so many that I really couldn't put
11   a specific number to it.  Over 100, less than a
12   thousand.
13       Q.  Okay.  Thank you.  All right.  Let's take a
14   look at what has been marked as Deposition Exhibit
15   No. 1.  Do you have that document in front of you?
16       A.  I do.
17       Q.  Okay.  And what do you understand Exhibit 1 to
18   be?
19       A.  I understand Exhibit 1 to be an ACDV generated
20   on behalf of John Baltz sent to U.S. Bank.
21       Q.  And it was sent to U.S. Bank by Experian on or
22   about September 28th, 2010; is that correct?
23       A.  Yes, sir, that's correct.
24       Q.  And U.S. Bank responded to the ACDV on or about
25   October 5th, 2010?
```

7

1        A.  Yes, that is correct.

2        Q.  All right.  Now, this dispute had to do with

3    "U.S. Bank" and an account number that reads

4    "5415680501092818"; is that correct?

5        A.  Yes, that is correct.

6        Q.  And the dispute that Mr. Baltz had communicated

7    to Experian, that in turn then was communicated to

8    U.S. Bank; do you see that on Exhibit No. 1?

9        A.  Yes, sir, I see the dispute reason.

10       Q.  Okay.  And what was it?

11       A.  The form states that the account does not

12   belong to Mr. Baltz.  There's additional text stating

13   that the account belongs to his aunt, Ms. Mary

14   Patterson.  That he was given the card for an emergency

15   use and that he is not liable for the account.

16       Q.  All right.  Now, given that dispute, would

17   Experian expect that U.S. Bank, in conducting its

18   investigation of this dispute, would review its internal

19   account records to process the ACDV?

20           MS. SILVERMAN:  Objection, calls for

21   speculation.  Lack of foundation.

22       A.  I -- I --

23           MR. JOLSON:  You can answer the question.

24       A.  Yeah, I would anticipate that since the dispute

25   revolves around the ownership, that the creditor would

8

1   go through the account records just to determine the --

2   the exact ownership, since that is in dispute.

3       Q.  (BY MR. LYONS) All right.  And as part of an

4   ownership dispute, does Experian expect its subscribers

5   or data furnishers -- like U.S. Bank -- to examine, in

6   this case, the account application or the account

7   records that gave rise to Mr. Baltz being somehow

8   associated with the account?

9           MS. SILVERMAN:  Objection, calls for

10  speculation.  Lack of foundation.

11          You -- you can answer if your attorney

12  allows you to.

13          MR. JOLSON:  This is Matt Jolson.

14          Yes, you can answer, Jason.

15      A.  I'm not really sure what Experian would expect

16  them to review if it pertained to an application or a

17  contract of that sort.  I really wouldn't know.

18      Q.  (BY MR. LYONS) Well, let me put it a different

19  way, and maybe this is a good place to at least discuss

20  what the relationship is between these two entities.

21          U.S. Bank furnishes information to

22  Experian; is that correct?

23      A.  Yes.  U.S. Bank is a subscriber to Experian.

24      Q.  Okay.  And U.S. Bank is -- in this case, has --

25  has already -- prior to the ACDV being sent by Experian

9

1    to U.S. Bank, U.S. Bank has already been providing

2    information to Experian -- credit information belonging

3    to Mr. Baltz; is that correct?

4            MS. SILVERMAN:  Objection, lack of

5    foundation, but he can answer.

6       A.  Yes, there was a U.S. Bank account appearing on

7    Mr. Baltz' disclosure prior to the September 28th ACDV

8    date.

9       Q.  (BY MR. LYONS)  Okay.  And now the dispute

10    comes in from Mr. Baltz concerning him not being liable

11    for the account; and you read that in the dispute

12    reason, correct?

13       A.  Yes.

14       Q.  Okay.  And he actually provides another name

15    for whose account it was, correct?

16       A.  Yes, that is correct.

17       Q.  Okay.  So he -- he told Experian that the

18    account was Mary Patterson's and that he was either an

19    authorized user or he had been given a card, but he was

20    not liable on the account.  Am I reading that dispute

21    reason correctly?

22            MS. SILVERMAN:  Objection, that's -- I -- I

23    believe you are mis -- mischaracterizing the document,

24    but the witness can answer.

25       A.  It appears to me that you would have

10

1     interpreted the dispute reason correctly.

2          Q.   (BY MR. LYONS)   Okay.   And when you say

3     "correctly," I'm assuming that you are saying that

4     that -- I'm reading it the same way that U.S. Bank -- or

5     that Experian would have read it when it processed the

6     ACDV?

7                    MS. SILVERMAN:   Objection, calls for

8     speculation.

9          A.   When you summarize that the account belonged to

10    another individual -- his aunt, Mary Patterson -- and

11    that he was simply an authorized user or not liable for

12    making payment on the account, that's what I interpreted

13    your summary to be.   And that's what I believe the

14    Experian agent at that time interpreted Mr. Baltz's

15    dispute to be.

16         Q.   (BY MR. LYONS)   Okay.   And I thought that's --

17    we were all on the same page.   So, now, given that

18    understanding, my -- my question before was:   If this is

19    a dispute about liability and about ownership of the

20    account, doesn't Experian expect U.S. Bank to check the

21    application, find out if in fact Mr. Baltz is either a

22    signatory or an obligor on the account or simply an

23    authorized user?

24                    MS. SILVERMAN:   Objection, asked and

25    answered.   Calls for speculation.

11

1          A.  You know, again, that could be one thing that

2     they could consult.  There could be other documents.

3     I'm not really sure what any one document Experian would

4     have expected them to -- to turn to to answer or to

5     respond to this dispute.

6                    MR. JOLSON:  Mr. Scott, this is Matt

7     Jolson.  I'm just going to interject for a second.

8     I'm -- I'm not going to intervene every time that

9     opposing or U.S. Bank counsel makes an objection.  You

10    can go ahead and answer, unless I otherwise say you

11    can't, okay?

12                    THE WITNESS:  All right, Matt.

13                    MR. JOLSON:  Thanks.

14          Q.  (BY MR. LYONS)  Okay.  So I think you said,

15    sir, that one of the tools that Experian would expect

16    them to use -- maybe not the only tool, but one tool

17    that would be available to them to review would be the

18    account application; is that correct?

19                    MS. SILVERMAN:  Objection, I don't think he

20    said that.

21          A.  That could be one tool that they could turn to.

22    There may be others.

23          Q.  (BY MR. LYONS)  And are you aware of any

24    others?

25          A.  Their internal records regarding the account

12

1    itself, but, otherwise, no.

2       Q.  Okay.  Now, if I am reading this ACDV -- which

3    we have marked as Exhibit 1 -- correctly, the

4    information that is listed in the "On Profile" section

5    of the ACDV is the information that U.S. Bank is

6    currently reporting on this account related to John

7    Baltz; is that correct?

8       A.  Yes, that's how the account would have appeared

9    on Mr. Baltz' Experian disclosure at the date of the

10   ACDV generation, 09/28/2010.

11      Q.  Okay.  And then to the left of that, in the

12   column under "Subscriber Response," is what U.S. Bank

13   responded to the ACDV -- to this ACDV or to the Exhibit

14   No. 1?

15      A.  Yes.  The data that appears under "Subscriber

16   Response," that is the new data that they have

17   instructed Experian to display for the account.

18      Q.  All right.  And did Experian or -- strike that.

19          Did U.S. Bank instruct Experian to update

20   any information concerning the account being in

21   bankruptcy?

22      A.  I'm not sure I see any information regarding a

23   bankruptcy on this ACDV.

24      Q.  Okay.  And so is it safe to say that even under

25   the "On Profile" information, there's no information

Jason Scott

13

1     about bankruptcy?

2         A.   Not that this ACDV would indicate.

3         Q.   Okay.  The update from U.S. Bank -- if you can

4     look at those fields -- can you tell me what information

5     they updated?

6         A.   Yes, certainly.  It appears that they requested

7     to update the account status.  The code "05," that

8     indicates that it was transferred.  They indicate a zero

9     balance and a "Balance Date" as of "10/05/2010"; an

10    "Original Delinquency Date" of "08/02/2005"; an account

11    "Closed Date" as of "01/31/2006"; and a "Special Comment

12    Code:  O."

13        Q.   Which means what?

14        A.   I believe that goes back to a statement

15    indicating that the account was transferred.

16        Q.   All right.  And the "Payment Rating:  L"; does

17    that mean charged off?

18        A.   Yes, it does.

19        Q.   Okay.  And Experian consider the charged-off

20    account to be an adverse or negative trade line,

21    correct?

22        A.   To a third party, maybe concerning Mr. Baltz

23    for employment or for a credit opportunity, that

24    charge-off could be -- or could appear to be a negative

25    factor.

14

1        Q.  You wouldn't want -- you wouldn't want a

2    charge-off on your credit report, right, sir?

3              MR. JOLSON:  Objection.

4        A.  Well, I personally would not want a charge-off,

5    no.

6        Q.  (BY MR. LYONS)  Because it's negative?

7        A.  Because it may be negative to, like I said, a

8    third party trying to extend me credit.

9        Q.  Okay.  Thank you.  Okay.  So did U.S. Bank, in

10   response to this ACDV, instruct Experian to delete the

11   account from Mr. Baltz' credit profile?

12       A.  No, the response requests Experian to modify

13   the account as indicated.

14       Q.  And up above in the name and address data

15   field, the information on the left under "Consumer

16   Identification," is that the information that Mr. Baltz

17   had provided to Experian with his dispute?

18       A.  Yes, that is correct.

19       Q.  And the information on the right side then

20   where it says "Subscriber Consumer ID," that's the

21   information that was reported back by U.S. Bank; is that

22   correct?

23       A.  Yes, that is correct.

24       Q.  Okay.  Now, did U.S. Bank provide the Social

25   Security number of Mr. Baltz in response to the ACDV

15

1    that we have marked as Deposition Exhibit No. 1?

2        A.  Well, on the right-hand side of the ACDV, under

3    the field "SSN Flag," it indicates that it's the "Same."

4    So my understanding of that field is that they verified

5    in their records that Mr. Baltz had the same Social

6    Security number as what we provided.

7        Q.  But did they actually provide the numbers in

8    the field available under "Subscriber Consumer ID" that

9    we see on the right-hand side of the chart?

10               MS. SILVERMAN:  Objection, lack of

11   foundation.

12       A.  No.  The Social Security number for Mr. Baltz

13   is not located on the field "SSN" under "Subscriber

14   Consumer ID."

15       Q.  (BY MR. LYONS)  And did they provide in the

16   field provided a date of birth for Mr. Baltz?

17               MS. SILVERMAN:  Same objection.

18       A.  No, it does not appear a date of birth was

19   given or verified.  It states "Unknown" under the "DOB

20   Flag."

21       Q.  (BY MR. LYONS)  And the address information

22   that Mr. Baltz provided, was that verified or provided

23   by U.S. Bank?

24               MS. SILVERMAN:  Same objection.

25       A.  I'm not sure.  When you say if that address is

16

1    verified, I can state that U.S. Bank responded with a

2    different address than what we were provided from

3    Mr. Baltz.

4        Q.  (BY MR. LYONS)  Okay.  So under the "Subscriber

5    Consumer ID" field, there is a "3088 Harwood F" in

6    "Deerfield Beach, Florida" address provided, correct?

7        A.  Yes, provided by U.S. Bank.

8        Q.  Okay.  Which was different than the address

9    that Mr. Baltz had provided, correct?

10       A.  That appears -- that appears to be the case,

11   yes.

12       Q.  Okay.  The field a little further down from the

13   zip code says "Account Name."  Do you know what that

14   field represents?

15       A.  I'm not really sure.

16       Q.  Who would know that?

17       A.  I suppose I could -- I suppose I could research

18   that, but it's not anything I have access to at the

19   time.

20       Q.  And --

21                 MR. JOLSON:  A --

22                 MR. LYONS:  Go ahead.

23                 MR. JOLSON:  Thomas, this is Matt.  If --

24   if you want to take a break and just have Jason review

25   that and answer on behalf of Experian, we can do that.

Jason Scott

17

1          MR. LYONS:  Let's do that.

2          MR. JOLSON:  Okay.

3          MR. LYONS:  Thank you.

4          MR. JOLSON:  Can we go off the record for a

5    second?

6          MR. LYONS:  Sure.

7          (Off the record)

8    Q.  (BY MR. LYONS)  Mr. Scott, you have diligently

9    searched and have found the answer to what the field

10   "Account Name" means on Exhibit 1; is that correct?

11   A.  Yes, that's correct.

12   Q.  What does it mean?

13   A.  The "Account Name" field represents AKA or also

14   known as names.  These names generally appear on CDBs

15   and not ACDVs, is what I found out.

16   Q.  Thank you.  Below where you are looking at on

17   "Account Name," under "Trade Information," the "On

18   Profile" information that had been previously reported

19   by U.S. Bank showed the account as an individual

20   account; is that what the "1" under "On Profile"

21   represents in the "ECOA" field?

22   A.  Yes, that is correct.

23   Q.  All right.  And then if you go down to the

24   "Open Date," it says "5/1/1988," correct?

25   A.  Yes, sir, that is correct.

18

1      Q.   So reading those pieces of information together

2    on this ACDV, you would conclude, would you not, that

3    this was an individual account that was opened by

4    Mr. Baltz on May 1st, 1988?

5               MS. SILVERMAN:   Objection, calls for

6    speculation.   I'm not sure that's what the document

7    says.

8      A.   Well, based purely on the ACDV, yes, it does

9    indicate that this is an individual account opened on

10   May 1st, 1988.

11     Q.   (BY MR. LYONS)   And is there -- are there any

12   other indications on the ACDV concerning information

13   provided by U.S. Bank that this is anyone else's account

14   other than John Baltz?

15     A.   No.

16     Q.   Thank you.   U.S. Bank did not change or update

17   or modify the "ECOA" code in its response to the ACDV

18   that we've marked as Exhibit 1, correct?

19     A.   Yes, that is correct.

20     Q.   All right.   Moreover, U.S. Bank did not update

21   the "Consumer Compliance Code" field on Exhibit 1,

22   correct?

23     A.   That is correct.   I do not see any consumer

24   compliance code.

25     Q.   So this is -- as far as you can tell, it was

Jason Scott

19

1     not updated or marked as a disputed account by

2     U.S. Bank, correct?

3         A.  Based on this ACDV, you are correct.

4         Q.  Thank you.  Okay.  Let's set Exhibit 1 aside

5     and look at Exhibit No. 2, which I think has been marked

6     and presented to you.

7              MS. SILVERMAN:  Can you identify that for

8     me?  I'm sorry.

9              MR. LYONS:  Sure.  That's the investigation

10    results.  It's a two-page document, Experian --

11             MS. SILVERMAN:  The one that -- that's the

12    one that you faxed -- or that you emailed to me this

13    morning, right?

14             MR. LYONS:  I believe so.

15             MS. SILVERMAN:  Okay.  Great.  Thank you.

16        Q.  (BY MR. LYONS)  Mr. Scott, do you have that in

17    front of you?

18        A.  I do.

19        Q.  Okay.  It should be Experian/Baltz Subpoena

20    Confidential 0066 and Page 0067 that we have marked as

21    Exhibit 2; is that correct?

22        A.  Yes, sir, it is.

23        Q.  Okay.  And in response to Exhibit 1, Experian

24    then produced Exhibit 2, which is the investigation

25    results and sent that to Mr. Baltz; is that correct?

20

1          A.   Yes, sir, that is correct.

2          Q.   Okay.  And the first page of Exhibit 2 explains

3     to Mr. Baltz that the U.S. Bank trade line that he had

4     been disputing had been "Updated," correct?

5          A.   Yes, that is correct.

6          Q.   And "Updated" means that "A change was made to

7     this item; review this report to" -- "to view the

8     change.  If ownership of the item was disputed, then it

9     was verified" it was -- "as belonging to you"; do you

10    see that?

11         A.   Yes, sir, I do.

12         Q.   All right.  And when it says "it was verified

13    as belonging to you," who verified that?

14         A.   That would have been verification from

15    U.S. Bank.

16         Q.   Thank you.  Now, turning to Page 2 of

17    Exhibit 2, this is the updated trade line for the

18    U.S. Bank item that was disputed by Mr. Baltz, correct?

19         A.   Yes, that is correct.

20         Q.   And this report date that we are looking at is

21    "October 5th, 2010," correct?

22         A.   Yes, sir.

23         Q.   All right.  And this shows that U.S. Bank is

24    now reporting the trade line as "Individual," correct?

25         A.   Yes.

21

1          Q.   Meaning that it is Mr. Baltz alone, correct?

2          A.   Well, meaning -- yes, that's correct.

3          Q.   All right.  And that it was opened in May

4     of 1988, correct?

5          A.   Yes.

6          Q.   That it was discharged through a Chapter 7

7     Bankruptcy, correct?

8          A.   Yes, that is -- the CDV -- or, I'm sorry, the

9     CDF does indicate that it was discharged through a

10    Chapter 7 Bankruptcy.

11         Q.   And it has -- it has a recent balance as of

12    October of 2010 of zero?

13         A.   Yes, that is correct.

14         Q.   And it also indicates that U.S. Bank is

15    telling -- or is stating that the account was

16    transferred to another lender, correct?

17         A.   Yes.

18         Q.   All right.  Do you know whether or not the

19    special comment code and the consumer compliant

20    condition code can be populated at the same time on an

21    Experian report that we are looking at like Exhibit 2?

22         A.   Could you repeat the question, please?

23         Q.   Sure.  If a subscriber like U.S. Bank wanted to

24    populate both a special comment code and a consumer

25    compliance condition code, is there room on the report

Jason Scott

22

1   for both of those codes to be reported simultaneously?

2                MS. SILVERMAN:   Objection.   If you are

3   referring to Exhibit No. 2, that's an Experian document,

4   so I'm a little confused.

5                MR. JOLSON:   I'm going to join that

6   objection and just ask for clarification.

7       Q.   (BY MR. LYONS)   Sure.   Let's look back at

8   Deposition Exhibit No. 1.   Mr. Scott, do you see that

9   there is a "Special Comment Code" field?

10      A.   Yes.

11      Q.   Under "Subscriber Response," correct?

12      A.   Yes.

13      Q.   And we talked about that "O," meaning that it

14   had been transferred to another lender?

15      A.   Correct.

16      Q.   Okay.   Then below that is the "Consumer

17   Compliance Code"; do you see that?

18      A.   I do.

19      Q.   Okay.   Now, there's nothing in that field --

20   U.S. Bank reported nothing, correct?

21      A.   That's correct.

22      Q.   But if they had -- if they had reported it as

23   disputed, what I'm asking you is if there are two codes

24   that are populated?   Will both of those -- both of

25   that -- let me start over.

23

1              Would both of those codes or their

2    information be populated on the second page of

3    Deposition Exhibit No. 2?

4         A.  I'm not really sure.

5         Q.  Who would you have to ask to find that out?

6         A.  I could probably, again, refer to, you know,

7    internal documents.  I can definitely go check on that

8    if that's something you need.

9         Q.  All right.  Let's -- let's put that on hold for

10   a minute, but I -- I do want to answer that question.

11        A.  Sure.

12        Q.  But let's continue for right now.  All right.

13   Let's take a look at Deposition Exhibit No. 3.  Do you

14   have that in front of you?

15        A.  I do.

16        Q.  Okay.  And that is Experian Document 0068

17   through 0081, correct?

18        A.  That is correct.

19        Q.  All right.  And can you tell me what Exhibit 3

20   is?

21        A.  This would be an Experian disclosure for

22   Mr. John Baltz.

23        Q.  Dated "November 17th, 2011"?

24        A.  That's correct.

25        Q.  Okay.  And in reviewing Deposition Exhibit

24

1    No. 3, can you find this U.S. Bank trade line that was

2    disputed by Mr. Baltz back in October of 2010?

3         A.  Sure.  One moment, let me review this.  I have

4    located the account.

5         Q.  And what page are you on?

6         A.  Page 4 of 14.

7         Q.  And that's Experian/Baltz Confidential Document

8    No. 0071, correct?

9         A.  Yes, sir.

10        Q.  All right.  And the U.S. Bank trade line is the

11   second trade line appearing there, correct?

12        A.  Yes, it is the bottom account on the page.

13        Q.  All right.  And it may be considered a negative

14   account, correct?

15        A.  Yes, sir.

16        Q.  All right.  And it says that the responsibility

17   is individual, correct?

18        A.  Yes.

19        Q.  That it was opened in May of 1988, correct?

20        A.  Yes.

21        Q.  All right.  Let's take a look at Deposition

22   Exhibit No. 4.  Can you place that in front of yourself?

23        A.  I have that.

24        Q.  Thank you.  And Deposition Exhibit No. 4

25   contains the Confidential Experian Documents 0092

Jason Scott

25

1   through 0109, correct?

2       A.  Yes, sir.

3       Q.  And what is Exhibit 4?

4       A.  This would be an Experian disclosure for "Mary

5   Kay Patterson," dated "November 16th, 2011."

6       Q.  Okay.  And can you locate the bank account that

7   we have been discussing this morning in Deposition

8   Exhibit No. 4?

9       A.  One moment, please.  I have located that

10  account.

11      Q.  And what page are you on?

12      A.  Page 6 of 18.

13      Q.  And that is Experian/Baltz Subpoena

14  Confidential, Bates No. 0097, correct?

15      A.  Yes, that's correct.

16      Q.  And on the page that I'm looking at, there are

17  two U.S. Bank trade lines.  Can you tell me the one that

18  you are referring to?

19      A.  Sure.  That would be the second U.S. Bank

20  account in the middle of the page.

21      Q.  All right.  And it shows that that account was

22  opened in May of 1988; is that correct?

23      A.  Yes, sir.

24      Q.  And the responsibility on that is joint with

25  Patrick J. Baltz, correct?

Jason Scott

26

1       A.  Yes, sir.

2       Q.  Now, the information that is contained in this

3   trade line was provided by U.S. Bank; is that correct?

4       A.  Yes, sir, that's correct.

5       Q.  All right.  And the information that we saw in

6   the -- in Exhibit 3 on Page 4 of 14 related to that

7   U.S. Bank account, that information was provided to

8   Experian by U.S. Bank; is that correct?

9       A.  Yes, sir, that is correct.

10      Q.  And would you agree with me that the

11  information concerning the responsibility is

12  inconsistent?

13          MS. SILVERMAN:  Objection, calls for

14  speculation.  Lack of foundation.

15      A.  Well, I've got both pages in front of me and

16  there is different information being reported regarding

17  the account responsibility.

18      Q.  (BY MR. LYONS)  And is that information

19  inconsistent?

20          MS. SILVERMAN:  Objection.

21      A.  Yes, the reporting of the account

22  responsibility is consistent in between the two pages of

23  the disclosures.

24      Q.  (BY MR. LYONS)  Is consistent or inconsistent?

25  I'm sorry, you broke up.

27

1          A.   The two disclosures are inconsistent with one

2     another regarding the account responsibility.

3                    MR. LYONS:   Short of the outstanding

4     question about the population of those codes, I have no

5     further questions.

6                    Now might be a good time to take a break

7     for a minute, Mr. Scott; and if you could find that

8     information out, I would really appreciate it.

9                    THE WITNESS:   Okay.  And just to clarify

10    you want to know in the SCC and the CCC can display on

11    the -- the same time on the consumer's disclosure; is

12    that correct?

13                   MR. LYONS:   Correct.

14                   THE WITNESS:   Okay.

15                   MR. JOLSON:   All right.  Can we clarify?

16    On the consumer's disclosure or on the ACDV?

17                   THE REPORTER:   Can you repeat that, please?

18    I didn't understand you.

19                   MR. JOLSON:   Yes, I was asking just for

20    clarification purposes of Mr. Lyons of -- if the SCC and

21    the CCC codes can populate at the same time on the ACDV,

22    meaning Exhibit 1, or the -- I think it was the credit

23    disclosure, meaning Exhibit 3?

24                   THE WITNESS:   Yes.

25                   MR. LYONS:   Actually --

28

1               MS. SILVERMAN:  Two.

2               MR. LYONS:  -- Exhibit 2.  So let's find

3      out if --

4               MR. JOLSON:  Okay.  Okay.

5               MR. LYONS:  Let's see if it can be

6      populated on both.

7               THE WITNESS:  All right.

8               MR. LYONS:  Okay.

9               MR. JOLSON:  Okay.  Thank you.

10               MR. LYONS:  Thank you.

11            (Recess taken)

12                   RE-EXAMINATION

13      BY MR. LYONS:

14         Q.  Mr. Scott, do you have an answer to the

15      question?  Do you need it read back, or do you remember

16      it?

17         A.  If I understand it differently, catch me.  On

18      the ACDV, the SCC field and the CCC field are two

19      different fields.  One is compliances; the second SCC

20      field is optional.  So had U.S. Bank reported an SCC

21      code and a CCC code, then both of them would have

22      displayed on the CDF.

23         Q.  Okay.  So they both would be populated on

24      Exhibit No. 2?

25         A.  Yes.

29

```
 1                    MR. LYONS:  Thank you.  I have no further
 2    questions.
 3                    MS. SILVERMAN:  I just have two really
 4    quick questions, Mr. Scott.
 5                              EXAMINATION
 6    BY MS. SILVERMAN:
 7        Q.  Again, my name is Ellen Silverman; and I'm
 8    representing U.S. Bank today.  If you could turn your
 9    attention, please, to Exhibit No. 3, which is Mr. Baltz'
10    credit report with Experian.
11        A.  Sure.
12        Q.  Thank you.  My question is:  Besides the
13    U.S. Bank account, there are three other accounts that
14    may be considered negative on his report; is that right?
15        A.  Yes, that does appear to be the case.  There's
16    a total of four potentially negative accounts.
17        Q.  Thank you.  And my last question for you is:
18    Looking at Exhibit No. 1, the ACDV --
19        A.  Yes, ma'am.
20        Q.  -- do you -- do you know what U.S. Bank did to
21    investigate before responding back to Equifax -- I mean,
22    Experian, sorry?
23        A.  If your questioning about if I understand what
24    documents they may have looked at or what resources they
25    may have consulted, no, I don't know that.
```

Jason Scott

30

1          Q.   Yes, that's what I was asking.

2                    MS. SILVERMAN:   Thank you.   That's all I

3      have.

4                    THE WITNESS:   Okay.

5                    MR. LYONS:   Mr. Scott, this is Mr. Lyons --

6      unless, Matt, do you have any questions?

7                    MR. JOLSON:   No, sir, I do not.

8                         RE-EXAMINATION

9      BY MR. LYONS:

10         Q.   Mr. Scott, one follow-up concerning Deposition

11     Exhibit No. 3.

12         A.   Yes, sir.

13         Q.   Do you know whether or not the J. Graham &

14     Associates trade line is related to the U.S. Bank trade

15     line in the potentially negative section?

16         A.   Well, the original creditor to the J. Graham &

17     Associates does not state U.S. Bank.   The date open is

18     different.   The amounts are different.   Based on -- my

19     conclusion is, no, that they would not be the same.

20                   MR. LYONS:   Thank you.   I have no further

21     questions.

22                   (Deposition concluded at 11:11 a.m.)

23

24

25

Civil Action Group 763.576.8832

USB App 96